## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **TOWER RECORDS, INCORPORATED** | : | **Case No. 04-_____  (    )** |
| **M T S, INCORPORATED** | : | **Case No. 04-_____  (    )** |
| **THREE A'S HOLDINGS, L.L.C.** | : | **Case No. 04-_____  (    )** |
| **8775 SUNSET, INC.** | : | **Case No. 04-_____  (    )** |
| **COLUMBUS & BAY, INC.** | : | **Case No. 04-_____  (    )** |
| **JEREMY'S HOLDINGS, LLC** | : | **Case No. 04-_____  (    )** |
| **R.T. RECORDS, INCORPORATED** | : | **Case No. 04-_____  (    )** |
| **TOWER DIRECT LLC** | : | **Case No. 04-_____  (    )** |
| **33RD STREET RECORDS, INCORPORATED** | : | **Case No. 04-_____  (    )** |
| **T.R. SERVICES, INCORPORATED** | : | **Case No. 04-_____  (    )** |
| **IRELAND TR, INCORPORATED** | : | **Case No. 04-_____  (    )** |
| **PIPERNICK CORP.** | : | **Case No. 04-_____  (    )** |
| **TR ARGENTINA, INCORPORATED** | : | **Case No. 04-_____  (    )** |
| **TR ISRAEL, INCORPORATED** | : | **Case No. 04-_____  (    )** |
| **TR MEXICO, INCORPORATED** | : | **Case No. 04-_____  (    )** |
| **TOWER GRAPHICS, INCORPORATED** | : | **Case No. 04-_____  (    )** |
| | : | **Case No. 04-_____  (    )** |
| **Debtors.** | : | |

## DISCLOSURE STATEMENT FOR DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED AS OF NOVEMBER 17, 2003

M T S, Incorporated ("MTS"), a California corporation, its parent holding company Tower Records, Incorporated, a Delaware corporation ("Tower"), and their direct and indirect wholly-owned subsidiaries, Three A's Holdings, L.L.C., a Delaware limited liability company ("Three A's"), 8775 Sunset, Inc., a California corporation ("8775 Sunset"), Columbus & Bay, Inc., a California corporation ("C&B"), Jeremy's Holdings, LLC, a Delaware limited liability company ("Jeremy's Holdings"), R.T. Records, Incorporated, a California corporation ("R.T. Records"), Tower Direct LLC, a Delaware limited liability company ("Tower Direct"), 33rd Street Records, Incorporated, a Delaware corporation ("33rd Street"), T.R. Services, Incorporated, a California corporation ("TR Services"), Ireland TR, Incorporated, a California corporation ("Ireland TR"), Pipernick Corp., a Delaware corporation ("Pipernick"), TR Argentina, Incorporated, a California corporation ("TR Argentina"), TR Israel, Incorporated, a California corporation ("TR Israel"), TR Mexico, Incorporated, a California corporation ("TR

Mexico"), and Tower Graphics, Incorporated, a California corporation ("Tower Graphics"), each as a debtor and debtor-in-possession (collectively, the "Debtors" or "MTS"), hereby present the disclosure statement (the "Disclosure Statement") for their Joint Chapter 11 Plan of Reorganization Dated as of November 17, 2003 (the "Pre-Packaged Plan"), a true and correct copy of which is attached hereto.

[The remainder of this page is intentionally left blank.]

Dated as of November 17, 2003          Sacramento, California

Respectfully submitted,

TOWER RECORDS, INCORPORATED,

By: _____
Its:

M T S, INCORPORATED,

By: _____
Its:

THREE A'S HOLDINGS, L.L.C.

By: _____
Its:

8775 SUNSET, INC.,

By: _____
Its:

COLUMBUS & BAY, INC.,

By: _____
Its:

3

JEREMY'S HOLDINGS, L.L.C.



By:
Its:

R.T. RECORDS, INCORPORATED,



By:
Its:

TOWER DIRECT LLC,



By:
Its:

33RD STREET RECORDS, INCORPORATED,



By:
Its:

T.R. SERVICES, INCORPORATED,



By:
Its:

4

IRELAND TR, INCORPORATED,



By:
Its:

PIPERNICK CORP.,



By:
Its:

TR ARGENTINA, INCORPORATED,



By:
Its:

TR ISRAEL, INCORPORATED,



By:
Its:

TR MEXICO, INCORPORATED,



By:
Its:

5

TOWER GRAPHICS, INCORPORATED,

By:

Its:


Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

Stephen H. Warren
Austin K. Barron
Christopher D. Morris
Emily R. Culler
O'MELVENY & MYERS LLP
400 South Hope St.
Los Angeles, California 90071
(213) 430-6000

PROPOSED ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

6

LA3:1059897 2

# CONFIDENTIAL OFFERING MEMORANDUM AND CONSENT SOLICITATION STATEMENT

# MTS, INCORPORATED

**Exchange Offer to Holders of 9⅜% Senior Subordinated Notes due 2005**

**Solicitation of Consents of the Holders of Senior Subordinated Notes to Amend the Indenture Dated as of April 23, 1998, Between MTS, Incorporated, as Issuer, and U.S. Bank, N.A., as Trustee, Under Which the Senior Subordinated Notes are Governed**

**Solicitation of Consents of the Holders of Class B Common Stock to Amend the Articles of Incorporation of MTS, Incorporated to Eliminate Class A Common Stock and Amend the Terms of Class B Common Stock, and to Approve a 1,500-to-1 Stock Split**

**Solicitation of Votes on a Prepackaged Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code from Certain Holders of Impaired Claims and Interests**

**Dated November 17, 2003**

_____

The Exchange Offer (as defined herein) made pursuant to this offering memorandum will expire at 5:00 p.m., New York time, on Wednesday, December 17, 2003, unless extended (as defined herein, the "Expiration Date"). Votes to accept or reject the Prepackaged Plan must be received on or before the Expiration Date.

The Exchange Offer is being made in reliance upon an exemption from registration under the Securities Act of 1933, as amended (the "Securities Act"), for an offer and sale of securities which does not involve a public offering. The securities offered have not been registered with or approved or disapproved by the Securities and Exchange Commission ("SEC") or any state securities authority, nor has the SEC, any state securities authority or any similar authority or any court passed upon the accuracy or adequacy of the information contained in this offering memorandum or upon the merits of the Restructuring (as defined herein). Any representation to the contrary may be a criminal offense. This offering memorandum does not constitute an offer to any person in any jurisdiction in which the Exchange Offer would be unlawful and the Exchange Offer is not being made to, and tenders will not be accepted from, holders of Notes (as defined herein) in jurisdictions in which the Exchange Offer or acceptance thereof would constitute a violation of the securities or blue sky laws of that jurisdiction.

_____

**Questions and requests for assistance or for additional copies of this offering memorandum, the accompanying consent letter, or any other required documents may be directed to Innisfree M&A Incorporated at its address and telephone number set forth on the back cover. This offering memorandum and the accompanying materials are being sent to holders of Notes and Class B Common Stock (as defined herein) who were registered holders as of November 12, 2003.**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ i

FORWARD-LOOKING STATEMENTS ................................................................................ ii

NOTICE TO INVESTORS .................................................................................................. iii

SUMMARY ........................................................................................................................ 1

RISK FACTORS ................................................................................................................ 21

THE RESTRUCTURING AND THE LOCK-UP AGREEMENT ............................................ 30

THE EXCHANGE RESTRUCTURING ................................................................................ 35

THE PREPACKAGED PLAN .............................................................................................. 40

THE NEW NOTES AND THE NEW INDENTURE .............................................................. 60

TENDERING, CONSENTING AND VOTING PROCEDURES ............................................ 77

CAPITALIZATION PRIOR TO AND FOLLOWING THE RESTRUCTURING .................... 82

DESCRIPTION OF OUR CAPITAL STOCK ...................................................................... 83

THE COMPANY ................................................................................................................ 84

MANAGEMENT'S DISCUSSION AND ANALYSIS OF  FINANCIAL CONDITION AND RESULTS OF OPERATIONS .......................................................................... 92

CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE EXCHANGE RESTRUCTURING AND THE PREPACKAGED PLAN ...................................... 98

ACCOUNTING TREATMENT .......................................................................................... 104

Exhibits

| Exhibit A | The Lock-Up Agreement |
|---|---|
| Exhibit B | Form of the Escrow Agreement |
| Exhibit C | Form of the Prepackaged Plan |
| Exhibit D | Confidential Document |
| Exhibit E | Confidential Document |
| Exhibit F | Form of the Governance Agreement |
| Exhibit G | Consolidated Liquidation Analysis under Chapter 7 |
| Exhibit H | Form of the New Indenture |
| Exhibit I | Form of Amended and Restated Articles of Incorporation of the Company |

Appendices

| Appendix A | 2003 Unaudited Financial Statements of the Company |
|---|---|
| Appendix B | 2002 Unaudited Financial Statements of the Company |

**This offering memorandum is confidential, is intended solely for the purposes stated herein and may not be reproduced or redistributed by the recipients, in whole or in part, nor may any of its contents be disclosed to anyone other than the parties to whom it is distributed by us, except as expressly authorized hereby. A holder of Notes may make this offering memorandum available to a prospective transferee of such Notes solely in connection with such prospective transfer and solely on a confidential basis. This offering memorandum contains certain financial and other information regarding us that is material nonpublic information. Federal securities laws prohibit the purchase and sale of securities on the basis of material nonpublic information, and persons who purchase or sell securities on the basis of material nonpublic information, or disseminate information to others who do so, may be subject to penalties.**

## INTRODUCTION

This offering memorandum is provided on a confidential basis for use solely by the holders of the outstanding 9⅜% Senior Subordinated Notes due 2005 (the "Notes") and the current outstanding Class B Common Stock, no par value (the "Class B Common Stock") of MTS, Incorporated in connection with a proposed restructuring.

The proposed restructuring will be accomplished through one of two alternatives: the Exchange Restructuring or the Prepackaged Plan. In order to effect the Exchange Restructuring, pursuant to this offering memorandum, we are:

- offering to holders of Notes who tender their Notes, upon the terms and subject to the conditions set forth in this offering memorandum and in the accompanying Consent, Letter of Transmittal and Prepetition Ballot (collectively, the "Letter of Transmittal"), to issue $30 million in aggregate principal amount of new notes (as described below, the "New Notes") and 8,500,000 shares of our New Common Stock (defined below) in exchange for all of the outstanding principal amount of Notes tendered (the "Exchange Offer");

- soliciting consents of holders of Class B Common Stock to, among other things, (i) amend our Articles of Incorporation as described herein to, among other things, cancel and eliminate our Class A Common Stock, no par value, of which no shares are presently outstanding, (ii) redesignate our Class B Common Stock as Common Stock (the "New Common Stock"), (iii) amend certain terms of the New Common Stock, (iv) approve a 1,500-to-1 stock split in the New Common Stock and authorize the issuance of up to 100,000,000 shares of New Common Stock, and (v) increase the number of members of our board of directors from four to five (the "Charter Amendments" and, together with the Exchange Offer and the Solicited Consents (defined below), the "Exchange Restructuring");

- soliciting consents of holders of Notes to amend the Indenture, dated as of April 23, 1998, between us, as issuer, and U.S. Bank, N.A., as trustee (the "Old Indenture Trustee"), under which the Notes are currently governed and any Notes not tendered in the Exchange Offer will continue to be governed (the "Old Indenture") to, among other things, eliminate the protective covenants included therein (the "Old Indenture Amendments"); and

- soliciting consents of holders of Notes to waive any event of default under the Old Indenture, including any rights and remedies arising therefrom (including such holders' rights pursuant to Section 6.02 of the Old Indenture to declare the principal of and interest on the Notes to be immediately due and payable) (the "Old Indenture Waiver").

In order to effect the Prepackaged Plan, pursuant to this offering memorandum, we are additionally:

- soliciting votes of the holders of Notes and Class B Common Stock to accept or reject a prepackaged plan of reorganization under Chapter 11 of the United States Bankruptcy Code (the

"Prepackaged Plan") to effectuate the transactions hereunder (but only in the event that we are directed to file the Prepackaged Plan as provided in the Lock-Up Agreement (described below)).

Additionally, we are soliciting consents of holders of Notes to tender their Notes upon the closing of any acquisition of the Company in exchange for consideration that is economically consistent with the consideration the holders would have received had the Restructuring taken place immediately before such acquisition (this consent, together with the consent to the Old Indenture Waiver and the Old Indenture Amendments, are sometimes collectively referred to as the "Solicited Consents").

The effects of the transactions summarized above, whether accomplished by means of the Exchange Restructuring or through the confirmation and effectuation of the Prepackaged Plan, are herein referred to collectively as the "Restructuring." See "Risk Factors" for a discussion of certain factors which should be considered in connection with the Exchange Restructuring. The date on which the Restructuring may be consummated is referred to herein as the "Closing," and the date on which the Prepackaged Plan may be consummated is referred to herein as the "Effective Date."

The record date for shares of Class B Common Stock participating in the Exchange Restructuring and for holders of Notes and Class B Common Stock voting to accept or reject the Prepackaged Plan is November 12, 2003 (the "Record Date"). Only beneficial owners of record of Class B Common Stock at the close of business on the Record Date may participate in the Exchange Restructuring and/or vote to accept or reject the Prepackaged Plan, and parties wishing to participate in the Exchange Restructuring or vote to accept or reject the Prepackaged Plan must return the appropriate paperwork to the Exchange Agent by the Expiration Date.

**M&A Transaction**

At the same time that we are soliciting consents to participate in the Exchange Restructuring and votes to accept or reject the Prepackaged Plan pursuant to this offering memorandum, we are also actively seeking to enter into a transaction to be acquired by a third party (an "M&A Transaction"). Pursuant to the terms of the Lock-Up Agreement, we have agreed to structure any M&A Transaction, including an M&A Transaction consummated under the Prepackaged Plan, in a manner calculated to provide to holders of Notes and Class B Common Stock consideration that is economically consistent with the consideration they would have received had the Restructuring taken place immediately before the M&A Transaction, and the Holders who are party to the Lock-Up Agreement have agreed to tender their Notes at the closing of any M&A Transaction. By consenting to the Exchange Restructuring, you will additionally be consenting to tender your Notes upon the closing of any M&A Transaction in exchange for consideration that is economically consistent with the consideration you would have received had the Restructuring taken place immediately before the M&A Transaction.

**Reservation Of Right To Withdraw Exchange Restructuring And/Or Prepackaged Plan**

**To the extent permitted by applicable law and the Lock-Up Agreement, we also reserve the right to withdraw or amend the Exchange Restructuring or the Prepackaged Plan, before or after the Expiration Date.**

## FORWARD-LOOKING STATEMENTS

This offering memorandum contains "Forward-Looking Statements." All statements other than statements of historical facts included in this offering memorandum regarding our operations, financial position and business strategy may constitute forward-looking statements. In addition, forward-looking statements generally can be identified by the use of forward-looking terminology such as "may," "will," "expect," "intend," "estimate," "anticipate," "believe," or "continue" or the negative thereof or variations thereon or similar terminology. Although we believe that the expectations reflected in such forward-looking statements are reasonable at this time, we can give no assurance that such expectations will prove to have been correct. Important factors that could cause actual results to differ materially from our expectations are disclosed in this offering memorandum, including, without limitation, in conjunction with the forward-looking statements included in this offering memorandum under "Risk

RLF1-2703545-1

Factors." All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are qualified in their entirety by these cautionary statements.

Although stated with particularity, the pro forma financial information is unaudited and is based on a variety of generalizations, estimates and assumptions. Such generalizations, estimates and assumptions are considered reasonable by management, although they may prove to have been incorrect or unfounded; further, they are inherently subject to significant economic, competitive, tax and other uncertainties beyond our control. There can be no assurance that the pro forma results will be realized, and actual results may vary materially and adversely from those projected.

### NOTICE TO INVESTORS

**The securities offered hereby have not been registered under the Securities Act and have not been approved or disapproved by the SEC or any state securities commission nor has the SEC or any state securities commission passed upon the accuracy or adequacy of this memorandum. Any representation to the contrary may be a criminal offense.**

The Exchange Offer is being made in reliance upon an exemption from registration under the Securities Act for an offer and sale of securities which does not involve a public offering. Neither the New Notes nor the New Common Stock have been registered under the Securities Act or any state securities laws and, unless registered, may not be offered or sold except under an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws. The Exchange Offer is being made only to holders of Notes that are either "accredited investors" or "qualified institutional buyers" (as defined under Rule 501(a) or Rule 144A under the Securities Act, respectively), in reliance on the exemption from the registration requirements of the Securities Act. Accordingly, each holder surrendering Notes in the Exchange Offer will be required to represent that such holder is exchanging Notes for its own account or for one or more accounts as to which it exercises sole investment discretion, and not with a view towards distribution of the New Notes or New Common Stock in violation of the Securities Act or any state securities laws, and that it is either an "accredited investor" or a "qualified institutional buyer" at the time of the issuances of the New Notes and the New Common Stock and it is aware that the issuance of the New Notes and the New Common Stock to it will be made in reliance on exemption from registration under the Securities Act.

In making an investment decision regarding the New Notes and the New Common Stock offered for exchange hereby, holders of Notes must rely on their own examination of the Company and the terms of the Exchange Offer, including, without limitation, the merits and risks involved. The Exchange Offer is being made on the basis of this offering memorandum. The information contained in this offering memorandum was provided by us and other sources believed by us to be reliable, but no assurance can be given as to the accuracy and completeness of such information. We are not incorporating any information by reference into this offering memorandum except as specifically identified herein. In particular, please see the discussion of our historical financial statements under "Summary Consolidated Financial Data" at page 15.

Each person receiving this offering memorandum and participating in the Exchange Offer will also be deemed to:

- acknowledge that such person has been afforded an opportunity to request from us and to review, and has received, all additional information considered by it to be necessary to verify the accuracy of or to supplement the information herein;

- acknowledge that it has not relied on us or any person affiliated with us in connection with its investigation of the accuracy of such information or its investment decision;

- acknowledge that no person has been authorized to give information or to make any representation concerning us or the New Notes and the New Common Stock other than as contained herein and, if given or made, such other representation should not be relied upon as having been authorized by us or any other person;

- acknowledge that the New Notes and New Common Stock have not been registered under the Securities Act or any state securities laws;

- agree that it will give to each person to whom it transfers New Notes or New Common Stock notice of any and all restrictions on transfer of the New Notes or New Common Stock;

- acknowledge that if an offer, sale, pledge, or other transfer of the New Notes or New Common Stock (other than pursuant to an effective registration statement) is to be made within two years after the last original issuance of the New Notes or New Common Stock, such person must furnish to the trustee such certifications, legal opinions or other information as we may reasonably require to confirm that the proposed transfer is being made pursuant to an exemption from registration under the Securities Act or in a transaction not subject to the Securities Act;

- acknowledge that we and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agree that if any acknowledgment, representation or agreement deemed to have been made by its participation in the Exchange Offer is no longer accurate, it shall promptly notify us; and

- if it is acquiring any of the New Notes or New Common Stock as fiduciary or agent for one or more investor accounts, represent that it has sole investment discretion with respect to each account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account and that each such account is eligible to purchase the New Notes and New Common Stock.

No representation or warranty, express or implied, is made by us as to the accuracy or completeness of any of the information set forth herein, and nothing contained in this offering memorandum is or shall be relied upon as a promise or representation, whether as to the past or the future. The information contained herein is as of the date hereof and is subject to change, completion or amendment without notice. Neither the delivery of this offering memorandum at any time nor any subsequent commitment to enter into any exchange shall, under any circumstances, create any implication that there has been no change in the information set forth herein or in the affairs of us and our subsidiaries since the date hereof.

We reserve the right not to accept surrendered eligible Notes from any tendering holder if such acceptance could, in our sole determination, affect the availability of a private placement exemption under, or result in a violation of, applicable federal or state securities laws. This offering memorandum does not constitute an offer to any person in any jurisdiction in which the Exchange Offer would be unlawful, and the Exchange Offer is not being made to, and tenders will not be accepted from, holders of eligible Notes in states in which the Exchange Offer or acceptance thereof would constitute a violation of the securities or blue sky laws of that jurisdiction.

Holders of Notes and Class B Common Stock are not to construe the contents of this offering memorandum as legal, business or tax advice. Each holder should consult its own attorney, business advisor and tax advisor as to legal, business, tax and related matters concerning this offering.

Each certificate representing a New Note or New Common Stock will bear the following legend (unless that New Note or New Common Stock, as applicable, has been sold pursuant to a registration statement that has been declared effective under the Securities Act):

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT IN ACCORDANCE WITH THE SECURITIES ACT, THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION THEREUNDER, AND ALL APPLICABLE STATE SECURITIES LAWS.

# SUMMARY

*The following summary is qualified in its entirety by the more detailed information and financial statements contained elsewhere in or incorporated by reference into this offering memorandum, as well as by the express terms of any documents referred to herein.  All references to the Company, "we," "our" and "us" refer to MTS, Incorporated, a California corporation, and, unless the context otherwise indicates, its subsidiaries.*

## The Company

Founded in 1960, we are one of the largest specialty retailers of recorded music and movies in the United States in terms of revenues and one of the most widely recognized music retail brand names in the world. We offer a diversified line of music and movie products including compact discs, DVD and VHS recorded movies, recorded audio cassettes, and other complementary products, including books, magazines, video games, blank tapes,  personal electronics and accessories.

Our headquarters are located at 2500 Del Monte Street, West Sacramento, California 95691, Telephone Number: (916) 373-2500.  For a more complete description of our business, see "The Company."

## Background

We are currently in a precarious financial situation.  We have not made required interest payments on the Notes since November 2002.  In the Lock-up Agreement, the holders of approximately 91% of the Notes agreed not to take action based on these defaults (or any other defaults) so long as the Lock-Up Agreement is in effect.   If the Lock-Up Agreement were to terminate, as a result of such payment defaults and other potential defaults, the holders of the Notes could accelerate the maturity thereof.  Such defaults and such acceleration could lead to defaults under and acceleration of other indebtedness as well.  Our financial position has been discussed in filings made with the SEC and is generally known to our suppliers and creditors.  We believe it is imperative to consummate the Restructuring, improve our capital structure and reestablish normal relations with all of our creditors and suppliers as swiftly as possible.  There is a substantial likelihood that we will be forced to initiate bankruptcy proceedings without a prepackaged plan and without agreement from significant creditor groups such as that exemplified by the Lock-Up Agreement if the Restructuring is not consummated and we are unable to complete an M&A Transaction. In such event, we would likely remain under bankruptcy court jurisdiction for an extended period of time.  The result, we believe, could be a material erosion of our market position and ability to conduct our business, with consequent detrimental effect on our abilities to satisfy our indebtedness and other liabilities.  For a more complete description of factors leading to the Restructuring, see "The Restructuring and Lock-Up Agreement."

The Restructuring is anticipated to have substantially similar structural results whether effected as the Exchange Restructuring or pursuant to the Prepackaged Plan.  By substantially reducing our debt service obligations and overall level of indebtedness, the Restructuring is designed to provide us with reduced debt service burden, financial stability and access to liquidity necessary for the maintenance of normal relationships with creditors and suppliers.

We are proposing the Restructuring through one of two alternatives:

- *The Exchange Restructuring*.  The Exchange Restructuring consists of the Exchange Offer, the Charter Amendments and the Solicited Consents, which are described below.

- *The Prepackaged Plan*.  Concurrently with the Exchange Offer and solicitation of consents, we are soliciting votes for the Prepackaged Plan, which may be implemented if we are unable to obtain the necessary consents to effect the Exchange Restructuring or if we are directed to do so by the holders of the Notes as provided in the Lock-Up Agreement.

RLF1-2703545-1

**The Lock-Up Agreement**

Prior to the circulation of this offering memorandum, we entered into a lock-up agreement (the "Lock-Up Agreement") with: the holders of approximately 91% of the Notes outstanding (the "Consenting Holders"); Tower Records, Incorporated as the current holder of all of the issued and outstanding Class B Common Stock (the "Current Shareholder"); Mr. Russell Solomon, the founder and current Chairman Emeritus of the Company; and the Russell Solomon Trust, the Michael T. Solomon 1994 Trust, the David Solomon 1994 Trust, the Andrew Solomon Trust and the Aaron O. Solomon Trust, Mr. Michael Solomon and Mr. David Solomon (collectively, the "Solomon Interests"), which are the holders of all of the shares of the Current Shareholder. The Lock-Up Agreement sets forth the terms and conditions of, and commitments of the parties with respect to, the Restructuring.

The Lock-Up Agreement provides, among other things, that the parties thereto will support and pursue the Exchange Restructuring and, if necessary or appropriate, the Prepackaged Plan. Pursuant to the Lock-Up Agreement, the Consenting Holders agreed to tender their Notes in the Exchange Offer and to vote to accept the Prepackaged Plan, and the Current Shareholder agreed to approve the Charter Amendments and to vote to accept the Prepackaged Plan. The Lock-Up Agreement is subject to termination in certain circumstances, as described more fully in this offering memorandum. We believe that the agreement to accept the Prepackaged Plan by the Consenting Holders and the Current Shareholder, subject to certain conditions, makes it highly likely that we will receive the acceptances necessary to confirm the Prepackaged Plan should we seek confirmation of the Restructuring by means of the Prepackaged Plan. Under the Prepackaged Plan, the holders of Notes and the Current Shareholder will receive the same consideration in exchange for their claims as they would receive in the Exchange Restructuring. However, it should be noted that the value of that consideration, in particular the New Common Stock, could be adversely affected by the economic impact of bankruptcy on us. See "Risk Factors—Risks Related to the Prepackaged Plan."

For a more detailed description of the Lock-Up Agreement, see "The Restructuring and the Lock-Up Agreement." A copy of the Lock-Up Agreement is attached to this offering memorandum as Exhibit A, and the descriptions of the Lock-Up Agreement in this offering memorandum are summary only and are qualified in their entirety by the terms of the Lock-Up Agreement itself.

**Summary Of Terms Of The Exchange Restructuring**

| | |
|---|---|
| The Exchange Offer | Subject to the terms and conditions stated herein, upon the consummation of the Exchange Offer, we will exchange all Notes tendered for a pro-rata share of: |

- $30 million in aggregate principal amount of New Notes, as described below; and

- 8,500,000 shares of our New Common Stock.

For a description of the New Notes, and the material differences between the Notes and the New Notes, see "The New Notes and the New Indenture."

After the Exchange Restructuring, we will have 100,000,000 shares authorized and 10,000,000 shares of New Common Stock outstanding.

| | |
|---|---|
| Old Indenture Amendments | Due to the possibility that the Minimum Tender Condition (as defined below) may be reduced by us (with the consent of the Current Shareholder and holders of at least 85% of the total face amount of the Notes), concurrently with the Exchange Offer, we are soliciting the consent of holders of Notes to eliminate certain protective covenants contained in the Old Indenture so that any non-tendered Notes do not restrict our ability to effect the Exchange Offer or our future financial and operating flexibility.  Such covenants include restrictions on our ability to: |

- incur additional indebtedness;

- pay dividends on or redeem our capital stock;

- make certain investments;

- consummate certain asset sales and sales of the stock of our subsidiaries;

- enter into transactions with affiliates; and

- create liens.

Notes tendered in the Exchange Offer (and not withdrawn prior to the Expiration Date) by noteholders will also constitute the delivery of a consent to the Old Indenture Amendments.  If the Old Indenture Amendments are approved, a supplemental indenture with respect to the Notes will be executed by us and the Old Indenture Trustee.  The supplemental indenture will be effective upon execution but will not be operative until the Effective Date.  IF THE EXCHANGE OFFER IS CONSUMMATED, HOLDERS OF NOTES WHO DO NOT EXCHANGE THEIR EXISTING NOTES IN THE EXCHANGE OFFER WILL BE BOUND BY THE OLD INDENTURE AMENDMENTS REGARDLESS OF WHETHER OR NOT SUCH HOLDER CONSENTED THERETO.  If 100% of the Notes are tendered pursuant to the Exchange Offer and the Exchange Restructuring is effected, the debt evidenced by the Notes will be extinguished and the Old Indenture will be terminated.

| | |
|---|---|
| Solicited Consents | The consent of holders of Notes to: |

- tender their Notes upon the closing of any acquisition of the Company in exchange for consideration that is economically consistent with the consideration they would have received had the Restructuring taken place immediately before the M&A Transaction,

- approve the Old Indenture Amendments, and

- waive any event of default under the Old Indenture, including any rights and remedies arising therefrom (including such holders' rights pursuant to Section 6.02 of the Old Indenture to declare the principal of and interest on the Notes to be immediately due and payable).

- 3 -

| | |
|---|---|
| Charter Amendments | Concurrently with the Exchange Offer, we are soliciting the approval of the Charter Amendments from the holders of our Class B Common Stock (all of which is presently held by the Current Shareholder), which will, among other things, (i) amend our Articles of Incorporation to cancel and eliminate our Class A Common Stock, no par value, of which no shares are presently outstanding, (ii) redesignate the Class B Common Stock as the New Common Stock, (iii) amend certain terms of the New Common Stock, (iv) approve a 1,500-to-1 stock split in the New Common Stock and authorize the issuance of up to 100,000,000 shares of New Common Stock, and (v) increase the number of members of our board of directors from four to five. |
| Escrow Agreement | The Current Shareholder's shares of Class B Common Stock will convert into shares of New Common Stock (representing 15% of our equity issued and outstanding after the Closing) and be subject to the Escrow Agreement (a copy of which is attached hereto as Exhibit B) that provides, among other things, that two thirds of the Current Shareholder's shares will be placed in escrow. 25% of the escrowed shares will be released on each of the four anniversaries following the Closing. All of the escrowed shares will be immediately released from the escrow upon the death or disability of Mr. Russell Solomon, or upon a change of control of the Company. Any shares held in escrow will be subject to repurchase by us at a nominal purchase price upon the occurrence of certain triggering events provided in the Employment Agreement. |
| Effects of Tendering, Consenting | By tendering Notes in the Exchange Offer, holders of Notes will also be consenting to the Solicited Consents and will be voting to accept the Prepackaged Plan. |
| Expiration Date | Holders of Notes or Class B Common Stock wishing to participate in the Exchange Offer must return the appropriate paperwork to the Exchange Agent by Wednesday, December 17, 2003, unless we extend such date in our sole discretion. |
| Vote Required | The consummation of the Exchange Offer (and hence the entire Exchange Restructuring) is conditioned upon tender of not less than 100% of the aggregate principal amount of the outstanding Notes (the "Minimum Tender Condition"). |
| | The Minimum Tender Condition may be reduced below 100% with our consent and the consent of the Current Shareholder and Consenting Holders holding at least 85% of the total face amount of the Notes. Therefore, the Exchange Offer may be approved even if less than 100% of the aggregate principal amount of the outstanding Notes is tendered. Pursuant to the Lock-Up Agreement, 91% of the aggregate principal amount of the outstanding Notes have agreed to support and pursue the Restructuring and to tender their Notes in the Exchange Offer. If the Minimum Tender Condition is reduced, we will notify you. |
| | If you do not consent to the Exchange Restructuring, the Old Indenture would require us to offer to repurchase your Notes for 101% of their |

- 4 -

aggregate face value upon the consummation of the Exchange Restructuring. However, unless reduced with the consent of each of us, the Current Shareholder and Consenting Holders holding at least 85% of the total face amount of the Notes, the Minimum Tender Condition requires the tender of 100% of the Notes as a condition to the consummation of the Exchange Restructuring.

Approval of the Charter Amendments requires the consent of the holders of a majority of the Class B Common Stock. Pursuant to the Lock-Up Agreement, the Current Shareholder, as the sole holder of the Class B Common Stock, has agreed to vote all its shares in favor of the Charter Amendments.

Terms of the New Notes

Upon the Closing of the Exchange Restructuring, the New Notes will be issued by us and have the following terms:

- Aggregate Principal Amount: $30 million.

- Ranking: Senior unsecured indebtedness of the Company, but subject to subordination in favor of our existing and future senior debt.

- Interest: (i) 2.0% per year payable in cash, plus (ii) at our option, either (a) 8.0% per year payable in cash, or (b) 10.0% per year to be capitalized as principal.

- Payment Dates: semi-annual.

- Maturity Date: Five years after the Closing of the Exchange Restructuring.

- Mandatory Redemption: Upon consummation of a sale of substantially all the assets of the Company or any change of control of the Company.

- The New Indenture will contain certain covenants which, among other things, restrict our ability to:

  - incur additional indebtedness;

  - pay dividends on or redeem our capital stock;

  - make certain investments;

  - consummate certain asset sales and sales of the stock of our subsidiaries;

  - enter into transactions with affiliates;

  - create liens; and

  - consolidate, merge or sell all or substantially all of our assets.

  The covenants set forth above are subject to a number of important qualifications and exceptions.

For a summary description of the material differences between the Notes and the New Notes, see "The New Notes and the New Indenture."

**Summary Of Terms Of The Prepackaged Plan**

We have prepared the Prepackaged Plan as an alternative method for effecting the Restructuring if the conditions to the completion of the Exchange Offer, including the Minimum Tender Condition, are not met or waived but we receive the required acceptances to seek confirmation of the Prepackaged Plan. In addition, as described below in "The Restructuring and the Lock-Up Agreement," the holders of the Notes can direct us to file the Prepackaged Plan even if the conditions to the Exchange Offer have been met pursuant to the terms of the Lock-Up Agreement. We are therefore soliciting the vote of each holder of Notes in favor of the Prepackaged Plan by circulating ballots for the Prepackaged Plan with this offering memorandum.

The Prepackaged Plan consists of a plan of reorganization under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") that would effect the same transactions contemplated by the Exchange Restructuring, including the issuance of the New Notes and New Common Stock to the holders of the Notes, and potentially the completion of an M&A Transaction that would result in the same economic effects for the holders of the Notes. Under the Prepackaged Plan, the holders of Notes and the Current Shareholder will receive substantially the same consideration in exchange for their claims as they would receive in the Exchange Restructuring. The Prepackaged Plan contemplates that bankruptcy petitions shall be filed by us and our direct and indirect subsidiaries, and also may be filed by our Current Shareholder, Tower Records, Incorporated. The entities that ultimately commence such bankruptcy petitions are referred to collectively herein and in the Prepackaged Plan as the "Debtors." The Prepackaged Plan contemplates that the claims of the holders of the Notes and the interests of our Current Shareholder would be "impaired" by the Prepackaged Plan.

The following table summarizes the classification and material terms of the treatment of Claims and Interests under the Prepackaged Plan. The classification and treatment for all classes are described in more detail under "The Prepackaged Plan – Classification and Treatment of Claims and Interests." The allocation of shares of New Common Stock under the Prepackaged Plan is set forth in "Capitalization Prior to and Following the Restructuring." All defined terms used herein and not defined will have the meanings assigned to them in the Prepackaged Plan. This summary is qualified in its entirety by reference to the provisions of the Prepackaged Plan, a copy of which is attached hereto as Exhibit C.

**Classification and Treatment of Claims and Interests**

| | |
|---|---|
| Class 1, Priority Claims (*e.g., employee payroll, health benefits, vacation and sick leave, and certain miscellaneous debt*) | *Unimpaired*<br><br>Allowed Claims in Class 1 (including those of Scheduled Employees) will be paid the allowed amount of such Claim in full, in cash, at the Debtors' option (i) on the Effective Date, (ii) on the date such Claim becomes an Allowed Claim or (iii) in the ordinary course of business as such claims become due. Holders are not entitled to vote to accept or reject the Plan. The Debtors intend to pay holders of Claims in Class 1 in the ordinary course of business. |
| Class 2, Secured Claims (*e.g., amounts due to and secured by liens of our lenders*) | *Unimpaired*<br><br>Holders of Allowed Secured Claims will retain, unaltered, their original legal, equitable and contractual rights except that we may take such actions as are permitted under Bankruptcy Code section 1124, such as reinstating such Claims or paying the holders thereof the amount of such Allowed Claims on the later of the Effective Date or the date such Claim becomes an Allowed Claim, in either case with the result that each such Allowed Claim shall be unimpaired by the Plan. Holders are not entitled to vote to accept or reject the Prepackaged Plan. |

RLF1-2703545-1

| | |
|---|---|
| Class 3, General Unsecured Claims, (*e.g., amounts owed to vendors in the ordinary course of business, including, without limitation, Trade Claims and Claims of the Old Indenture Trustee (including any such Claims for legal fees and expenses) and Prepetition Professional Claims*) | *Unimpaired*<br><br>The legal, equitable and contractual rights of each holder of an Allowed Claim in Class 3 shall be unaltered by the Plan, except that the Debtors may take any actions as are permitted under Bankruptcy Code section 1124, such as reinstating such Claims or paying the holders thereof the amount of such Allowed Claims on the later of the Effective Date or the date such Claim becomes an Allowed Claim, in either case with the result that each such Allowed Claim shall be unimpaired by the Plan.  Holders are not entitled to vote to accept or reject the Prepackaged Plan. |
| Class 4, Claims of Holders of Notes | *Impaired*<br><br>Holders of Allowed Claims in Class 4 will receive, in the aggregate, their Pro Rata Share (as defined in the Prepackaged Plan) of (i) (a) $30 million in aggregate principal amount of New Notes and (b) 8,500,000 shares of New Common Stock (representing 85% of the equity in the Company issued and outstanding after the Effective Date), or (ii) in the event that an M&A Transaction is effected through the Prepackaged Plan, consideration that is economically consistent with the consideration they would have received had the Restructuring taken place immediately before the M&A Transaction. |
| Class 5, Class B Common Stock | *Impaired*<br><br>The Current Shareholder will retain its shares, which will represent 15% of the equity in the Company issued and outstanding after the Effective Date (and will thereafter be part of the New Common Stock) and will enter into the Escrow Agreement (a copy of which is attached hereto as Exhibit B) that provides, among other things, that two thirds of the Current Shareholder's shares will be placed in escrow.  25% of the escrowed shares will be released to the Current Shareholder on each of the four anniversaries following the Effective Date.  All of the escrowed shares will be immediately released to the Current Shareholder from the escrow upon the death or disability of Mr. Russell Solomon, or upon a change of control of the Company.  Any shares held in escrow will be subject to repurchase by us at a nominal purchase price upon the occurrence of certain triggering events provided in the Employment Agreement.  In the event that an M&A Transaction is effected through the Prepackaged Plan, the Current Shareholder will receive consideration that is economically consistent with the consideration it would have received had the Restructuring taken place immediately before the M&A Transaction. |
| Class 6, Other Interests | *Unimpaired*<br><br>Holders of Allowed Interests in Class 6 will retain their Interests. Holders are not entitled to vote to accept or reject the Prepackaged Plan. |

Administrative Expenses (unclassified)

*Unimpaired*

Allowed Administrative Claims (as defined in the Prepackaged Plan) will be paid in cash, on the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Administrative Claim; provided, however, that Administrative Claims not yet due or that represent obligations incurred by the Debtors in the ordinary course of their business during the Chapter 11 case of the Debtors (the "Reorganization Case"), or assumed by the Debtors during the Reorganization Case, will be paid or performed when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations.

Priority Tax Claims (Unclassified)

*Unimpaired*

Allowed Priority Tax Claims (as defined in the Prepackaged Plan) will be paid in cash, at our option, (i) on the Effective Date, (ii) on the date such claim becomes an Allowed Priority Tax Claim (as defined in the Prepackaged Plan), (iii) together with interest from the Effective Date, in equal quarterly installments over a period not exceeding six years after the date of assessment of such tax or (iv) in the ordinary course of business as such claims become due.

Retained Professionals (Unclassified)

*Unimpaired*

Professionals employed at the expense of the Debtors' estates and entities that may be entitled to an allowance of fees and expenses from the Debtors' estates under sections 503(b)(2) through 503(b)(6) of the Bankruptcy Code will be paid by the Debtors, in cash, as soon as practicable after the entry of an order approving such allowance of compensation or reimbursement of expenses. For these purposes, professionals employed at the expense of the Debtors' estates will include without limitation the professionals representing the Debtors' estates as well as those representing any Representative Committee, and unless ordered otherwise by the Bankruptcy Court, from and after the entry of the Confirmation Order such professionals will not be required to file fee applications with the Bankruptcy Court, and the Debtors may pay such professionals in the ordinary course for fees and expenses incurred after the Confirmation Order.

RLF1-2703545-1

| | |
|---|---|
| Bar Dates | Unless otherwise ordered by the Bankruptcy Court, holders of Claims in Classes 1, 2 and 3 (other than those Claims in any such Class arising from rejection of Executory Contracts under Article IX of the Plan) need not file proofs of claim with the Bankruptcy Court and shall be subject to Bankruptcy Court process only to the extent provided in the Plan.  On and after the Effective Date, all such Claims shall be paid in the ordinary course of business of the Debtors.  If the Debtors dispute any such Claim, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Reorganization Case had not been commenced and shall survive the Effective Date and consummation of the Plan as if the Reorganization Case had not been commenced, provided that (i) the Debtors may elect, at their sole option, to proceed by objection under section 502 and other applicable provisions of the Bankruptcy Code and Bankruptcy Rules with respect to any proof of claim filed by or on behalf of the holder of a Claim in any Class and (ii) any Claim resulting from an Executory Contract rejected under Article IX of the Plan shall be determined in accordance with the provisions of that Article.  Notwithstanding the foregoing, unless otherwise ordered by the Bankruptcy Court, the Debtors may elect, at their sole option, to establish one or more bar dates and require the filing of proofs of claims by holders of Claims in Classes 1, 2 and/or 3 and/or non-debtor parties to executory contracts and unexpired leases rejected pursuant to Section 365 or 1123 of the Bankruptcy Code. |

### Other Provisions

| | |
|---|---|
| Acceptance of the Prepackaged Plan | All holders of Claims or Interests in unimpaired classes (i.e., Classes 1, 2, 3 and 6) are conclusively presumed under the Bankruptcy Code to have accepted the Prepackaged Plan.  Only holders (with respect to the Class B Common Stock, on the Record Date) of Claims or Interests in an impaired class that will receive or retain property under the Prepackaged Plan (i.e., Classes 4 and 5) are entitled to vote on the Prepackaged Plan. |
| | A class of Claims (in this case, the holders of the Notes) has accepted the Prepackaged Plan if it is approved by holders who hold at least two-thirds in amount and more than one-half in number of the Allowed Claims voting in such class.  A class of Interests (in this case the holders of Class B Common Stock) has accepted the Prepackaged Plan if votes to accept the Prepackaged Plan are cast by holders who hold at least two-thirds in amount of the Interests voting in such class.  Pursuant to the Lock-Up Agreement, holders of over two-thirds of the Notes, and the current holder of all Class B Common Stock, have agreed with us that they, subject to certain conditions, would accept the Prepackaged Plan. Therefore we believe that we will receive sufficient acceptances of the Prepackaged Plan to seek confirmation of the Prepackaged Plan.  See "The Prepackaged Plan – Requirements for Prepackaged Plan Confirmation." |

- 9 -

| | |
|---|---|
| Charter Amendment | We will adopt and file a Charter Amendment to its existing certificate of incorporation, which shall, among other things, (i) include a provision prohibiting the issuance of nonvoting equity securities as required by Bankruptcy Code section 1123(a)(6), (ii) cancel and eliminate our Class A Common Stock, no par value, of which no shares are presently outstanding, (iii) redesignate our Class B Common Stock as the New Common Stock, (iv) amend certain terms of the New Common Stock, (v) approve a 1,500-to-1 stock split in the New Common Stock and authorize the issuance of up to 100,000,000 shares in total of New Common Stock, and (vi) increase the number of members of our board of directors from four to five. |

Discharge and Releases of Claims:        Upon the consummation of the Prepackaged Plan:

- except as expressly provided in the Prepackaged Plan, all claims against the Debtors which any holder of Claims or Interests may possess as a result of the acquisition or possession of such Claim or Interest will be discharged;

- each holder of a Claim or Interest that votes in favor of the Prepackaged Plan, to the fullest extent allowable by law, each entity that receives or retains property under the Prepackaged Plan and each party to the Lock-Up Agreement and each of the Debtors will be deemed to waive and release all claims relating to the Debtors and their respective officers and Boards of Directors, the Reorganization Case, the Lock-Up Agreement, the Employment Agreement, the Separation Agreement, the Old Indenture or the Plan that such entity has against the Debtors, any Representative Committee, the Old Indenture Trustee, any party to the Lock-Up Agreement (which release will be in addition to the discharge of Claims and termination of Interests provided in the Plan and under the Confirmation Order and the Bankruptcy Code), provided that such releases will not apply to (i) any and all indemnification obligations of the Debtors to Mr. Michael Solomon and/or Mr. Russell Solomon as provided by the Lock-Up Agreement, (ii) any and all rights, claims provided to or reserved by the parties to the Lock-Up Agreement, the Employment Agreement, the Separation Agreement, the Non-Compete Agreement (as defined in the Lock-Up Agreement) and the other documents associated therewith in or under such documents or the Prepackaged Plan; and

- the Debtors will release certain claims (including fraudulent conveyance and preference claims) they may have against certain persons, including the Debtors present and former directors and officers and holders of Claims or Interests.

For more information, see "The Prepackaged Plan – Releases."

| | |
|---|---|
| Modification of the Prepackaged Plan: | We, subject to the consent of the parties to the Lock-Up Agreement as may be required thereby, reserve the right to amend or modify the terms of the Prepackaged Plan or waive any conditions thereto, if and to the extent that we determine that such amendments, modifications or waivers are necessary or desirable in order to consummate the Prepackaged Plan.  We will give holders of Claims and Interests such notice of such amendments, modifications or waivers as may be required by applicable law.   See "The Prepackaged Plan – Modification of the Prepackaged Plan."   It is also possible that the Bankruptcy Court could modify the terms of the Prepackaged Plan before confirming it.  See "Risk Factors – Risks Relating to the Prepackaged Plan."  By voting to accept the Prepackaged Plan, you are consenting to such amendments as may be agreed to or imposed, subject to the conditions set forth in the Lock-Up Agreement. |
| Certain First Day Orders: | In addition to customary procedural motions typically filed on the first day of a bankruptcy case, we intend to file with the Bankruptcy Court a number of motions which attempt to expedite payments to trade creditors and employees and ameliorate the effects of the bankruptcy proceeding on us, our creditors and employees.  For example, we intend to file a motion permitting us to pay as they come due all prepetition claims unimpaired under the Prepackaged Plan or, should the Bankruptcy Court not permit such treatment, to pay in the normal course of business prepetition trade claims of creditors that continue to ship product and provide services to us. We will similarly file a motion seeking authority to pay prepetition employee expenses and health claims in order that employees be paid on an uninterrupted, regular basis for wages and health insurance benefits that accrued prior to the filing of the Reorganization Case and to assume the Employment Agreement, the Separation Agreement and certain employment, retention and severance agreements.  While we will use our best efforts to obtain the approval of the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will grant any such approvals, and the Prepackaged Plan is not conditioned upon the Bankruptcy Court granting any such approvals. |

**Board Of Directors Following The Restructuring (Exchange Restructuring or Prepackaged Plan)**

Pursuant to the Lock-Up Agreement, the Current Shareholder and the Consenting Holders have agreed to enter into a governance agreement in the form of Exhibit F (the "Governance Agreement") concerning the governance of the Company following the Restructuring, whether accomplished through the Exchange Restructuring or the Prepackaged Plan.  The Board of Directors following the Restructuring will initially consist of five directors. The Governance Agreement will provide that (a) one director will be appointed by the Current Shareholder so long as the Current Shareholder holds no less than 7.5% of the fully diluted shares of New Common Stock (for this purpose, treating escrowed shares as being held by the Current Shareholder) and persons or entities affiliated with the family of Mr. Russell Solomon continue to hold all of the shares of the Current Shareholder, and (b) the other shareholders will be entitled to designate the remaining four directors.  The Governance Agreement will also provide that parties entitled to designate any director will also have the right to remove such director and designate his or her replacement.

**Alternatives To The Restructuring**

At the same time that we are soliciting consents to participate in the Exchange Restructuring and votes to accept or reject the Prepackaged Plan pursuant to this offering memorandum, we are also actively seeking to be acquired by a third party (an "M&A Transaction").  Pursuant to the terms of the Lock-Up Agreement, we have agreed to structure any M&A Transaction in a manner calculated to provide to holders of Notes and Class B Common Stock consideration that is economically consistent with the consideration they would have received had the Restructuring taken place immediately before the M&A Transaction.  There can be no guaranty that we will be able to find a buyer or that any proposed M&A Transaction would ultimately close.

By consenting to the Exchange Restructuring, you will additionally be consenting to tender your Notes upon the closing of any M&A Transaction in exchange for consideration that is economically consistent with the consideration you would have received had the Restructuring taken place immediately before the M&A Transaction.

**Risk Factors**

Prior to deciding whether to participate in the Restructuring, you should carefully consider all of the information contained and incorporated by reference in this offering memorandum, especially the information set forth in "Risk Factors" at page 21.

**Tendering, Consenting And Voting Procedures**

The following table summarizes the provisions relating to participating in the Exchange Restructuring and voting to accept or reject the Prepackaged Plan.

| | |
|---|---|
| Record Date: | The record date for shares of Class B Common Stock participating in the Exchange Restructuring and for voting to accept or reject the Prepackaged Plan is November 12, 2003 (the "Record Date").  Only beneficial owners of record of Class B Common Stock at the close of business on the Record Date may participate in the Exchange Restructuring and/or vote to accept or reject the Prepackaged Plan. This offering memorandum is being sent to holders of the Notes of record on November 12, 2003 and any eligible holder may participate in the Exchange Restructuring and/or vote on the Prepackaged Plan. |
| Expiration Date: | Holders of Notes and Class B Common Stock wishing to participate in the Exchange Restructuring or vote to accept or reject the Prepackaged Plan must return the appropriate paperwork to the Exchange Agent by Wednesday, December 17, 2003, unless such date is extended by us in our sole discretion (such date the "Expiration Date"). |
| Procedures for Holders of Notes: | A holder electing to tender Notes in the Exchange Offer should follow the procedures described in "Tendering, Consenting and Voting Procedures."  By validly tendering their Notes in the Exchange Offer and not withdrawing before the Expiration Date, holders of Notes will also be consenting to the Solicited Consents and will be voting to accept the Prepackaged Plan.  See "The Exchange Restructuring – Proposed Amendments to the Old Indenture" and "The Prepackaged Plan."  Holders of Notes may not tender their Notes in the Exchange Offer and vote to reject the Prepackaged Plan.  Holders of Notes that do not tender their Notes but that wish to reject the Prepackaged Plan must deliver to the |

|  | Exchange Agent, prior to the Expiration Date, a duly executed Notice of Rejection.  We are not accepting partial tenders of eligible Notes.  Accordingly, holders wishing to validly tender their Notes must tender all of their Notes. |
|---|---|
| Procedures for Beneficial Owners | Holders of record may tender Notes or shares of Class B Common Stock in the Exchange Offer and/or vote to accept or reject the Prepackaged Plan on behalf of beneficial owners only if they have actual authority to do so.  Therefore, beneficial owners of Notes and Class B Common Stock held of record (with respect to the Class B Common Stock, on the Record Date) in the name of a broker, dealer, bank, trust company or other nominee should return the beneficial owner documentation received by them to the record holder by December 12, 2003 so that the record holder may return a Master Ballot to the Exchange Agent on their behalf by the Expiration Date. |
| Procedures for Holders of Class B Common Stock: | Holders of Class B Common Stock, if electing to consent to the Restructuring, should follow the procedures described in "Tendering, Consenting and Voting Procedures." |
| Withdrawal Rights and Revocation: | Letters of Transmittal, Ballot and Consent Letters or Notices of Rejection may be withdrawn by holders of Notes or Class B Common Stock at any time prior to the Expiration Date by following the procedures described in this offering memorandum.  See "Tendering, Consenting and Voting Procedures."  However, any such withdrawal will not affect any party's obligations under the Lock-Up Agreement. |
| Interest on the Notes Tendered | Interest on the Notes has been accruing since November 1, 2002, which was the last date on which interest for Notes was paid.  We did not make the interest payments on the Notes that were due on May 1 and November 1, 2003 (the "Notes Unpaid Interest Amount"), which were the last scheduled interest payment dates for the Notes.<br><br>We will not pay any of the interest accrued on the eligible Notes tendered in the Exchange Offer on the Closing Date.  Accordingly, if the Exchange Offer is consummated, record holders of eligible Notes that were exchanged in the Exchange Offer will waive payment of an amount equal to the accrued and unpaid interest (including any default interest) on the exchanged Notes from November 1, 2002 to the Closing Date (whether or not such holders continue to own Notes). |
| The Exchange Agent: | The record holder of Class B Common Stock should return its Ballot and Consent Letter and any other documents required hereby, and record holders of the Notes should return their Letters of Transmittal, Notices of Rejection or Master Ballots and any other documents required hereby to: The Bank of New York, Corporate Trust Operation, Reorganization Unit, 101 Barclay Street – 7 East, New York, NY  10286, Attn: Mr. William Buckley, Telephone Number: (212) 815-5788, Fax: (212) 298-1915.  Beneficial owners should follow the directions in the materials received from the record holder. |

- 13 -

*It is important that all holders of Notes and Class B Common Stock vote to accept or reject the Prepackaged Plan because, under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders who vote will be counted. Failure by a holder to send a duly completed and signed Letter of Transmittal, Notice of Rejection or Ballot and Consent Letter will be deemed to constitute an abstention by such holder with respect to a vote regarding the Prepackaged Plan. Abstentions as a result of not submitting a duly completed and signed Letter of Transmittal, Notice of Rejection or Ballot and Consent Letter will not be counted as votes to accept or reject the Prepackaged Plan.*

**Recommendations of the Board of Directors With Respect To The Restructuring**

Our Board of Directors has approved the Restructuring and recommends that holders of Notes and Class B Common Stock participate in the Exchange Restructuring and vote to accept the Prepackaged Plan.

**Reservation Of Right To Withdraw Exchange Restructuring And Prepackaged Plan**

At the same time that we are soliciting consents to participate in the Exchange Restructuring and votes to accept or reject the Prepackaged Plan pursuant to this offering memorandum, we are also actively seeking to be acquired by a third party in an M&A Transaction. Pursuant to the terms of the Lock-Up Agreement, we have agreed to structure any M&A Transaction in a manner calculated to provide to holders of Notes and Class B Common Stock consideration that is economically consistent with the consideration they would have received had the Restructuring taken place immediately before the M&A Transaction, and the Consenting Holders have agreed to tender their Notes at the closing of any M&A Transaction. By consenting to the Exchange Restructuring, you will additionally be consenting to tender your Notes upon the closing of any M&A Transaction in exchange for consideration that is economically consistent with the consideration you would have received had the Restructuring taken place immediately before the M&A Transaction. To the extent permitted by applicable law and the Lock-Up Agreement, we also reserve the right to withdraw or amend the Exchange Restructuring or the Prepackaged Plan, before or after the Expiration Date.

**Federal Income Tax Considerations (Exchange Restructuring and Prepackaged Plan)**

For a discussion of certain federal income tax consequences of the Restructuring (whether as the Exchange Restructuring or the Prepackaged Plan) to you and to us, see "Certain Federal Income Tax Consequences of the Exchange Restructuring and the Prepackaged Plan."

**Fees And Expenses**

We will pay the expenses of the solicitation, including the fees of the Exchange Agent and the Information Agent. The principal solicitation is being made by mail; however, additional solicitation may be made by telephone or in person by our officers and regular employees. Arrangements may also be made with brokerage houses and other custodians, nominees and fiduciaries to forward the offering memorandum and related material to the beneficial owners of the Notes. We will reimburse such forwarding agents for reasonable out-of-pocket expenses incurred by them.

**Additional Information**

Questions and requests for assistance or for additional copies of this offering memorandum or the accompanying Letter of Transmittal, Notice of Rejection or Ballot and Consent Letter, or any other required documents may be directed to Innisfree M&A Incorporated at (212) 750-5833.

**Summary Consolidated Financial Data**

The following table presents unaudited summary consolidated financial and other data as of and for the fiscal years ended July 31, 2003 and 2002.  The summary financial data as of and for the fiscal years ended July 31, 2003 and 2002 are derived from and should be read in conjunction with our unaudited consolidated financial statements and the related notes thereto included elsewhere in this offering memorandum.  Our management believes the unaudited 2003 and 2002 financial statements prepared by us reflect our financial position and results of operations in accordance with generally accepted accounting principles in the United States of America (GAAP) for such periods.

The 2003 financial statements reflect, among other things, the discontinued operations of our former Japanese subsidiary following guidance of Statement of Financial Accounting Standards No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," and the reclassification of cooperative advertising rebates and supplier promotional and in-store advertising reimbursements received , originally recorded as a reduction to SG&A expense, as a reduction to cost of sales following guidance of Emerging Issues Task Force Issue No. 02-16, "Accounting by a Customer (Including a Reseller) for Certain Consideration Received from a Vendor."  To allow for comparisons between 2003 and 2002 results of operations, we have prepared and provided unaudited adjusted 2002 financial statements to reflect the reclassification of discontinued operations and certain vendor rebates and allowances.  Our audited historical 2002 financial statements were audited by an independent accounting firm but do not contain these reclassifications and should not be relied upon, and we may need to receive a consent for reissuance of fiscal year 2002 financial statements to audit the reclassification of these amounts.  If our unaudited 2002 financial statements were to be audited, further adjustments could be required.  The independent auditor who audited our 2003 financial statements declined to consent to the inclusion of its audit report in this offering memorandum due to their stated concerns about our inability to provide audit reports for years prior to 2003.  Our independent auditor's report on the 2003 financial statements includes an explanatory paragraph which refers to a substantial doubt as to our ability to continue as a going concern based upon factors similar to those described in Note 1 to our unaudited 2003 consolidated financial statements attached as Appendix A.  We intend to engage our independent auditor to re-examine the going concern matter and its impact on its audit report once the financial restructuring is completed.   Even if the Restructuring is completed, there can be no assurances that our independent auditor will remove the explanatory paragraph about going concern from their audit report.

The information set forth below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations."

**MTS, INCORPORATED**
**Unaudited Consolidated Balance Sheets**
**As of July 31, 2003 and 2002**

(Dollars in Thousands)

| | July 31, 2003 | July 31, 2002 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 5,835 | $ 7,477 |
| Receivables, less allowance for doubtful accounts of | | |
| $896 and $1,455, respectively | 5,754 | 21,710 |
| Merchandising inventories | 151,147 | 167,609 |
| Prepaid expenses | 5,253 | 8,055 |
| Assets held for sale | 2,675 | — |
| Total current assets | 170,664 | 204,851 |
| | | |
| Fixed assets, net | 90,453 | 114,894 |
| Other assets | 9,463 | 13,210 |
| Assets of discontinued operations | — | 145,049 |
| | | |
| Total assets | $ 270,580 | $ 478,004 |
| | | |
| **Liabilities and Shareholder's (Deficit) Equity** | | |
| Current liabilities: | | |
| Current maturities of long-term debt | $ 194,999 | $ 82,776 |
| Accounts payable | 100,685 | 112,904 |
| Reserve for restructuring costs | 12,362 | 6,839 |
| Accrued liabilities | 33,720 | 28,664 |
| Deferred revenue | 4,940 | 2,286 |
| Total current liabilities | 346,706 | 233,469 |
| | | |
| Long-term debt, net of current maturities | 4,621 | 115,771 |
| Other long-term liabilities | 105 | 118 |
| Liabilities of discontinued operations | — | 169,433 |
| | | |
| Total liabilities | $ 351,432 | $ 518,791 |
| | | |
| Shareholder's (deficit) equity: | | |
| Class B common stock, no par value; 10,000,000 | | |
| shares authorized; 1,000 shares issued and outstanding | 6 | 6 |
| Retained (deficit) earnings | (80,858) | (21,355) |
| Accumulated other comprehensive loss | - | (19,438) |
| Total shareholder's (deficit) equity | (80,852) | (40,787) |
| | | |
| Total liabilities and shareholder's (deficit) equity | $ 270,580 | $ 478,004 |

- 16 -

# MTS, INCORPORATED
## Unaudited Consolidated Statements of Operations
### For the Years Ended July 31, 2003 and 2002
(Dollars in Thousands)

|  | July 31, 2003 | July 31, 2002 |
|---|---|---|
| Net revenue | $       546,349 | $       610,809 |
| Cost of sales (a)(b) | 345,415 | 395,925 |
| Gross profit (b) | 200,934 | 214,884 |
| | | |
| Operating expenses: | | |
| Selling, general and administrative expenses (c) | 196,346 | 217,350 |
| Restructuring and asset impairment costs, net | 26,496 | 22,337 |
| Depreciation and amortization | 19,764 | 22,054 |
| Loss from operations | (41,672) | (46,857) |
| | | |
| Other (expenses) income: | | |
| Interest expense | 21,504 | 24,017 |
| Loss on disposal of assets | 9,929 | 346 |
| Other | 3,258 | 251 |
| Loss from continuing operations before income taxes | (76,363) | (71,471) |
| | | |
| Provision for income taxes | 368 | (7,778) |
| Loss from continuing operations | (76,731) | (63,693) |
| | | |
| Discontinued operations: | | |
| Income from operation of discontinued Japanese subsidiary | | |
| (including gain on disposal of $15,847, net of U.S. income | | |
| and foreign taxes of $6,512 for the year ended July 31, 2003) | 17,228 | 6,490 |
| | | |
| Net (loss) income | $       (59,503) | $       (57,203) |

_____

(a)    Includes $2.3 million and $14.2 million of inventory write-downs related to the restructuring activities in 2003 and 2002, respectively

(b)    Excludes depreciation and amortization related to retail and distribution assets of $12.2 million and $14.6 million in 2003 and 2002, respectively, which have been included in operating expenses.

(c)    Includes $3.1 million and $5.9 million of professional fees related to the restructuring activities in 2003 and 2002, respectively

RLF1-2703545-1

**Unaudited Pro Forma Summary Selected Consolidated Financial Data**

The following table presents selected unaudited pro forma consolidated financial data as of and for the year ended July 31, 2003. The unaudited pro forma balance sheet data is presented as if the Restructuring had occurred on July 31, 2003. The unaudited pro forma statement of operations data is presented as if the Restructuring had occurred on August 1, 2002. The unaudited pro forma consolidated financial data is based on the estimates and assumptions management believes are reasonable, which are preliminary and have been made solely for the purpose of developing such pro forma information. The unaudited pro forma consolidated financial data is presented for illustrative purposes only and is not necessarily indicative of the financial position or results of operations that would have been achieved had the Restructuring occurred as of the dates indicated, nor is it indicative of our future financial position or results of operations. Upon completion of the Restructuring, the transactions will be recorded using GAAP which we believe will reflect a material gain to the financial statements. The ultimate gain that will be recorded depends on the estimated value of the equity exchanged and other costs of the proposed restructuring, which cannot be reliably determined at this time. The pro forma information presented may be materially different when recorded in accordance with GAAP. The financial data set forth below should also be read in conjunction with the historical financial statements and related notes included in this offering memorandum and in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

The first column of the following table sets forth unaudited pro forma consolidated financial data as of July 31, 2003. The second and third columns show our adjustments to such financial data assuming that the Exchange Restructuring had occurred on July 31, 2003. The fourth and fifth columns show our adjustments to such financial data assuming that the Prepackaged Plan had been consummated on July 31, 2003.

The "Fresh Start" adjustments in the fourth column show adjustments under the guidelines of the AICPA's Statement of Position 90-7 (SOP 90-7), "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code." Under these guidelines all assets and liabilities are restated to reflect their reorganization value, which approximates fair market value for financial reporting purposes, at the date of reorganization. Goodwill is replaced in the resulting initial balance sheet by an intangible asset entitled "reorganization value in excess of amounts allocable to identifiable assets."

**MTS, INCORPORATED**
**Unaudited Pro Forma Condensed Consolidated Balance Sheet**
**As of July 31, 2003**
(Dollars in Thousands)

| | Historical | Pro Forma Adjustments | | Pro Forma Exchange Restructuring | Fresh Start Adjustments | Pro Forma Prepackaged Plan |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Current Assets: | | | | | | |
| Cash and cash equivalents | $ 5,835 | $ — | | $ 5,835 | $ — | $ 5,835 |
| Receivables, less allowance for doubtful accounts of $896 | 5,754 | — | | 5,754 | — | 5,754 |
| Merchandising inventories | 151,147 | — | | 151,147 | — | 151,147 |
| Prepaid expenses | 5,253 | — | | 5,253 | — | 5,253 |
| Assets held for sale | 2,675 | — | | 2,675 | — | 2,675 |
| Total current assets | 170,664 | | | 170,664 | | 170,664 |
| Fixed assets, net | 90,453 | — | | 90,453 | | 90,453 |
| | | (1,260) | (1) | | | |
| | | (1,257) | (2) | | | |
| Other assets | 9,463 | (2,517) | | 6,946 | — | 6,946 |
| Reorganization value in excess of amounts allocable to identifiable assets | — | | | — | 18,141 | 18,141 |
| Total assets | $ 270,580 | | | $ 268,063 | | $ 286,204 |
| **Liabilities and Shareholder's (Deficit) Equity** | | | | | | |
| Current liabilities: | | | | | | |
| | | $ (110,000) | (3) | | | |
| | | (58,756) | (4) | | | |
| | | (25,000) | (4) | | | |
| Current maturities of long-term debt | $ 194,999 | (193,756) | | $ 1,243 | $ — | $ 1,243 |
| Accounts payable | 100,685 | — | | 100,685 | — | 100,685 |
| Reserve for restructuring costs | 12,362 | — | | 12,362 | — | 12,362 |
| Accrued liabilities | 33,720 | (7,734) | (5) | 25,986 | — | 25,986 |
| Deferred revenue | 4,940 | — | | 4,940 | — | 4,940 |
| Total current liabilities | 346,706 | | | 145,216 | | 145,216 |
| Other long-term liabilities | 105 | — | | 105 | — | 105 |
| | | 30,000 | (3) | | | |
| | | 58,756 | (4) | | | |
| | | 25,000 | (4) | | | |
| | | 4,859 | (6) | | | |
| Long-term debt, net of current maturities | 4,621 | 118,615 | | 123,236 | — | 123,236 |
| Total liabilities | $ 351,432 | | | $ 268,557 | | $ 268,557 |
| Shareholder's (deficit) equity: | | | | | | |
| Class B common stock, no par value; 10,000,000 shares authorized; 1,000 shares issued and outstanding | 6 | (6) | | — | — | — |
| Common Stock, no par value; 100,000,000 shares authorized; 10,000,000 shares issued and outstanding | — | 15,006 | (7) | 15,006 | — | 15,006 |
| Retained (deficit) earnings | (80,858) | 65,358 | (8) | (15,500) | 18,141 | 2,641 |
| Total shareholder's (deficit) equity | (80,852) | | | (494) | | 17,647 |
| Total liability and shareholder's (deficit) equity | $ 270,580 | | | $ 268,063 | | $ 286,204 |

_____

(1) Unamortized deferred financing costs on the bonds
(2) Capitalized fees related to the restructuring
(3) Elimination of $110 million in bond debt in exchange for $30 million in aggregate principal amount of new notes and 85% of the common equity
(4) Reclassification of the CIT Line of Credit and Chase Term Loan from Current Maturities of Long-Term Debt to Long-Term Debt
(5) Accrued interest on the bonds as of 7/31/2003
(6) Estimated fees and expenses associated with the restructuring
(7) Represents 15% of equity retained by the Current Shareholder and 85% of equity being distributed to noteholders. The estimated value of the 85% of the common equity being distributed to holders of Notes is $15 million. This estimate of equity value remains subject to further analysis by us and our financial advisors.
(8) Gain on debt extinguishment. Calculated as $110 million in cancelled debt plus $7.7 million in accrued interest less $2.5 million in deferred financing costs and capitalized fees related to the restructuring, $30 million in aggregate principal amount of new notes, $4.9 million in estimated fees associated with the transaction and $15 million in estimated value of equity distributed to holders of the notes

- 19 -

The first column of the following table sets forth unaudited consolidated financial data for the year ended July 31, 2003.  The second and third columns show our unaudited pro forma adjustments to such financial data assuming that the Restructuring (either through the Exchange Restructuring or the Prepackaged Plan) had occurred at the beginning of our 2003 fiscal year.

**MTS, INCORPORATED**
**Unaudited Pro Form Condensed Consolidated**
**Statements of Operations**
**For the Year Ended July 31, 2003**
(Dollars in Thousands)

| | Historical | Pro Forma Adjustments | | Pro Forma |
|---|---|---|---|---|
| Net revenue | $        546,349 | $         — | | $        546,349 |
| Cost of sales | 345,415 | — | | 345,415 |
| Gross profit | 200,934 | | | 200,934 |
| | | | | |
| Operating expenses: | | | | |
| Selling, general and administrative expenses | 196,346 | — | | 196,346 |
| Restructuring and asset impairment costs, net | 26,496 | — | | 26,496 |
| Depreciation and amortization | 19,764 | — | | 19,764 |
| | | | | |
| Loss from operations | (41,672) | | | (41,672) |
| | | | | |
| Other income (expense): | | | | |
| | | 10,313 | (1) | |
| | | (3,600) | (2) | |
| Interest expense | (21,504) | 6,713 | | (14,791) |
| | | | | |
| Loss on disposal of assets | (9,929) | | | (9,929) |
| Gain on extinguishment of debt | — | 65,358 | (3) | 65,358 |
| Other | (3,258) | — | | (3,258) |
| | | | | |
| Loss from continuing operations before income taxes | (76,363) | | | (4,292) |
| | | | | |
| Provision for income taxes | 368 | 1,307 | (4) | 1,675 |
| | | | | |
| Loss from continuing operations | (76,731) | | | (5,967) |
| | | | | |
| Discontinued operations: | | | | |
| | | | | |
| Income from operation of discontinued Japanese subsidiary (including gain on disposal of $15,847, net of U.S. income and foreign taxes of $6,512 for the year ended July 31, 2003) | 17,228 | — | | 17,228 |
| | | | | |
| Net (loss) income | $        (59,503) | | | $        11,261 |

_____
(1) Represents the elimination of interest associated with the bonds.
(2) Represents the maximum annual interest expense on the New Notes.  Interest of 2% per annum will be paid in cash ($600).  Additionally, at our option, either another 8% of interest per annum will be paid in cash ($2,400) or 10% of interest per annum will be capitalized as principal ($3,000).
(3) Gain on debt extinguishment:  Calculated as $110 million in cancelled debt plus $7.7 million in accrued interest less $2.5 million in deferred financing costs and capitalized fees related to the restructuring, $30 million in aggregate principal amount of New Notes, $4.9 million in estimated fees associated with the transaction and $15 million in estimated value for the 85% of common equity distributed to holders of the Notes.  This estimate of equity value remains subject to further analysis by us and our financial advisors.
(4) Assumes consummation of the Exchange Restructuring.  If the Restructuring is instead consummated through the Prepackaged Plan, this number could be reduced by the utilization of NOLs.

- 20 -

# RISK FACTORS

*The following factors, in addition to the other information set forth in this offering memorandum, should be considered carefully by holders of Notes and Class B Common Stock in deciding whether to participate in the Exchange Restructuring and/or the Prepackaged Plan.*

## General Risks Relating To The Restructuring

*If the Restructuring is Not Completed in a Timely Manner, We May Be Declared in Default Under Our Existing Senior Credit Facilities, Which May Cause the Cessation of Our Access to the Revolving Credit Line Necessary to Operate Our Business*

As described in more detail below under "The Restructuring and the Lock-Up Agreement – Background," we maintain two senior credit facilities secured by substantially all of our assets on which we rely for our operations. When we elected not to make the interest payment on the Notes, the resulting default under the Old Indenture created a cross-default under the agreements with respect to those credit facilities. As part of a forbearance related to that cross default, certain benchmarks concerning the Restructuring were imposed. At present, we are operating under a forbearance that lasts through February 28, 2004. If we do not complete the Restructuring by that date or if there are any other defaults under the credit agreements with our senior lenders, we will have to renegotiate our forbearance or face being in default under our senior credit agreements. If we do not satisfy the terms of the forbearance or do not obtain an extension of the forbearance, our senior lenders could enforce remedies including cessation of our access to the revolving credit line necessary to operate our business.

*If the Restructuring is Not Completed in a Timely Manner, We Will Not Be Able to Continue to Operate Our Business Without Substantial Additional Funding, Which May Not Be Available on Acceptable Terms, or at All*

As of July 31, 2003, we had cash and cash equivalents of approximately $5.8 million, and anticipate that our liquid assets are likely to be insufficient to cover our estimated funding needs if the Restructuring is not completed in a timely manner. There is no guarantee that additional funds would be available on acceptable terms, or at all, in the event the Restructuring is not completed in a timely manner.

We are substantially leveraged, with aggregate outstanding indebtedness of $199.6 million and shareholder's deficit of $80.9 million at July 31, 2003, inclusive of restructuring and impairment costs, inventory write-downs and professional fees incurred in connection with restructuring activities of $120.5 million from fiscal 2001 through fiscal 2003. We also have substantial lease obligations and other recurring business expenses. Our substantial leverage could have the following effects: (i) our ability to obtain additional financing for working capital, capital expenditures, general corporate purposes or other purposes in the future could be reduced; (ii) a substantial portion of our cash flow from operations must be dedicated to the payment of principal and interest on our indebtedness, which reduces the funds available to us for other purposes; (iii) certain of our borrowings are at variable rates of interest, which exposes us to interest rate fluctuation risk; (iv) we may be hindered in our ability to adjust rapidly to changing market conditions; (v) we could be more vulnerable in the event of a downturn in general economic conditions or our business, and (vi) we may be required to delay or abandon some of our expansion plans or expenditures, which could harm our business and competitive position.

*We May Lose Tax Attributes and Incur Income Tax Liability as a Result of the Exchange Restructuring (or the Prepackaged Plan)*

Although the Exchange Restructuring (or the Prepackaged Plan) will allow us to be discharged from a significant amount of debt, we believe that we will not incur additional federal income tax liability as a result of such discharge, based on the insolvency or bankruptcy provisions of the Internal Revenue Code. We will, however, be required to reduce or utilize certain of our tax attributes (and possibly the tax attributes of our subsidiaries),

- 21 -

including net operating losses and loss carryforwards, and we may be limited in the use of our remaining tax attributes following the exchange.  Since the precise amount of the discharge and of our tax attributes cannot be determined until immediately prior to the debt exchange, if such amounts on the date of the exchange differ significantly from our current estimates, we may be required to recognize taxable income, although we believe that the risk of incurring any significant federal income tax liability is remote.

In addition, the issuance of New Common Stock in the Exchange Restructuring or the Prepackaged Plan will result in an ownership change of the Company for tax purposes.  In the case of the Exchange Restructuring, this ownership change will eliminate the use of our remaining  net operating loss carryforwards to offset future income (other than potentially certain of our built in gains in our assets at the time of the Exchange Restructuring ), if any.  In the case of the Prepackaged Plan, the affect of the ownership change may be significantly less adverse than the Exchange Restructuring, although our use of our remaining net operating loss carryforwards will still be limited.  Although we are currently unable to quantify the relative cash value of the increased potential utilization of the NOLs following the Prepackaged Plan as compared to the Exchange Restructuring, we do note such cash value may be significant and may affect your decision on whether to vote for the Prepackaged Plan.  See "Certain Federal Income Tax Consequences - Code Section 382 Limitation."

Since the holders of the Notes will hold a significant equity position following the Restructuring, whether achieved through the Exchange Restructuring or the Prepackaged Plan, if the holders of the Notes dispose of all or a significant portion of their New Common Stock after the exchange, such a disposition may cause us to undergo a further ownership change for tax purposes, resulting in a further limitation of its ability to use tax attributes following that ownership change as described above.

*The New Indenture Will Place Restrictions on Our Ability to Make Capital Expenditures and Engage in Acquisitions*

We cannot assure you that we will have timely access to additional financing sources on acceptable terms.  Our ability to issue debt securities, borrow funds from additional lenders and participate in vendor financing programs will be restricted under the terms of the New Indenture to the extent that any New Notes are issued and we cannot assure you that our lenders will waive these restrictions if we need additional financing beyond that which is permitted.  If they do not, we may not be able to grow our business.

*To Service Our Indebtedness, We Will Require a Significant Amount of Cash – Our Ability to Generate Cash Depends on Many Factors Beyond Our Control*

Our ability to pay the principal of and interest on the New Notes, to service our other debt and to finance indebtedness when necessary depends on our financial and operating performance, each of which is subject to prevailing global and national economic conditions and to financial, business, legislative and regulatory factors as well as other factors beyond our control.

We cannot assure you that we will generate sufficient cash flow from operations or that we will be able to obtain sufficient funding to satisfy all of our obligations including the New Notes.  If we are unable to pay our debts, we will be required to pursue one or more alternative strategies, refinancing or restructuring our indebtedness or selling additional debt or equity securities.  We cannot assure you that our business will generate cash flow from operations or that future borrowings will be available to us in an amount sufficient to enable us to pay our debt or to find other liquidity needs.  As a result we may need to refinance all or a portion of our debt on or before maturity.  We cannot assure you, however, that any alternative strategies will be feasible at the time or prove adequate.  Also, some alternative strategies will require the consent of our lenders before we engage in those strategies.

*The Covenants and Limitations Contained in the New Indenture Will Limit Our Financial Flexibility*

The New Indenture will limit our financial flexibility in a number of ways.  The New Indenture will require us to maintain specified financial ratios and tests, and will restrict, among other things, our ability to incur additional

indebtedness, sell assets, create liens or other encumbrances, incur guarantee obligations, repay the New Notes or amend the New Indenture, make certain payments, including dividends or other distributions, make investments, loans or advances and make acquisitions and capital expenditures beyond a certain level. Our failure to maintain specified financial ratios or otherwise to comply with the restrictions contained in the New Indenture could lead to an event of default thereunder, which could result in an acceleration of such indebtedness. In such event, our lenders could elect to declare all amounts outstanding thereunder, together with accrued and unpaid interest, to be immediately due and payable, and, if we were unable to repay such amounts, such lenders would have the right to proceed against the collateral granted to them to secure such indebtedness and other amounts (which is expected to be substantially all our assets).

*Risk Of Bankruptcy Not Pursuant To A Prepackaged Plan*

If the Exchange Restructuring is not consummated and we determine that we will be unable or are unwilling to implement the Prepackaged Plan, there is substantial likelihood that we will seek, or will be forced to seek, protection under the Bankruptcy Code without a pre-approved plan of reorganization. If a case is filed under the Bankruptcy Code without having received sufficient acceptances to confirm the Prepackaged Plan, we believe that (i) we might remain under the jurisdiction of the Bankruptcy Court for an indeterminate amount of time, (ii) we would bear a higher level of expenses than would be borne under a case with such prior acceptances, and (iii) the uncertainty generated among our suppliers and employees would likely be increased, which would adversely affect our business. Our solicitation of votes on the Prepackaged Plan, and any subsequent commencement of bankruptcy proceeding, even in connection with the Prepackaged Plan, may have adverse effects on our business and operations. In addition, due to uncertainties about our business future (i) suppliers may restrict ordinary credit terms, require financial assurances of performance or refrain entirely from shipping goods, and (ii) employees may be distracted from performance of their duties or more easily attracted to other career opportunities. These concerns and effects typically become more acute when bankruptcy case continues for a protracted period without indication of how or when the case may be completed. We have sought, through the structure and terms of the Prepackaged Plan, to reduce these risks.

*The New Notes and New Common Stock are New Issues of Securities and the Trading Markets for the New Notes and the New Common Stock May be Limited*

The New Notes and New Common Stock have not been registered under the Securities Act or under any other securities laws. Accordingly, in the absence of such registration, the New Notes and shares of New Common Stock may be offered or sold only pursuant to an exemption from the registration requirements of the Securities Act and similar provisions of applicable state securities laws or pursuant to an effective registration statement. The New Common Stock is a new security for which there currently is no active trading market, and there may be no or only limited market making activity for the New Common Stock. Accordingly, there can be no assurance as to the development of any market or liquidity of any market that may develop for the New Common Stock, the ability of the holders of New Common Stock to sell their New Common Stock, or the prices at which such holders would be able to sell their New Common Stock. We do not intend to apply for registration of the New Common Stock or for the listing of the New Common Stock on any national securities exchange or for quotation on any automated quotation system.

The New Notes have not been registered under the Securities Act or under any other securities laws, although we are obligated to register the New Notes under federal securities laws in certain circumstances pursuant to the Lock-Up Agreement. However, the registration of the New Notes may be subject to delay if we are not able to provide audited financial statements that comply with federal securities requirements in a timely manner. Our fiscal 2003 financial statements reflect the discontinued operations of our former Japanese subsidiary following guidance of statement of financial accounting standards number 144, "Accounting for the Impairment or Disposal of Long-Lived Assets" and the reclassification of co-op revenue following guidance of Emerging Issues Task Force Issue Number 02-16, "Accounting by a Customer (Including a Reseller) for Certain Consideration Received from a Vendor." Our audited financial statements for prior years do not contain these reclassifications and should not be relied upon, and we may need to re-audit fiscal year 2001 and receive a consent for reissuance of fiscal year 2002

- 23 -

financial statements to audit the reclassification of these amounts.  See "Summary–Summary Consolidated Financial Data."

> *We Do Not Expect to Pay Dividends on Our New Common Stock*

We do not anticipate paying any cash dividends on our New Common Stock in the foreseeable future. Instead, we intend to retain future earnings to fund our business.  In addition, the New Indenture will restrict, and we expect our future indebtedness may restrict, our ability to pay dividends on our New Common Stock.

> *The Terms Of The Lock-Up Agreement May Need To Be Amended To Complete The Restructuring*

Under the terms of the Lock-Up Agreement, we have agreed that we will not effect the Restructuring unless it is in accordance with the terms of the Lock-Up Agreement, copies of which are attached to this offering memorandum as Exhibit A.  A material alteration of those terms could cause the Lock-Up Agreement to terminate unless amended.

## Risks Relating To The Exchange Restructuring

> *If The Minimum Tender Condition Is Not Met Or We Do Not Otherwise Implement The Exchange Restructuring, There Nonetheless May Be Sufficient Votes To Accept The Prepackaged Plan*

The consummation of the Exchange Restructuring is conditioned upon, among other things, the receipt of valid tenders of 100% of the Notes outstanding immediately before the expiration of the Exchange Offer, subject to the condition that, upon consent of the Current Shareholder and the holders of 85% of the total value of the Notes, the Minimum Tender Condition may be amended to reduce that percentage below 100%.  To obtain approval of the Prepackaged Plan, however, we need to receive the affirmative votes from holders of only at least two-thirds in dollar amount and more than one-half in number of those holders of Notes who actually cast ballots, and the affirmative votes of holders of at least two-thirds in amount of such holders of Class B Common Stock who actually cast ballots.

If we are not able to complete the Exchange Restructuring because the Minimum Tender Condition is not met or waived or for any other reason, but we do receive the required votes to accept the Prepackaged Plan, we will likely seek confirmation of the Prepackaged Plan by the Bankruptcy Court.  Even if the Minimum Tender Condition is satisfied, we may be instructed by the holders of the Notes to file the Prepackaged Plan as provided in the Lock-Up Agreement.  If the Prepackaged Plan is confirmed by the Bankruptcy Court, it will bind all holders of the Notes and Class B Common Stock regardless of whether they voted for or against or did not vote at all on the Prepackaged Plan.  Therefore, assuming the Prepackaged Plan satisfies the other requirements of the Bankruptcy Code for confirmation, a significantly smaller number of security holders can bind other security holders to the terms of the Prepackaged Plan than to the Exchange Restructuring.

> *If a Holder of Notes Does Not Elect to Exchange the Notes that It Holds in the Exchange Offer, and the Old Indenture Amendments Are Approved as Described in this Offering Memorandum, Most of the Protections under the Old Indenture will be Eliminated.*

If the Exchange Offer and solicitation of consents to the Old Indenture Amendments are completed, the Old Indenture will be amended to eliminate most of the restrictive covenants and some events of default, and the remaining holders of Notes who do not tender their Notes for exchange will no longer benefit from the protection to their credit interest afforded by those restrictive covenants and events of default.  As described in greater detail under "The Exchange Restructuring – Proposed Amendments to the Old Indenture," the elimination of these restrictive covenants in the Old Indenture would permit us to, among other things, incur indebtedness, sell assets, pay dividends or make other restricted payments, incur or make other investments and engage in transactions with affiliates that would otherwise not have been permitted.  In addition, certain events, including the foregoing, which would have constituted a violation of such covenants would no longer constitute events of default.

- 24 -

*The Exchange Restructuring May Reduce The Marketability Of Any Notes That Are Not Tendered*

There is currently a limited trading market for the Notes, and no reliable public pricing information for the Notes is generally available. The Notes are not traded on any national securities exchange or automated quotation system. The trading market for Notes that remain outstanding following the Exchange Restructuring is likely to become much more limited, or possibly nonexistent, due to the reduction in the amount of such Notes outstanding upon completion of the Exchange Restructuring and the elimination of many protective covenants contained presently in the Old Indenture, which might adversely affect the marketability, market price and price volatility of any unexchanged Notes.

*In The Future, We May Acquire Any Notes That Are Not Tendered In The Exchange Offer For Consideration Different Than That Offered In The Exchange Offer*

If the Minimum Tender Condition is reduced to require less than 100% of the Notes to be tendered in the Exchange Offer, we may in the future acquire any Notes that are not tendered in the Exchange Offer through open market purchases, privately negotiated transactions or such other means as we deem appropriate. Any such acquisition will occur upon such terms and at such prices as we may determine in our discretion, which may be more or less than the value of the New Notes and shares of New Common Stock being exchanged for the Notes under the Exchange Offer, and could be for cash or other consideration.

*Risks Particular to Tendering Holders of Notes*

Holders of Notes who tender in the Exchange Offer will receive New Common Stock and New Notes, but will lose all rights associated with the tendered Notes. In addition, if we were to become a debtor in a case under the Bankruptcy Code within 90 days after the completion of the Exchange Offer (or, with respect to any insiders specified in the Bankruptcy Code, within one year after completion of the Exchange Offer) and certain other conditions were met, the consideration paid to holders of Notes in the Exchange Offer, absent an applicable defense as provided by the Bankruptcy Code, potentially could be voided as a preferential transfer and, to the extent avoided, the value of such consideration could be recovered from such holder and possibly from subsequent transferees.

**Risk Factors Relating To The Prepackaged Plan**

*The Commencement Of A Bankruptcy Case To Implement The Prepackaged Plan Could Adversely Impact Our Business*

The Prepackaged Plan has been developed in any effort to avoid any material impact on our operations. For example, the Prepackaged Plan does not seek to impair any creditors other than the holders of the Notes and we intend to seek to deal with our creditors other than the holders of the Notes essentially as though we had not filed bankruptcy. We also expect that the time we would be in bankruptcy would be short if the Prepackaged Plan is confirmed. Nonetheless, it is possible that a bankruptcy proceeding to confirm the Prepackaged Plan could itself have an adverse effect on our business. We expect that the Prepackaged Plan would be confirmed quickly, but obviously there are always risks inherent in any such proceeding and if a bankruptcy were prolonged, a lengthy bankruptcy proceeding would involve additional expenses and divert the attention of our management from operation of the business.

Any possible disruption that a bankruptcy proceeding would inflict upon our business operations would increase with the length of time it takes to complete the proceeding and the severity of any such disruption would depend upon the attractiveness and feasibility of the Prepackaged Plan from the perspective of the constituent parties on whom we depend, including vendors, employees, and customers. If the Prepackaged Plan is not confirmed on a timely basis, because of a challenge to the Prepackaged Plan or a failure to satisfy the conditions to the effectiveness of the Prepackaged Plan, we may be forced to operate in bankruptcy for an extended period while attempting to develop a different reorganization plan that can be confirmed. A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above. In addition, in a protracted bankruptcy

proceeding, a noteholder, an official creditors' committee or other party in interest may seek confirmation of an alternative, competing plan that may propose different and materially less advantageous treatment of creditors and other parties in interest.

> *We May Not Be Successful In Obtaining First Day Orders To Permit Ordinary Course Of Business Payments*

We intend to address potential concerns of our key customers, vendors, employees, licensors/licensees and other key parties in interest that might arise from the filing of the Prepackaged Plan.  Specifically, in the Lock-Up Agreement we have agreed with the Consenting Noteholders and the other parties thereto that we will seek appropriate court orders to permit the payment of accounts payable as and when due in the ordinary course of business (i.e. without specific or further court approval), and to assume executory contracts with such parties in interest.  Alternatively, we may move, in the case of those key vendors who have agreed to continue to extend business terms to us during and after the commencement of the bankruptcy proceedings, to provide for the payments of prepetition accounts payable.  However, there can be no guarantee that the Bankruptcy Court will enter such court orders or that we would be successful in obtaining any other necessary approvals for such arrangements or that such arrangements will be approved for every party in interest that we may seek to treat in this manner, and as a result our business and access to credit, supplies or inventory might suffer.

> *Our Business May Be Negatively Impacted If We Are Unable To Assume our Executory Contracts*

The Prepackaged Plan provides for the assumption of all executory contracts and unexpired leases, other than those that we specifically determine to reject.  The intention is to preserve as much of the benefit and value to us of those contracts and leases as possible.  However, we may not be able to assume certain classes of executory contracts, such as certain types of intellectual property licenses, absent consent from the non-debtor parties to such contracts.  There is no guarantee that such consents would either be forthcoming or that conditions would not be attached to any such consents that would make assuming such contracts unattractive.  The non-debtor parties to such contracts may also seek approval of the Bankruptcy Court to terminate those contracts and if they succeeded, we would then be required to choose to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

> *Even If The Holders Of The Notes And Class B Common Stock Accept The Prepackaged Plan, The Prepackaged Plan May Not Become Effective*

Even if we pursue the Prepackaged Plan, there can be no assurances that the Prepackaged Plan will be confirmed by the Bankruptcy Court.  Even if all classes of Claims and Interests accept or are deemed to accept the Prepackaged Plan, the Bankruptcy Court may decline to confirm the Prepackaged Plan if certain standards are not satisfied.  Section 1129 of the Bankruptcy Code, which sets forth the standards for confirmation,  requires, among other things, that (i) it is not likely that the confirmation of a plan of reorganization will be followed by the need for further financial reorganization or a liquidation not provided for in the plan, and (ii) the value of distributions to dissenting holders of Claims and Interests will not be less than the value of such distributions if we were liquidated under Chapter 7 of the Bankruptcy Code.  See "The Prepackaged Plan—Requirements for Prepackaged Plan Confirmation."  Although we believe that the Prepackaged Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

In addition, Section 1126(b) of the Bankruptcy Code provides that the holder of a Claim or Interest who accepts or rejects a plan of reorganization before the commencement of a Chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitation, or, if no such law applies, such acceptance was solicited after disclosure of "adequate information."  In the event the Bankruptcy Court determines that the solicitation of holders of Claims and Interests by us did not comply with the requirements of Section 1126(b) of the Bankruptcy Code, we may be required to resolicit acceptances, and confirmation of the Prepackaged Plan would be delayed and could be jeopardized.  We believe that

- 26 -

our solicitation of votes on the Prepackaged Plan complies with the requirements of Section 1126(b) of the Bankruptcy Code and that, if we receive sufficient acceptances, the Bankruptcy Court should confirm the Prepackaged Plan. Even if the requirements of Section 1126 are met, there can be no assurance that modification of such Prepackaged Plan will not be required for confirmation or that such modification would not require a resolicitation of acceptances.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place claims or interests in a particular class only if such Claim or Interest is substantially similar to other claims or interests in such class. The determination of whether claims or interests are substantially similar is based on the Claims' or Interests' relationship to the debtor or the bankruptcy estate. We believe that only Claims and Interests which are substantially similar have been placed in the same classes pursuant to the Prepackaged Plan. However, the Bankruptcy Court could require that we reclassify Claims. If the Bankruptcy Court ordered reclassification, it could require resolicitation of votes on the Prepackaged Plan.

See "The Prepackaged Plan– Confirmation of the Prepackaged Plan," which describes generally the requirements under Bankruptcy Code Section 1129 for confirming a Chapter 11 plan of reorganization.

The Bankruptcy Court may conclude that the feasibility test and other requirements of Section 1129 of the Bankruptcy Code have not been met with respect to the Prepackaged Plan. We could be required to repeat one or all of the steps in the process of seeking votes to accept or reject the Prepackaged Plan or to start the process all over again from the beginning by filing another plan and disclosure statement, seeking approval from the Bankruptcy Court of the disclosure statement, soliciting votes from classes of debt and equity holders, and seeking Bankruptcy Court confirmation of the new plan. If we were required to resolicit votes for the Prepackaged Plan after commencement of a bankruptcy case, it could significantly extend the amount of time we spent in a bankruptcy proceeding.

It is also possible that the resolicitation of votes of the Prepackaged Plan could not take place within a sufficiently short period of time as provided in the Lock-Up Agreement to bind the Consenting Holders or the Current Shareholder to their respective obligations under the Lock-Up Agreement to continue to support the Prepackaged Plan in this circumstance. If this occurs, confirmation of the Prepackaged Plan would be delayed and possibly jeopardized.

> *Should The Prepackaged Plan Not Become Effective Or Should We Be Required To Re-Solicit Votes On The Prepackaged Plan Or A Successor Plan, The Lock-Up Agreement May Not Be Enforceable To Ensure Votes From The Current Holders Of The Notes*

Although the Lock-Up Agreement requires the parties thereto to support not only the Prepackaged Plan but also any successor plan under Chapter 11 consistent in all material respects with the Prepackaged Plan, one or more parties to the Lock-Up Agreement could assert that a successor plan proposed by us was materially different from the Prepackaged Plan or that it was otherwise not bound to the terms of the Lock-Up Agreement, particularly if the Bankruptcy Court requires modifications to the Prepackaged Plan prior to confirmation. Also, there can be no assurance that the Current Shareholder or the Consenting Holders (who have already agreed to support the Prepackaged Plan pursuant to the Lock-Up Agreement) or other parties in interest would support such a new plan or disclosure statement under such circumstances. This situation would likely entail significantly greater risk of delay, expense and uncertainty, which would likely have a material adverse effect upon our business and financial condition. See "The Prepackaged Plan– Conditions to Effective Date of the Prepackaged Plan."

> *If The Prepackaged Plan Cannot Be Confirmed, A Chapter 11 Reorganization Case May Be Converted To A Liquidation Case Under Chapter 7 Of The Bankruptcy Code.*

If no plan can be expected to be confirmed or we cease to be able to operate our business successfully during the Reorganization Case, such as by reason of being unable to pay post-bankruptcy debts as they become due, our Reorganization Case under Chapter 11 may be converted to a liquidation case under Chapter 7 of the

- 27 -

Bankruptcy Code.  In that event, a trustee would be appointed or elected to liquidate our assets for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of holders of claims against and equity interests in the Company, as well as our liquidation analysis, are set forth under "The Prepackaged Plan– Liquidation Analysis."  We believe that liquidation under Chapter 7 would result in:

- smaller distributions being made to holders of claims than those provided for in the Prepackaged Plan because of:

  o    the likelihood that our assets would have to be sold or otherwise disposed of in a less orderly fashion over a short period of time;

  o    additional administrative expenses involved in the appointment of a trustee;

  o    additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of our operations; and

- equity interest holders receiving or retaining less or even no property.

## Business Risks

### Our Business Could Be Harmed By A Lack Of Availability Of Popular Music or Movies

Our business is affected by the release of "hit" music and movie titles, which can create cyclical trends in sales distinctive to the music and movie industries. It is not possible to determine the timing of these cycles or the future availability of hit titles.  Entertainment product sales depend to some extent upon the availability of hit products.  If there are no hit products, entertainment companies may be unprofitable even though the general economy is doing well.  We cannot determine in advance the timing of these cycles or the future availability of hit products. Hit products are important because they generate customer traffic in stores.  We do not control the content of the products we sell and are dependent upon the major music and movie producers to continue to produce hit products.  To the extent that new hits are not available, or not available at prices attractive to consumers, our sales may be adversely affected.

### Our Sales May Suffer If We Do Not Accurately Predict Which New Product Or Distribution Technologies Will Be Adopted By Consumers

The emergence of new technologies may attract consumers from one technology to another and reduce sales and profit margins of existing technologies.  For example, the shift from VCR to DVD reduced the demand for VCR cassettes.  New technologies are also increasing the ways products can be offered to the public.  A wide selection of music and movie products can now be offered to consumers by the Internet, cable companies, direct broadcast satellite companies, telephone companies, and other telecommunications companies.  In particular, Internet and cable technologies (including peer-to-peer file sharing technology) coupled with high-quality digital recording technologies allows direct downloading of recorded music and movies by consumers via the Internet.  Technological advances have resulted in significant changes in existing distribution channels for pre-recorded music and movies.  If we are unable to predict or participate in new product or distribution technologies that consumers accept widely, our business, financial condition and results of operations may suffer.

### Increased Competition From Existing Retailers, Internet Music and Movie Distribution Sites And Competing Home Entertainment Options May Adversely Affect Our Results

The retail entertainment, music and movie business is highly competitive.  We compete with a wide variety of music and movie retailers, including regional and national mall-based music and movie chains, international

- 28 -

chains, deep-discount retailers, mass merchandisers, consumer electronics outlets, mail order, record clubs and independent operators, some of which have greater financial and other resources than we do.  We also expect continued growth in competing home entertainment options, including the Internet and larger numbers of television and music channels offered by cable companies.  This increased competition may reduce sales at our stores, reduce our gross margins, increase our operating expenses and decrease our profit margins in specific markets.  If these competing home entertainment options continue to grow, retail stores may cease being a primary channel for distribution of recorded music and movie, which could harm our ability to compete within the music and movie retail business.

> *A Decline In Current Levels Of Consumer Spending Could Reduce Sales*

Our business is directly affected by the level of consumer spending.  One of the primary factors that affect consumer spending is the general state of the local economies in which we operate.  Lower levels of consumer spending in regions in which we have significant operations could have a negative impact on our business, financial condition or results of operations.

> *A Change In One Or More Of Our Vendors' Policies Or Our Relationship With Those Vendors Could Adversely Affect Our Operations*

The majority of our purchases come from twelve vendors.  Standard for the music and movie industries, we do not maintain long-term contracts with our suppliers but instead make purchases through purchase orders.  If we fail to maintain customary trade terms or enjoy positive vendor relations, it would have an adverse effect on our results of operations and financial condition.

> *Loss Of Key Personnel Could Harm Our Business*

We believe that our future prospects depend, to a significant extent, on the services of our executive officers, as well as our ability to attract and retain additional key personnel with the skills and expertise necessary to manage our business.  The loss or unavailability of the services of certain of our executive officers and other key management personnel could harm our business, financial condition and results of operations.

> *Our 2003 Financial Statement Audit Report Includes an Explanatory Paragraph on Going Concern*

Our independent auditor's report on the consolidated financial statements as of and for the year ended July 31, 2003 includes an explanatory paragraph which refers to a substantial doubt as to our ability to continue as a going concern based upon factors similar to those described in Note 1 to our unaudited 2003 consolidated financial statements.  Even if the Restructuring is completed, there can be no assurances that our independent auditor will remove the explanatory paragraph about going concern from their audit report.

## THE RESTRUCTURING AND THE LOCK-UP AGREEMENT

**Background**

We are currently in a precarious financial situation. We have not made required interest payments on the Notes since November 2002. In the Lock-up Agreement, the holders of approximately 91% of the Notes agreed not to take action based on these defaults (or any other defaults) so long as the Lock-Up Agreement is in effect. If the Lock-Up Agreement were to terminate, as a result of such payment defaults and other potential defaults, the holders of the Notes could accelerate the maturity thereof. Such defaults and such acceleration could lead to defaults under and acceleration of other indebtedness as well. Our financial position has been discussed in filings made with the SEC and is generally known to our suppliers and creditors. We believe it is imperative to consummate the Restructuring, improve our capital structure sheet and reestablish normal relations with all of our creditors and suppliers as swiftly as possible. There is a substantial likelihood that we will be forced to initiate bankruptcy proceedings without a prepackaged plan and without agreement from significant creditor groups such as that exemplified by the Lock-Up Agreement if the Restructuring is not consummated and we are unable to complete an M&A Transaction. In such event, we would likely remain under bankruptcy court jurisdiction for an extended period of time. The result, we believe, could be a material erosion of our market position and ability to conduct our business, with consequent detrimental effect on our abilities to satisfy our indebtedness and other liabilities.

*Description of Current Credit Facilities*

In addition to the Notes issued pursuant to the Old Indenture, we maintain two senior credit facilities secured by substantially all of our assets (collectively, the "Senior Credit Facilities"). The most senior of our credit facilities is agented by the CIT Group Business Credit, Inc. ("CIT") which is among the lender parties to a certain loan and security agreement dated October 9, 2002 (as amended, the "CIT Credit Agreement"). The CIT Credit Agreement includes a revolving credit facility under which we borrow funds for operating purposes. Although the maximum available credit under the CIT revolving line is set at $100 million, the actual amount available to us is determined by the value of our borrowing base as defined under the CIT Credit Agreement. The borrowing base is a valuation based principally on the net orderly liquidation value of our inventory as determined by a third party valuation firm. The amount outstanding under the CIT revolving line of credit varies and currently is approximately $58 million. Our cash is swept to an account controlled by CIT; thus, we rely upon continuous availability of funds from the revolving line of credit for our operations. In addition to the revolving loans under the CIT Credit Agreement, the facility includes a real estate line of credit under which we have borrowed $7.5 million, the maximum amount available under that portion of the facility.

The CIT Credit Agreement contains a number of covenants and restrictions on our operations. When we elected not to make the interest payment on the Notes, the resulting default under the Old Indenture created a cross-default under the CIT Credit Agreement. As part of a forbearance related to that cross default, CIT imposed certain benchmarks concerning the Restructuring of our obligations under the Old Indenture. At present, we are operating under a forbearance with CIT that lasts through February 28, 2004. If we do not complete the Restructuring or an M&A Transaction by that date or if there are any other defaults under the CIT Credit Agreement, we will have to renegotiate our forbearance with CIT or face being in default under the CIT Credit Agreement. If we do not satisfy the terms of the forbearance or do not obtain an extension of the forbearance, CIT could enforce remedies including cessation of our access to the revolving credit line necessary to operate our business.

In addition to the CIT Credit Agreement, we maintain a $25 million secured term facility agented by JP Morgan Chase Bank ("JPMC") and the lenders party to a credit agreement dated October 9, 2002 (the "JPMC Credit Agreement"). The liens securing the term loan under the JPMC Credit Agreement are junior to the obligations under the CIT Credit Agreement. CIT and JPMC have entered an intercreditor agreement dated October 9, 2002 (the "Intercreditor Agreement"), which governs certain key rights among the lenders and us. The

Intercreditor Agreement provides that to the extent that CIT has granted certain waivers or consents under the CIT Credit Agreement, JPMC is deemed to have given similar waivers and consents. Accordingly, we believe that the forbearance applicable to the CIT Credit Agreement also applies to the JPMC Credit Agreement. Were the forbearance provided by CIT to expire (or if the provisions of the Intercreditor Agreement were held not to apply), it is possible that JPMC might take certain actions under the JPMC Credit Agreement. However, its ability to exercise remedies is controlled by a certain Intercreditor Agreement. Specifically, the Intercreditor Agreement restricts JPMC's ability to take actions concerning the collateral while the CIT Credit Agreement remains in place.

In the event that we complete the Restructuring through the Exchange Offer, we intend to keep the two Senior Credit Facilities in place unless and until we are able to refinance one or both of them. We reserve the right to seek refinancing of either or both of the two Senior Credit Facilities in the event of an Exchange Offer, but can give no assurance that we will be able to do so. In the event that we pursue the Prepackaged Plan, we will need to obtain either the consent of CIT for use of our cash collateral or debtor-in-possession financing during the course of the Reorganization Case. In order to emerge from the Reorganization Case, we would either need to refinance the Senior Credit Facilities or reinstate them. We believe that we will be able to reinstate these secured facilities under the Bankruptcy Code. However, we believe that we will need the continuing cooperation of CIT and the lenders under the CIT Credit Agreement in order to effectuate the transition. In the event that such cooperation is not forthcoming, or if we are unable to reinstate or refinance the Senior Credit Facilities, it could substantially delay and impair our ability to emerge from the Reorganization Case.

**Lock-Up Agreement**

*The Lock-Up Agreement is included as Exhibit A to this offering memorandum. The following summary of the terms of the Lock-Up Agreement is qualified in its entirety by the actual terms of the Lock-Up Agreement.*

We have entered into a Lock-Up Agreement with the Consenting Holders, who hold approximately 91% of the outstanding Notes, the Current Shareholder, which is the current holder of the Class B Common Stock, and the Solomon Interests. The Lock-Up Agreement sets forth the terms and conditions of, and commitments of the parties with respect to, the Restructuring, and it provides that the parties will support and pursue the Exchange Offer and, if necessary, the Prepackaged Plan.

*Agreements to Complete the Restructuring*

Each party to the Lock-Up Agreement agreed to complete the Restructuring, whether completed through the Exchange Restructuring or the Prepackaged Plan. We agreed to solicit votes from the holders of the Notes and the Class B Common Stock regarding the Exchange Offer, the Solicited Consents, and the Prepackaged Plan no later than November 17, 2003. The Consenting Holders have agreed to tender their notes in the Exchange Offer, and both the Consenting Holders and the Solomon Interests agreed to vote in favor of the Prepackaged Plan, all within 10 business days after they receive this solicitation.

The Lock-Up Agreement provides that the holders of Notes who were original signatories to the agreement may deliver a notice to us at any time on or after January 2, 2004, directing us to proceed either with the Exchange Offer or the Prepackaged Plan, and we have agreed to effect the Closing of the Exchange Offer or the initiation of the Prepackaged Plan within five business days of receiving that notice. If we do not receive a notice from the holders of Notes by February 2, 2004, we are obligated by February 9, 2004 to either (i) effect the Closing of the Exchange Offer if the Minimum Tender Condition has been met (or reduced), or (ii) initiate the Prepackaged Plan if the Minimum Tender Condition has not been met. In addition, if the Minimum Tender Condition is satisfied and any event occurs that would be likely to cause our earnings before interest, taxes, depreciation and amortization ("EBITDA") for the five-month period from August 1, 2003 to December 31, 2003 to be lower than our projected EBITDA for that period by more than $2,000,000, we have agreed to effect the Closing of the Exchange Offer within five business days of being instructed to do so by the holders of the Notes.

In addition, the parties to the Lock-Up Agreement have agreed to the following:

- 31 -

- We agreed not to initiate any exchange offer for the Notes or to seek to restructure the Notes other than through the Restructuring.

- Each of the parties to the Lock-Up Agreement agreed not to withdraw or change its vote in favor of the Prepackaged Plan, to take any actions to delay or prevent the Prepackaged Plan, or to support any other plan or reorganization under the Bankruptcy Code.  The Consenting Holders also agreed not to support any action to appoint a trustee, conservator, receiver or examiner for the Company, or to dismiss any case commenced by us under Chapter 11 of the Bankruptcy Code, or to convert any such Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code.

- The parties agreed that they will not require us to be a reporting company under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), but that we shall register the New Notes under the Exchange Act within 30 days after their issuance, unless directed otherwise by parties to the Lock-Up Agreement holding in the aggregate at least 85% of the face amount of the New Notes.

- Each Consenting Holder agreed not to exercise such Consenting Holder's rights and remedies arising from any event of default under the Old Indenture, including rights pursuant to Section 6.02 of the Old Indenture to declare the principal of and interest on the Notes to be immediately due and payable, and to direct the Old Indenture Trustee rescind and annul any such declaration.

- Each Consenting Holder and the Current Shareholder agreed not to transfer any Notes or shares of Class B Common Stock held by it until the closing of the Restructuring, unless the transferee agrees to be bound by the Lock-Up Agreement.

*M&A Transaction*

The Lock-Up Agreement permits us to negotiate an acquisition of the stock of the Company or all or substantially all of our assets and liabilities (an "M&A Transaction"), if such acquisition is mutually agreeable to the Current Shareholder and Consenting Holders holding more than 59% of the face amount of the Notes (the "Requisite Holders").  The parties have agreed to cooperate in good faith to consummate the M&A Transaction. The Parties further agreed (i) that the Restructuring must occur prior to or simultaneously with the closing of an M&A Transaction, and (ii) if an M&A Transaction is closed before or simultaneously with the Restructuring, the division of net proceeds from the M&A Transaction will be made economically consistent with the provisions of the Restructuring, and the Consenting Holders have agreed to tender and deliver their Notes in exchange therefore (in lieu of New Notes and New Common Stock).  By consenting to the Exchange Restructuring, you will additionally be consenting to tender your Notes upon the closing of any M&A Transaction in exchange for consideration that is economically consistent with the consideration you would have received had the Restructuring taken place immediately before the M&A Transaction.

We have additionally agreed to give to the Consenting Holders access to board meetings and any information provided to our board.

*Termination of the Lock-Up Agreement*

The Lock-Up Agreement may be terminated under certain circumstances, including the following:

- Upon a material breach of the Lock-Up that is not cured within five business days after notice of the breach;

- Thirty days following the filing of an involuntary bankruptcy or insolvency case against us, unless we file the Prepackaged Plan in such involuntary bankruptcy case;

- If the Bankruptcy Court rules that our disclosure statement does not comply with applicable requirements, and we fail to correct any deficiencies as provided in the Lock-Up Agreement.

- If the Bankruptcy Court's confirmation of the Prepackaged Plan is reversed on appeal or vacated on grounds that would require a change in treatment of the parties that materially differs from the treatment described in the Lock-Up Agreement.

- If, after confirmation of the Prepackaged Plan, it does not become effective as provided in the Prepackaged Plan.

- In addition, the holders of 34% or more of the Notes may terminate the Lock-Up Agreement in the event that our EBITDA for the five-month period from August 1, 2003 through December 31, 2003 is lower than our projected EBITDA for that period by more than $5,000,000.

*Amendments*

The terms of the Lock-Up Agreement and the Restructuring may be amended only with our written consent and the consent of the Current Shareholder and:

- Holders of at least 85% of the face amount of the Notes if the amendment would alter any material economic terms of the Restructuring, the Minimum Tender Condition, our obligations to register the New Notes and provide information to holders of Notes, or the timing of our obligations to effect the Closing of the Exchange Offer or the initiation of the Prepackaged Plan; or

- Holders of at least 59% of the face amount of the Notes for any other amendments.

**Related Agreements**

*The following sets forth brief descriptions of certain agreements entered into or to be entered into in connection with the Lock-Up Agreement. The summaries of provisions of the Escrow Agreement, Employment Agreement, Separation Agreement and Governance Agreement are qualified in their entireties by reference to the full and complete terms contained in the such agreements, which are attached hereto as Exhibits B, D, E and F.*

*Escrow Agreement*

Immediately after consummation of the Restructuring, whether through the Exchange Restructuring or the Prepackaged Plan, the Current Shareholder will hold 1,500,000 shares of the Company's New Common Stock, or 15% of its outstanding equity. One-million (1,000,000) of those shares will be placed in escrow pursuant to the terms of the Escrow Agreement to be entered into between the Current Shareholder and the Company at the Closing of the Exchange Restructuring or upon the Effective Time of the Prepackaged Plan. The Escrow Agreement will provide that 25% of the escrowed shares will be released to the holder on each of the four anniversaries following the consummation of the Restructuring. All of the escrowed shares will be immediately released from the escrow upon the death or disability of Mr. Russell Solomon, or upon a change of control of the Company. Any shares held in escrow will be subject to repurchase by us at a nominal purchase price upon the occurrence of certain triggering events provided in the Employment Agreement.

*Employment Agreement*

Simultaneously with the execution of the Lock-Up Agreement, we entered into an employment agreement (the "Employment Agreement") with Mr. Russell Solomon. Pursuant to the terms of the Employment Agreement, Mr. Russell Solomon will act as our Chairman Emeritus for a period of five years. The Employment Agreement will terminate in the event that the Lock-Up Agreement is terminated for any reason. The Employment Agreement includes the following terms:

- 33 -

- Mr. Russell Solomon will be paid a base salary of $400,000 per year, plus an additional payment of $232,000 per year that will be paid in the form of a note with substantially similar terms as the New Notes.

- If Mr. Russell Solomon's employment with the Company is terminated for "cause" or as a result of Mr. Russell Solomon's disability, or Mr. Russell Solomon voluntarily resigns without "good reason" (in each case as defined in the Employment Agreement), we will pay any accrued compensation owed to Mr. Russell Solomon, but all of our other obligations will terminate (provided, in the case of a termination resulting from Mr. Russell Solomon's disability, that we continue to provide Mr. Russell Solomon with disability insurance covering all future amounts potentially payable under the Employment Agreement).

- If Mr. Russell Solomon's employment with the Company is terminated without cause or as a result of Mr. Russell Solomon's death, or Mr. Russell Solomon voluntarily resigns with good reason, we will continue to pay to Mr. Russell Solomon (or his estate) the compensation due under the Employment Agreement as and when due.

*Separation Agreement*

Simultaneously with the execution of the Lock-Up Agreement, we entered into a separation agreement (the "Separation Agreement") with Mr. Michael Solomon, pursuant to which Mr. Michael Solomon resigned as President of the Company. The Separation Agreement provides that we will pay Mr. Michael Solomon a severance payment of $540,150 over eighteen months, or, in the event an M&A Transaction has occurred that generates sufficient proceeds to retire the New Notes, any unpaid severance amounts will be paid immediately in full. The Separation Agreement will terminate in the event that the Lock-Up Agreement is terminated for any reason. Mr. Michael Solomon's existing retention agreement was terminated upon the execution of the Separation Agreement.

*Governance Agreement*

Pursuant to the Lock-Up Agreement, the Current Shareholder and the Consenting Holders have agreed to enter into a governance agreement (the "Governance Agreement") concerning the governance of the Company following the Restructuring, whether accomplished through the Exchange Restructuring or the Prepackaged Plan. The Board of Directors following the Restructuring will initially consist of five directors. The Governance Agreement will provide that (a) one director will be appointed by the Current Shareholder so long as the Current Shareholder holds no less than 7.5% of the fully diluted shares of New Common Stock (for this purpose, treating escrowed shares as being held by the Current Shareholder) and persons or entities affiliated with the family of Mr. Russell Solomon continue to hold all of the shares of the Current Shareholder, and (b) the other shareholders will be entitled to designate the remaining four directors. The Governance Agreement will also provide that parties entitled to designate any director will also have the right to remove such director and designate his or her replacement.

## THE EXCHANGE RESTRUCTURING

### Overview

The Exchange Offer, the Old Indenture Amendments and the Charter Amendments are components of the Exchange Restructuring, our plan to restructure our balance sheet by means of a series of transactions not involving a filing under the Bankruptcy Code, referred to collectively herein as the Exchange Restructuring.

*Each part of the Exchange Restructuring is dependent upon receiving approval to complete each other part of the Exchange Restructuring, and failure to obtain consent to either portion of the Exchange Restructuring will result in the failure of the Exchange Restructuring and each part thereof.*

If the Exchange Restructuring is consummated:

- tendering holders of Notes will own, in the aggregate, $30 million in aggregate principal amount of New Notes immediately following the Closing;

- tendering holders of Notes will own, in the aggregate, 85% of New Common Stock outstanding, on a fully diluted basis, immediately following the Closing; and

- holders of Class B Common Stock will own, in the aggregate, 15% of New Common Stock outstanding immediately following the Closing, with two-thirds of such New Common Stock held in escrow and subject to release or forfeiture on the conditions described herein.

The Exchange Restructuring is conditioned upon, among other things, the Minimum Tender Condition, the Solicited Consents having been received and the Charter Amendments having been approved. However, as described in more detail herein, the Minimum Tender Condition may be reduced to less than 100%. Assuming the Exchange Restructuring is approved, only holders of Notes who have validly tendered and not withdrawn their Notes prior to the Expiration Date will be entitled to receive New Notes or shares of New Common Stock.

### Recommendations With Respect To The Exchange Restructuring

Our Board of Directors has approved the Exchange Restructuring and the transactions contemplated thereby, and recommends that holders of Notes and Class B Common Stock approve and participate in the Exchange Restructuring.

### Exchange Offer

We are offering to holders of Notes who tender their Notes, upon the terms and subject to the conditions set forth in this offering memorandum and in the accompanying Letter of Transmittal, to issue in exchange for all of the outstanding principal amount of Notes tendered:

- $30 million in aggregate principal amount of New Notes, and

- 8,500,000 shares of our New Common Stock.

Holders of Notes who have tendered their Notes in the Exchange Restructuring and who have not withdrawn such Notes prior to the Expiration Date will also be deemed to have consented to the Old Indenture Amendments and voted to accept the Prepackaged Plan.

- 35 -

**The New Notes and Terms of the New Indenture**

For a summary description of the terms of the New Notes and the New Indenture, and a comparison of the material differences between the Notes and the New Notes, see "The New Notes and the New Indenture."

**The Charter Amendments**

Concurrently with the Exchange Offer, we are soliciting approvals of the Charter Amendments from the holders of our Class B Common Stock (all of which is presently held by the Current Shareholder), which will (i) amend our Articles of Incorporation as described herein to, among other things, cancel and eliminate our Class A Common Stock, no par value, of which no shares are presently outstanding, (ii) redesignate the Class B Common Stock as the New Common Stock (the "New Common Stock"), (iii) amend certain terms of the New Common Stock, (iv) approve a 1,500-to-1 stock split in the New Common Stock and authorize the issuance of up to 100,000,000 shares of New Common Stock, and (v) increase the number of members of our board of directors from four to five.  In addition, the Charter Amendments will delete the existing restrictions on ownership of our Class A Common Stock by persons other than Solomon family members, and will delete the requirement that holders of our capital stock first offer their shares to other holders before selling or otherwise disposing of their shares to a third party.

Under California law, the Charter Amendments must be approved by holders of record of a majority of the outstanding shares of our common stock.

For a description of the rights and privileges of the New Common Stock following adoption of the Charter Amendments, see "Description of Our Capital Stock."

**Proposed Amendments To The Old Indenture**

*The following sets forth a description of the Old Indenture Amendments for which consents are being sought in connection with the Exchange Offer.  Capitalized terms appearing below in the description of the Old Indenture Amendments have the meanings assigned to such terms in the Old Indenture.*

The primary reason we are seeking consents to the Old Indenture Amendments is to eliminate certain protective covenants contained in the Old Indenture if we receive less than 100% of the Notes tendered in the Exchange Offer and we (with the consent of the Current Shareholder and the holders of at least 85% of the Notes) decide to reduce the Minimum Tender Condition.  The Old Indenture Amendments will eliminate or modify certain restrictive covenants and other provisions contained in the Old Indentures so that any non-tendered Notes do not restrict our ability to effect the Exchange Offer or our future financial and operating flexibility.

A holder validly tendering Notes will, by tendering such Notes, be consenting to the Old Indenture Amendments, which will apply only to Notes that are not tendered in the Exchange Offer.  The Old Indenture Amendments are being presented as a single, unified proposal with respect to the Old Indenture.  If Notes representing a majority of the outstanding aggregate principal amount of Notes are tendered for exchange, the Old Indenture Amendments with respect to the Old Indenture will become operative upon the completion of the Exchange Offer, at which time we and the Old Indenture Trustee shall execute a supplemental indenture reflecting the Old Indenture Amendments (the "Supplemental Indenture").  If 100% of the Notes are tendered pursuant to the Exchange Offer and the Exchange Restructuring is effected, the debt evidenced by the Notes will be extinguished and the Old Indenture will be terminated.

Once effective, the Old Indenture Amendments would eliminate the following covenants and sections from the Old Indenture and, as a result, the restrictions and limitations set forth in such covenants will not apply to us:

- The covenant entitled "Provision of Financial Information" (Section 4.10 of the Old Indenture). Such elimination would abolish our obligation to deliver certain information to the Old Indenture Trustee and the remaining holders of Notes.

- The covenant entitled "Limitation on Indebtedness" (Section 4.03 of the Old Indenture). Such elimination would permit us to incur substantial amounts of additional Indebtedness without being required to meet any ratio of Consolidated EBITDA to our Interest Expense Charges or any other restriction with respect to the incurrence of Indebtedness specified in the Old Indenture.

- The covenant entitled "Limitation on Restricted Payments" (Section 4.05 of the Old Indenture). Such elimination would permit us to pay dividends and make other Restricted Payments, regardless of our default status, our ability to incur additional Indebtedness or the aggregate amount of the Restricted Payment.

- The covenant entitled "Transactions with Affiliates" (Section 4.09 of the Old Indenture). Such elimination would permit us or any of our Restricted Subsidiaries to conduct business with or enter into any transaction or series of related transactions with any Affiliate (a) even if the terms of such transaction are less favorable to us or any of our Subsidiaries, and (b) without having to obtain, with respect to such transaction, (i) approval of our non-interested Directors, or (ii) a fairness opinion from an independent financial advisor.

- The covenant entitled "Limitation on Liens" (Section 4.07 of the Old Indenture). Such elimination would permit us to create or otherwise permit or suffer to exist or become effective any Liens of any kind on any of our properties or assets, without providing similar security for the Notes.

- The covenant entitled "Limitation on Dividend and other Payment Restrictions affecting Subsidiaries" (Section 4.08 of the Old Indenture). Such elimination would permit us or any of our Restricted Subsidiaries to create or otherwise suffer to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to (a) pay dividends or make any other distributions on or in respect of our Equity Interests, (b) make loans or advances or pay or guarantee any Indebtedness or other obligations to the Company, or (c) transfer any property or assets to the Company.

- Clause (a)(ii) of the section entitled "Mergers" (Section 8.01 of the Old Indenture). Such elimination would permit us or any of our subsidiaries to consolidate or merge with or into any Person or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all if our assets without regard to the status, the Consolidated Net Worth or ability to incur Indebtedness of the surviving corporation.

- The covenant entitled "Maintenance of Office or Agency" (Section 4.02 of the Old Indenture). Such elimination would remove our obligation to give written notice to the Old Indenture Trustee of the offices and agencies that we are required to maintain for the presentment or surrender of Notes for registration of transfer, exchange of payment.

- The covenant entitled "Limitation on Senior Subordinated Indebtedness" (Section 4.04 of the Old Indenture). Such elimination would permit us to incur indebtedness that ranks senior in right of payment to the Notes.

- The covenant entitled "Future Guarantees" (Section 4.11 of the Old Indenture). Such elimination would remove our obligation to cause our Restricted Subsidiaries to guarantee our obligations under the Notes and the Old Indenture when either (i) in excess of 10.0% of our consolidated net assets are owned by our Restricted Subsidiaries (other than Foreign Subsidiaries), or (ii) in excess of 10.0% of our consolidated EBITDA is derived from our Restricted Subsidiaries (other than Foreign Subsidiaries).

- The covenant entitled "Designation of Unrestricted Subsidiaries" (Section 4.12 of the Old Indenture). Such elimination would remove the provisions of the Old Indenture relating to our designation of certain subsidiaries as Unrestricted Subsidiaries.

- The covenant entitled "Notice of Defaults" (Section 4.14 of the Old Indenture). Such elimination would remove our obligation to deliver certificates reporting events of default and notices of acceleration of our other material indebtedness.

- The covenant entitled "Corporate Existence" (Section 4.16 of the Old Indenture). Such elimination would permit termination of our rights and franchises or those of any of our subsidiaries.

The Old Indenture Amendments would also delete those definitions or portions of definitions from the Old Indenture when references to such definitions would be eliminated as a result of the foregoing.

**Board of Directors Upon Completion Of The Exchange Restructuring**

Our Board of Directors will initially consist of five directors upon completion of the Exchange Restructuring. In accordance with the Governance Agreement, one director will be designated by the Current Shareholder, so long as it holds no less than 7.5% of the fully diluted shares of New Common Stock (for this purpose, treating escrowed shares as being retained). The other shareholders will be entitled to designate the remaining directors. Each party entitled to designate any director will also have the right to remove such director and designate his or her replacement.

**Capital Stock Following The Exchange Restructuring**

Following the Exchange Restructuring, 15% of the New Common Stock will be held by the Current Shareholder, and 85% of the New Common Stock will be held by the holders of Notes who tender their Notes pursuant to the Exchange Offer. See "Capitalization Prior to and Following the Restructuring." For a description of the rights and privileges of the New Common Stock following the Exchange Restructuring, see "Description of Our Capital Stock."

**Tendering, Consenting And Voting**

A holder of Notes electing to tender their Notes in the Exchange Offer will be deemed to consent to the Solicited Consents and to vote to accept the Prepackaged Plan. A holder wishing to tender their Notes should follow the procedures described in "Tendering, Consenting and Voting Procedures—Noteholder Procedures for Tendering Notes and Delivering Consents to the Solicited Consents and Prepackaged Plan."

A holder of Class B Common Stock wishing to consent to the Restructuring should follow the procedures described in "Tendering, Consenting and Voting Procedures—Shareholder Procedures for Consenting to Charter Amendments and Prepackaged Plan."

**Acceptance Of Notes For Exchange; Acceptances Of Letters of Transmittal**

Upon the terms and subject to the conditions of the Exchange Offer, the appropriate New Notes and shares of New Common Stock will be issued in exchange for Notes validly tendered and not withdrawn, promptly after the later of (i) the Effective Date or (ii) the satisfaction or waiver of the conditions specified herein. We will not accept Notes for exchange subsequent to the Expiration Date. We reserve the right to waive any condition to the Exchange Offer and to accept tenders and to issue New Notes and New Common Stock in exchange for Notes promptly after the satisfaction or waiver of any such conditions. New Notes and shares of New Common Stock will be issued in

exchange for Notes only after timely receipt by the Exchange Agent of Notes, a properly completed and duly executed Letter of Transmittal (or facsimile thereof) and Master Ballot and all other documents required thereby.

**Conditions To The Exchange Restructuring**

The Minimum Tender Condition is a condition to the Exchange Offer, although that condition may be reduced by us with the consent of the Current Shareholder and the holders of at least 85% of the Notes.

In addition, we will not be required to consummate the Exchange Offer if the Lock-Up Agreement terminates.  For a summary description of the termination provisions of the Lock-Up Agreement, see "The Restructuring and the Lock-Up Agreement – Termination of the Lock-Up Agreement."

- 39 -

## THE PREPACKAGED PLAN

**None of the Company, the Current Shareholder or its subsidiaries have commenced a case under Chapter 11 of the Bankruptcy Code at this time.  However, whether or not  the Exchange Restructuring could be consummated with the required acceptances by the holders of Notes and Class B Common Stock, we (and the Current Shareholder),  pursuant to the terms of the Lock-Up Agreement, may commence Chapter 11 cases in order to restructure our financial affairs.  This offering memorandum solicits advance acceptance of the Prepackaged Plan and contains information relevant to a decision to accept or reject the Prepackaged Plan.**

**Although we have made every effort to ensure that statements and information concerning the Debtors (as defined in the Prepackaged Plan) set forth in this memorandum are complete and accurate, such statements and information have not been approved by a Bankruptcy Court as containing adequate information or otherwise satisfying the informational requirements for soliciting votes to accept or reject the Prepackaged Plan.  Should we receive votes to accept the Prepackaged Plan in sufficient numbers to seek its confirmation, we intend to seek such approval from the Bankruptcy Court.**

**Neither the SEC, nor any state securities commission, has approved or disapproved this memorandum as it pertains to the Prepackaged Plan.  Pursuant to the Prepackaged Plan, any securities of the Debtors issued to any party under, pursuant to or in effecting the Prepackaged Plan, and the offering and issuance thereof by any party, including without limitation the Company, are exempt from Section 5 of the Securities Act and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and otherwise enjoy all exemptions available for distributions of securities under a plan in accordance with all applicable law, including without limitation Section 1145 of the Bankruptcy Code.**

**Nothing in the Prepackaged Plan or this offering memorandum is or shall be deemed a waiver of any rights or defenses of the Debtors under the Bankruptcy Code, all of which are reserved and preserved.**

### Statement To Creditors

Please read this offering memorandum and the Prepackaged Plan completely and carefully.  Although we believe that the Exchange Restructuring is the most viable and least costly alternative for recapitalizing the Company, in the event the Exchange Restructuring cannot be consummated or we are directed to do so pursuant to the Lock-Up Agreement, we are soliciting acceptances to the Prepackaged Plan pursuant to Section 1126(b) of the Bankruptcy Code from holders of Claims and Interests impaired under the Prepackaged Plan and entitled to vote thereon.  We believe that soliciting acceptances of the Prepackaged Plan is important in order to allow the Debtors the ability to effect a recapitalization if the Exchange Restructuring cannot be consummated or if we are instructed pursuant to the Lock-Up Agreement to effectuate the Restructuring through the Prepackaged Plan.

The form of the Prepackaged Plan is attached to this offering memorandum as Exhibit C.  The following summaries of material provisions of the Prepackaged Plan do not purport to be complete and are subject, and are qualified in their entireties by reference, to all the provisions of the Prepackaged Plan, including the definitions therein of certain terms used below.  Terms defined in the Prepackaged Plan and not otherwise defined herein will have the meanings ascribed thereto in the Prepackaged Plan and such definitions are incorporated herein by reference.

If the conditions to the Exchange Restructuring are not satisfied and the Prepackaged Restructuring is not consummated, we will consider making a bankruptcy filing under Chapter 11 of the Bankruptcy Code.  However, we may in our discretion choose to pursue other alternatives if either the Exchange Restructuring or the Prepackaged Plan is not consummated.

- 40 -

**Overview**

The Prepackaged Plan is the primary component of a plan to restructure our balance sheet by means of a series of transactions involving a filing under Chapter 11 of the Bankruptcy Code. The Prepackaged Plan is intended to create substantially the same economic effects as would have been provided if the Restructuring had taken place through the Exchange Restructuring, and relies on many of the same substantive documents, including the Escrow Agreement and the Governance Agreement. The Prepackaged Plan also permits the consummation of an M&A Transaction that will provide consideration that is economically consistent with the consideration that holders of Claims or Interests would have received had the Restructuring taken place immediately before the M&A Transaction. Terms used but not defined in this Section will have the meanings given them in the Prepackaged Plan.

Chapter 11 is the business reorganization chapter of the Bankruptcy Code. The primary purpose of a Chapter 11 reorganization case is to formulate and confirm a plan of reorganization as the vehicle for satisfying the holders of creditor claims against and equity interests in a debtor.

In connection with implementation of the Prepackaged Plan, we presently intend that one or more of our affiliates, including our parent Tower Records, Incorporated and our wholly owned direct and indirect domestic subsidiaries, may also commence Chapter 11 cases and be jointly reorganized under the Prepackaged Plan. The Prepackaged Plan does not impair the holders of claims against or interests in any of the Debtors other than the Company.

The Prepackaged Plan is a plan of reorganization relating to the Debtors that provides comparable treatment to comparably situated creditors and equity holders of the Debtors. The Prepackaged Plan provides specified distributions to the various classes of holders of claims against and interests in the Debtors. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Prepackaged Plan. See "—Requirements for Prepackaged Plan Confirmation." Many of these tests are designed to protect the interests of holders of Claims or Interests who do not vote to accept the Prepackaged Plan but who will be bound by the provisions of the Prepackaged Plan if it is confirmed by the Bankruptcy Court.

**Solicitation Of Votes On The Prepackaged Plan**

We hereby solicit from holders of Claims and Interests entitled to vote thereon votes to accept or reject the Prepackaged Plan under Chapter 11 of the Bankruptcy Code.

If, by the Expiration Date, holders of at least two-thirds in amount and more than one-half in number of Claims voting in each impaired class of Claims have voted to accept the Prepackaged Plan, and if holders of at least two-thirds in amount of Interests voting in each impaired class of Interests have voted to accept the Prepackaged Plan, but we have not received a sufficient number of acceptances for the Exchange Restructuring to be consummated, we may extend the time during which holders of such Claims and Interests may vote or tender their Claims and Interests for one or more additional periods. If at the end of such period or periods, we have not achieved the Minimum Tender Condition (or such lesser percentage as may be agreed by us, the Current Shareholder and the holders of at least 85% of the Notes), we (and the other Debtors) intend to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and to use the acceptances solicited pursuant to this offering memorandum to seek as promptly as practicable confirmation of the Prepackaged Plan under Chapter 11 of the Bankruptcy Code. In addition, as described in "The Restructuring and the Lock-Up Agreement," the holders of the Notes can direct us to file the Prepackaged Plan even if the conditions to the Exchange Offer have been met pursuant to the terms of the Lock-Up Agreement.

Under the Bankruptcy Code, only those who vote to accept or reject the Prepackaged Plan will be counted for purposes of determining acceptance or rejection of the Prepackaged Plan by any impaired class of Claims or Interests. The Prepackaged Plan could therefore be approved by the affirmative vote of significantly less than two-thirds in amount and one-half in number of the Notes, or by holders of Class B Common Stock with the affirmative vote of significantly less than two-thirds in amount outstanding. Note also that under certain circumstances the

Prepackaged Plan may be confirmed, or modified and then confirmed, over the objections of a rejecting class of impaired Claims or Interests.  See "—Confirmation of the Prepackaged Plan Without Acceptance by All Voting Classes."

**IF THE PREPACKAGED PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, EACH HOLDER OF NOTES WOULD RECEIVE SUBSTANTIALLY THE SAME CONSIDERATION OFFERED IN THE EXCHANGE RESTRUCTURING, WHETHER OR NOT SUCH HOLDER ACCEPTED THE PREPACKAGED PLAN.  HOWEVER, THE VALUE OF THAT CONSIDERATION, PARTICULARLY THE NEW COMMON STOCK, COULD BE ADVERSELY AFFECTED BY THE IMPACT OF BANKRUPTCY ON THE DEBTORS' OPERATIONS.  MOREOVER, UPON CONFIRMATION, THE PREPACKAGED PLAN WOULD BE BINDING ON ALL OF THE DEBTORS' CREDITORS AND EQUITY SECURITY HOLDERS REGARDLESS OF WHETHER SUCH CREDITORS OR EQUITY SECURITY HOLDERS VOTED TO ACCEPT THE PREPACKAGED PLAN.**

**Voting On The Prepackaged Plan**

Under Section 1126(b) of the Bankruptcy Code, a holder of a Claim or Interest that has accepted or rejected a plan of reorganization before the commencement of a Chapter 11 case will be deemed to have accepted or rejected the plan for purposes of confirmation of such plan under Chapter 11 of the Bankruptcy Code if the solicitation of such acceptance or rejection is in compliance with any applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such a solicitation, or, in the absence of any such law, rule or regulation, if such acceptance or rejection was solicited after disclosure to such holder of adequate information, of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of Claims and Interests of the relevant class to make an informed judgment about the plan.  We believe that this offering memorandum complies with the requirements of Section 1126(b) for purposes of solicitation of acceptances or rejections of the Prepackaged Plan.  For instructions on how to vote on the Prepackaged Plan, see "Tendering, Consenting and Voting Procedures—Noteholder Procedures for Tendering Notes and Delivering Consents to the Solicited Consents and Prepackaged Plan."

The solicitation of acceptances of the Prepackaged Plan will expire on the Expiration Date for the Exchange Restructuring.  Votes on the Prepackaged Plan may be revoked at any time prior to the earlier of (a) the commencement of a case under the Bankruptcy Code and (b) the Effective Date.  Thereafter, revocation may be effected only with the approval of the Bankruptcy Court.  Any such withdrawal or revocation will not affect any party's obligations under the Lock-Up Agreement.  We (on behalf of ourselves and any other Debtors) reserve the right to amend the terms of the Prepackaged Plan or waive any conditions thereto if and to the extent we determine that such amendments or waivers are necessary or desirable.  The Debtors will give holders of Claims and Interests notice of such amendments or waivers as may be required by applicable law.  We (on behalf of ourselves and any other Debtors) reserve the right to use acceptances of the Prepackaged Plan to confirm any amendment of the Prepackaged Plan so long as the amendment does not materially and adversely affect the rights of the class of Claims or Interests under the Prepackaged Plan whose acceptances are sought to be used.  By voting to accept the Prepackaged Plan, you are consenting to such amendments as may be agreed to or imposed, subject to the conditions set forth in the Lock-Up Agreement.  In addition, we (on behalf of ourselves and any other Debtors) reserve the right to use acceptances of the Prepackaged Plan received in this solicitation to seek confirmation of the Prepackaged Plan under any other circumstances, including the filing of an involuntary petition against any of the Debtors.

**Requirements for Prepackaged Plan Confirmation**

In order for the Prepackaged Plan to be confirmed, and regardless of whether all impaired classes of claims and equity interests vote to accept the Prepackaged Plan, the Bankruptcy Code requires that the Bankruptcy Court determine that the Prepackaged Plan complies with the requirements of Section 1129 of the Bankruptcy Code. Section 1129 of the Bankruptcy Code requires for confirmation, among other things, that:

- 42 -

- except to the extent the Prepackaged Plan meets the "cram down" standards discussed below under "— Confirmation of the Prepackaged Plan of Reorganization Without Acceptance By All Voting Classes," the Prepackaged Plan be accepted by each impaired class of claims and equity interests by the requisite votes of holders of claims or equity interests in such impaired classes;

- the Prepackaged Plan is feasible, which means there is a reasonable probability that we will be able to perform our obligations under the Prepackaged Plan and continue to operate our business without the need for further financial reorganization (see "—The Feasibility Test"); and

- the Prepackaged Plan meets the requirements of Section 1129(a)(7) of the Bankruptcy Code, which requires that, with respect to each impaired class, each holder of a claim or interest in such class either (a) accepts the Prepackaged Plan or (b) receives or retains property of at least as much value pursuant to the Prepackaged Plan as such holder would receive in our liquidation under Chapter 7 of the Bankruptcy Code (see "—The Best Interests Test").

In addition, we must demonstrate in accordance with Section 1129 of the Bankruptcy Code that:

- the Prepackaged Plan is proposed in good faith;

- the Prepackaged Plan complies with the Bankruptcy Code;

- payments for services or costs and expenses in connection with the Reorganization Case, or in connection with the Prepackaged Plan, have been approved by or are subject to the approval of the Bankruptcy Court;

- the individuals to serve as our officers and directors have been disclosed and their appointment or continuance in such office is consistent with the interests of claim and equity interest holders;

- the identity of any insider that will be employed or retained by us is disclosed, as well as any compensation to be paid to such insider;

- all statutory fees have been or will be paid; and

- the Prepackaged Plan provides for the continued maintenance of retiree benefits, if any, at the level mandated by the Bankruptcy Code.

## Confirmation Of The Prepackaged Plan Without Acceptance By All Voting Classes

Section 1129(b) of the Bankruptcy Code provides for confirmation (or "cram-down") of a plan of reorganization even if the plan is not accepted or deemed accepted by all impaired classes of claims or interests, as long as at least one impaired class of claims has voted to accept the plan and certain other requirements are met.

Under cram-down provisions, if a class of secured claims rejects the plan, the plan may still be confirmed if (a) the holders retain the liens securing their claims and receive cash payments totaling at least the amount of their claim, of a value, as of the effective date, of at least the value of the holders' interest in the estate's interest in such property, (b) the property is sold with the holders' liens attaching to the proceeds of the sale, or (c) the holders realize the "indubitable equivalent of such claims." If a class of unsecured claims rejects the plan, the plan may still be confirmed if the plan provides that (m) each holder of a claim included in the rejecting class receives or retains on account of that claim property that has a value, as of the plan's effective date, equal to the allowed amount of that claim, or (n) the holder of any claim or interest that is junior to the claims of the rejecting class will not receive or retain any property at all on account of that junior claim or interest. If a class of equity security interests rejects a plan, the plan may be confirmed if the plan provides that (x) each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the plan's effective date, equal to the

- 43 -

greatest of the allowed amount of any fixed liquidation preference to which that holder is entitled, any fixed redemption price to which that holder is entitled, or the value of that interest, or (y) the holder of any interest that is junior to that holder's interest does not receive any property at all on account of that junior interest.

If any impaired Class fails to accept the Prepackaged Plan by the requisite statutory majorities, we (on behalf of ourselves and any other Debtors) reserve the right (i) to confirm the Prepackaged Plan by a cram-down of such non-accepting Class pursuant to section 1129(b) of the Bankruptcy Code and (ii) to propose any modifications to the Prepackaged Plan and to confirm the Prepackaged Plan as modified, without re-solicitation, to the extent permitted by the Bankruptcy Code.

**Feasibility of the Prepackaged Plan**

The Bankruptcy Code requires that, in order to confirm the Prepackaged Plan, the Bankruptcy Court must find that confirmation of the Prepackaged Plan (or any other plan of reorganization) will not likely be followed by our liquidation or a need for further financial reorganization. For the Prepackaged Plan (or any other plan of reorganization) to meet the "feasibility test," the Bankruptcy Court must find that we will possess the resources and working capital necessary to fund our operations and that we will be able to meet our obligations thereunder.

We have analyzed our ability to meet our obligations under the Prepackaged Plan. As part of our analysis, we have considered our forecasts of our financial performance after completion of our Reorganization Case. We believe, based on our analysis, that the Prepackaged Plan provides a feasible means of reorganization from which there is a reasonable expectation that, following the Confirmation Date, we will possess the resources and working capital necessary to fund our operations and to meet our obligations under the Prepackaged Plan. However, the Bankruptcy Court may not agree with our determination or accept the forecasts or the assumptions underlying our determination.

**The Best Interests Test**

Even if the Prepackaged Plan is accepted by each impaired class of claims and equity interests, Section 1129(a)(7) of the Bankruptcy Code requires that in order to confirm the Prepackaged Plan, the Bankruptcy Court must determine that either: (i) each member of an impaired class of claims or equity interests has accepted the Prepackaged Plan; or (ii) each nonaccepting member of an impaired class of claims or equity interests will receive or retain under the Prepackaged Plan property of a value at least equal to the value of property such member would receive or retain if we were liquidated under Chapter 7 of the Bankruptcy Code.

If all members of an impaired class of claims or equity interests accept the Prepackaged Plan, the best interests test does not apply with respect to that class.

The first step in meeting the best interests test is to determine the dollar amount that would be generated from the liquidation of our assets and properties in a liquidation of our assets under a Chapter 7 bankruptcy case. See "—Liquidation Analysis." The total amount available would be the sum of the proceeds from such a forced disposition of our assets by a Chapter 7 trustee and the cash held by us at the time of the commencement of the Chapter 7 case. The next step is to reduce that total by the amount of any claims secured by such assets (to the extent of the value of the collateral securing such claims), the costs and expenses of the liquidation and such additional administrative expenses and priority claims that may result from the termination of our business and the use of Chapter 7 for the purposes of liquidation. Finally, the present value of the resultant residual balance (taking into account the time necessary to accomplish the liquidation) is allocated to creditors and equity interest holders in the strict order of priority in accordance with Section 726 of the Bankruptcy Code, which requires that no junior claim or interest holder receive any distribution until all senior claim and interest holders are paid in full. The amounts so allocated can then be compared to the value of the property that is proposed to be distributed under the Prepackaged Plan on the date the Prepackaged Plan becomes effective.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors and interest holders in a Chapter 11 case, including: the increased costs and

- 44 -

expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail; and the substantial increases in claims which would be satisfied on a priority basis or on a parity with creditors in a Chapter 11 case, and as illustrated in the Liquidation Analysis, prepared with the assistance of our financial advisors, Jefferies & Company, Inc., we have determined that confirmation of the Prepackaged Plan will provide each creditor and equity interest holder with a recovery that is not less than it would receive pursuant to our liquidation under Chapter 7 of the Bankruptcy Code.  Moreover, we believe that the value of any distributions from the liquidation proceeds to each class of allowed claims and equity interests in a Chapter 7 case would be further impaired as compared to the value of distributions under the Prepackaged Plan because such distributions in Chapter 7 may not occur for a substantial period of time.  For example, the distribution of the proceeds of the liquidation may be significantly delayed by the need to resolve all objections to claims and prepare for distributions.

**Liquidation Analysis**

*We have prepared the liquidation analysis which is attached as Exhibit G (the "Liquidation Analysis") with the assistance of our financial advisors, Jefferies & Company, Inc.  The liquidation analysis estimates the values that may be obtained by claim and equity interest holders upon disposition of assets, pursuant to a liquidation in a bankruptcy case under Chapter 7 of the Bankruptcy Code, as an alternative to continued operation of the business under the Prepackaged Plan, based upon certain historical and projected information that may differ from that applicable were a liquidation to actually take place.  The Liquidation Analysis is based upon the assumptions discussed below and assumes we file for bankruptcy protection.  Because of numerous risks, uncertainties and contingencies beyond our control, there can be no assurances whatsoever that the following recoveries could be realized.  Moreover, because the Liquidation Analysis was prepared for purposes of the Prepackaged Plan and  reflects our estimates of potential recoveries that could be realized in a liquidation, the amounts disclosed are not likely to be meaningful for us as a going concern or indicative of actual returns that may eventually be realized by our stakeholders in a non-liquidation context.*

In the event of a Chapter 7 liquidation, a trustee would be elected by creditors or designated by the United States Trustee to liquidate all of the Debtors' assets and ultimately to distribute the proceeds in accordance with the priority rules of distribution contained in the Bankruptcy Code.  As reflected in the Liquidation Analysis, we believe that the values received for the Debtor's assets would diminish in any liquidation.  A significant portion of the value of the Debtors' businesses resides in the goodwill, market position and competitive information associated with them.  Such value may be attributable to certain intangible property that the Debtors own, but we believe that a substantial portion of such value might not be realized if such intangible assets were in liquidation and could be lost entirely if we ceased operations.  Also, as reflected in the Liquidation Analysis, certain claims would be entitled to priority treatment, thus diminishing the funds available for distribution to General Unsecured Creditors, holders of the Notes and the Current Shareholder.

Moreover, it is possible that litigation would be commenced in connection with preference, fraudulent conveyance, reclamation, equitable subordination or other issues.  In addition to increasing the expense of administering the Debtors' estates, the commencement of any significant litigation in the Reorganization Case could significantly delay any distributions to creditors, including secured and priority creditors, and could create significant uncertainty in the treatment of certain classes (particularly those of lower priority in the distribution scheme).  Debtors liquidating under Chapter 7 are also required to pay statutory fees to the liquidating trustee, which would further increase the costs of a Chapter 7 liquidation.

In light of the likely deterioration in asset values, as well as the delays, litigation expenses and additional negotiation costs which are likely to be involved in a liquidation proceeding, all of which are reflected in the Liquidation Analysis, we believe the amount ultimately distributed by a trustee on account of each Allowed Claim would be considerably less than that expected under the Prepackaged Plan.  Furthermore, we believe that in the event of a Chapter 7 liquidation, there would be insufficient funds to make any distributions to any holder of an Allowed Interest on account of such Allowed Interest and that there would likely be insufficient fund to make any distributions to any holder of an Allowed Claim that is not secured or entitled to priority.

- 45 -

The following table summarizes the results of the Liquidation Analysis. The following summary is qualified in its entirety by the Liquidation Analysis itself.

| | Total Estimated Claims | Estimated Recovery % | |
| | Liquidation Scenario | Plan of Reorganization | Liquidation Analysis |
| --- | --- | --- | --- |
| Senior Line of Credit | 59,090,063 | 100.0% | 100.0% |
| Term Loan | 25,126,389 | 100.0% | 100.0% |
| Other Secured Debt | 7,565,492 | 100.0% | 100.0% |
| Reclamation Claims | 9,000,000 | 100.0% | 93.2% |
| Priority Tax Claims | 2,580,643 | 100.0% | 0.0% |
| Senior Subordinated Notes | 117,734,375 | 38.2% | 0.0% |
| Trade Payables | 98,945,360 | 100.0% | 0.0% |
| Lease Rejection Claims | 30,000,000 | NA | 0.0% |
| Other General Unsecured Claims | 8,991,733 | 100.0% | 0.0% |
| Equity | NA | 15% of the reorganized equity | 0.0% |

## Treatment Of Administrative And Priority Tax Claims Under The Prepackaged Plan

*Treatment Of Administrative Expenses (Unimpaired)*

Administrative Expenses consist of the actual and necessary expenses incurred during the Reorganization Case. Such expenses include costs incurred in the operation of the Debtors' businesses after the commencement of the Reorganization Case, the actual, reasonable fees and expenses of professionals retained by the Debtors, post-petition taxes and certain other obligations, including payment obligations under any post-petition loan agreement, arising after the commencement of the Reorganization Case. The Prepackaged Plan provides that, except as otherwise agreed to by the holder of such a Claim, each holder of an Allowed Administrative Claim then due and owing will be paid the full amount of such Allowed Administrative Claim, in cash, on the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Administrative Claim; provided, however, that Administrative Claims not yet due or that represent obligations incurred by the Debtors in the ordinary course of their business during the Reorganization Case, or assumed by the Debtors during the Reorganization Case, will be paid or performed when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations.

*Retained Professionals (Unimpaired)*

Except as otherwise agreed to by the holder of such a Claim, professionals employed at the expense of the Debtors' estates and entities that may be entitled to an allowance of fees and expenses from the Debtors' estates under sections 503(b)(2) through 503(b)(6) of the Bankruptcy Code will be paid by the Debtors, in cash, as soon as practicable after the entry of an order approving such allowance of compensation or reimbursement of expenses. For these purposes, professionals employed at the expense of the Debtors' estates will include without limitation the

- 46 -

professionals representing the Debtors' estates as well as those representing any Representative Committee, and unless ordered otherwise by the Bankruptcy Court, from and after the entry of the Confirmation Order such professionals will not be required to file fee applications with the Bankruptcy Court, and the Debtors may pay such professionals in the ordinary course for fees and expenses incurred after the Confirmation Order.

*Priority Tax Claims (Unimpaired)*

Except as otherwise agreed to by the holder of such a Claim, each Allowed Priority Tax Claim will be paid in full, in cash, at the Debtors' option either (a) on the Effective Date, (b) the date on which such Claim becomes an Allowed Priority Tax Claim, (c) together with interest (at a rate to be agreed upon between the Debtors and the holder of such a Claim, or, in the absence of an agreement, as determined by the Bankruptcy Court) from the Effective Date, or, to the extent permitted by the Bankruptcy Court, the later of the Effective Date or the date on which such Claim becomes an Allowed Priority Tax Claim, in equal quarterly installments over a period not exceeding six years after the date of assessment of such Allowed Priority Tax Claim as permitted by Bankruptcy Code section 1129(a)(9)(C) or (d) in the ordinary course of business as such claims become due.  The number of equal quarterly installments to be made with respect to any such Allowed Priority Tax Claim assessed prior to the Effective Date will be equal to the difference between (x) 24 and (y) the quotient obtained by dividing (i) the number of months which have elapsed between the date of assessment of such Allowed Priority Tax Claim and the Effective Date by (ii) three; underline provided, however, that all fractions will be rounded to the next largest whole number. The first quarterly payment will be made three months after the later of the Effective Date or the date on which such Claim becomes an Allowed Priority Tax Claim.  Accrued and unpaid interest will be paid with each quarterly installment.

**Classification And Treatment Of Claims And Interests Under The Prepackaged Plan**

The Bankruptcy Code requires that a plan of reorganization classify the claims of a debtor's creditors and the interests of its equity holders.  The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim or interest of a creditor or equity holder in a particular class only if such claim or interest is substantially similar to the other Claims or Interests of such class. We believe that all Claims and Interests have been appropriately classified in the Prepackaged Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for the Prepackaged Plan to be confirmed, we (and the other Debtors) likely will seek (i) to modify the Prepackaged Plan to provide for whatever reasonable classification might be required for confirmation and (ii) to use the acceptances received from any creditor or equity holder pursuant to this solicitation for the purpose of obtaining the approval of the class or classes of which such creditor or equity holder ultimately is deemed to be a member.  Any such reclassification of creditors or equity holders could adversely affect the class in which such creditor or equity holder was initially a member, or any other class under the Prepackaged Plan, by changing the composition of such class and the vote required for approval of the Prepackaged Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring reclassification, would approve a plan of reorganization based upon such reclassification.

**EXCEPT TO THE EXTENT THAT MODIFICATION OF CLASSIFICATION IN THE PREPACKAGED PLAN ADVERSELY AFFECTS THE TREATMENT OF A CREDITOR OR AN EQUITY HOLDER AND REQUIRES RESOLICITATION, ACCEPTANCE BY ANY CREDITOR OR EQUITY HOLDER OF THE PREPACKAGED PLAN PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PREPACKAGED PLAN'S TREATMENT OF SUCH CREDITOR OR EQUITY HOLDER REGARDLESS OF THE CLASS AS TO WHICH SUCH CREDITOR OR EQUITY HOLDER IS ULTIMATELY DEEMED TO BE A MEMBER.**

The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each Claim or Interest of a particular class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its claim or interest.  We believe the Prepackaged Plan complies with the standard of equal treatment.  To the extent that the Bankruptcy Court finds that the Prepackaged Plan does not satisfy this standard, the Bankruptcy

- 47 -

Court could deny confirmation of the Prepackaged Plan if the creditors or equity holders affected do not consent to the treatment afforded them under the Prepackaged Plan.

Only classes that are impaired and are to receive or retain property under the Prepackaged Plan are entitled to vote to accept or reject the Prepackaged Plan.  As a general matter, a class of Claims or Interests is considered to be "unimpaired" under a plan of reorganization if (i) the plan does not alter the legal, equitable and contractual rights of the holders of such claims or interests, (ii) the plan reinstates any accelerated claims, cures any defaults therein, compensates holders for certain damages and otherwise does not alter the legal, equitable and contractual rights of the holders or (iii) the plan pays the full amount of an allowed claim in cash.  Under the Bankruptcy Code, holders of Claims or Interests in an unimpaired class are conclusively presumed to have accepted the plan and are not entitled to vote to accept or reject the plan.  Conversely, if holders of Claims or Interests are not proposed to receive any distribution under a Chapter 11 plan, the affected class is presumed to have rejected the plan.

We have determined that the following classes of Claims and Interests are unimpaired and thus are not entitled to vote on the Prepackaged Plan.  These classes of Claims are deemed to accept the Prepackaged Plan:

| | | |
|---|---|---|
| Priority Claims | Class 1 | Against the Debtors |
| Secured Claims | Class 2 | Against the Debtors |
| General Unsecured Claims | Class 3 | Against the Debtors |
| Interests | Class 6 | Against the Debtors (other than the Company) |

We have determined that the following classes of Claims and Interests are impaired and thus are entitled to vote on the Prepackaged Plan:

| | | |
|---|---|---|
| Note Claims | Class 4 | Against the Company |
| Interests | Class 5 | Class B Common Stock in the Company |

*Class 1 – Priority Claims (Unimpaired)*

Class 1 consists of all Priority Claims against the Debtors.  The Bankruptcy Code provides for priority payment of certain claims, subject to applicable limitations, including the following: allowed unsecured claims for wages, salaries or commissions; unsecured claims for contributions to employee benefit plans; unsecured claims of individuals arising from deposits for the purchase or lease of property or the purchase of services for personal or family use.

The Prepackaged Plan provides that, unless otherwise agreed to by the holder of such a Claim, each holder of an Allowed Claim then due and owing in Class 1 will be paid the allowed amount of such Claim in full, in cash, at the Debtors' option (i) on the Effective Date, (ii) on the date such Claim becomes an Allowed Claim or (iii) in the ordinary course of business as such claims become due.  Any Allowed Claim in Class 1 not due and owing on the Effective Date will be paid in full, in cash, when it becomes due and owing.  The Debtors intend to pay Claims in Class 1 in the ordinary course of business.  The Prepackaged Plan also provides that the Debtors may reject Executory Contracts during the pendency of the case or as part of the confirmation of the Prepackaged Plan, and that all such Claims will be allowed in accordance with provisions of the Bankruptcy Code, including section 502(b), and will, following their allowance pursuant to the terms of the Plan, be treated as Allowed Claims in Classes 1, 2 or 3 as appropriate.

Claims in Class 1 are unimpaired.  Holders of Claims in this class are deemed to accept the Prepackaged Plan and are not entitled to vote thereon.

*Class 2 – Secured Claims (Unimpaired)*

Class 2 consists of all Secured Claims against the Debtors. The Bankruptcy Code provides that, subject to applicable limitations, an allowed claim that is secured by a lien on or security interest in property of the estate or that is subject to an allowed setoff is deemed to be a secured claim to the extent of the value of the property securing such claim and that any deficiency is deemed to be an unsecured claim.

The Prepackaged Plan provides that, unless otherwise agreed to by the holder of such a Claim, the legal, equitable and contractual rights of each holder of an Allowed Claim in Class 2 (including such Allowed Claims deemed to be in their own separate Classes as described in section 3.1(b) of the Plan) will be unaltered thereby, except that the Debtors may take any actions as are permitted under Bankruptcy Code section 1124, such as reinstating such Claims or paying the holders thereof the amount of such Allowed Claims on the later of the Effective Date or the date such Claim becomes an Allowed Claim, in either case with the result that each such Allowed Claim shall be unimpaired by the Plan. The Prepackaged Plan also provides that the Debtors may reject Executory Contracts during the pendency of the case or as part of the confirmation of the Prepackaged Plan, and that all such Claims will be allowed in accordance with provisions of the Bankruptcy Code, including section 502(b), and will, following their allowance pursuant to the terms of the Plan, be treated as Allowed Claims in Classes 1, 2 or 3 as appropriate.

Claims in Class 2 are unimpaired. Holders of Claims in this class are deemed to accept the Prepackaged Plan and are not entitled to vote thereon.

*Class 3 – General Unsecured Claims (Unimpaired)*

Class 3 consists of all General Unsecured Claims against the Debtors (comprised of all unsecured claims against the Debtors other than those in Class 4). The Prepackaged Plan provides that the legal, equitable and contractual rights of each holder of an Allowed Claim in Class 3 will be unaltered thereby, except that the Debtors may take any actions as are permitted under Bankruptcy Code section 1124, such as reinstating such Claims or paying the holders thereof the amount of such Allowed Claims on the later of the Effective Date or the date such Claim becomes an Allowed Claim, in either case with the result that each such Allowed Claim shall be unimpaired by the Plan. To the extent permissible under the Bankruptcy Code and applicable orders of the Bankruptcy Court, General Unsecured Claims shall be treated for all purposes as if the Reorganization Case was not filed. Unless otherwise ordered by the Bankruptcy Court, holders of General Unsecured Claims (except Claims arising from the rejection of Executory Contracts) need not, and should not, file proofs of claim with the Bankruptcy Court. The Prepackaged Plan also provides that the Debtors may reject Executory Contracts during the pendency of the case or as part of the confirmation of the Prepackaged Plan, and that all such Claims will be allowed in accordance with provisions of the Bankruptcy Code, including section 502(b), and will, following their allowance pursuant to the terms of the Plan, be treated as Allowed Claims in Classes 1, 2 or 3 as appropriate. The Debtors intend to pay Claims in Class 3 in the ordinary course of business.

Claims in Class 3 are unimpaired. Holders of Claims in this class are deemed to accept the Prepackaged Plan and are not entitled to vote thereon.

*Class 4 – Claims Under The Notes (Impaired)*

Class 4 consists of all Unsecured Claims against the Debtors held by holders of the Notes arising from, under or with respect to the issuance or ownership of such Notes. The Prepackaged Plan provides that each holder of an Allowed Claim in Class 4 will receive on the Effective Date its Pro Rata Share of the Note Distribution, consisting of (i) (a) $30 million in aggregate principal amount of New Notes and (b) 8,500,000 shares of New Common Stock (representing 85% of equity in the Company issued and outstanding after the Effective Date, on a fully diluted basis), or (ii) in the event that an M&A Transaction is effected through the Prepackaged Plan, consideration that is economically consistent with the consideration they would have received had the Restructuring taken place immediately before the M&A Transaction.

- 49 -

Claims in Class 4 are impaired.  Holders of Claims in this class are entitled to vote on the Prepackaged Plan.

*Class 5 – Interests In The Company (Impaired)*

Class 5 consist of all Interests in the Company.  The Prepackaged Plan provides that each holder of an Allowed Interest in Class 5 will retain on the Effective Date its shares of our New Common Stock if and only if such holders execute the Escrow Agreement substantially in the form set forth in the Plan Supplement, which Escrow Agreement will provide, among other things, that two-thirds of the Current Shareholder's shares will be placed in escrow.  The Escrow Agreement will provide that 25% of the escrowed shares will be released to the holder on each of the four anniversaries following the Effective Date.  All of the escrowed shares will be immediately released from the escrow upon the death or disability of Mr. Russell Solomon, or upon a change of control of the Company.  Any shares held in escrow will be subject to repurchase by us at a nominal purchase price upon the occurrence of certain triggering events provided in the Employment Agreement.  In the event that an M&A Transaction is effected through the Prepackaged Plan, the Current Shareholder will receive consideration that is economically consistent with the consideration it would have received had the Restructuring taken place immediately before the M&A Transaction.

Interests in Class 5 are impaired.  Holders of Interests in this class are entitled to vote on the Prepackaged Plan.

*Class 6 – Interests In Other Debtors (Unimpaired)*

Class 6 consists of all Interests in any of the Debtors other than those in Class 5.  The Prepackaged Plan provides that the holders of Allowed Interests in Class 6 will retain their Interests.

Interests in Class 6 are unimpaired.  Holders of Interests in this class are deemed to accept the Prepackaged Plan and are not entitled to vote thereon.

*No Substantive Consolidation*

The Prepackaged Plan is a joint plan that does not provide for substantive consolidation of the Debtors' estates, and on the Effective Date, the Debtors' estates shall not be deemed to be substantively consolidated for purposes thereof.  Any Claims against one or more of the Debtors based upon a guaranty, indemnity, co-signature, surety or otherwise, of Claims against another Debtor shall be treated as separate and distinct Claims against the estate of the respective Debtors and shall be entitled to distributions under the Prepackaged Plan in accordance with the provisions thereof, and Claims and Interests as between the Debtors shall be unaffected by the Prepackaged Plan.

**Allowance Of Claims And Interests**

Under the Prepackaged Plan, an Allowed Claim or Allowed Interest is any Claim against or Interest in the Debtors, proof of which was filed on or before the bar date, if any, for such Claim or Interest, or which has been or is thereafter listed by the Debtors in their schedules as liquidated in amount and not disputed or contingent and, in either case, as to which no objection to the allowance thereof, or motion for estimation thereof, is interposed within the applicable period of limitation, if any, fixed by the Prepackaged Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or as to which an objection or motion to estimate has been interposed, following which such Claim or Interest has been allowed, in whole or in part, by a final order of the Bankruptcy Court.

*Objections To And Estimation Of Claims*

The Debtors may object to the allowance of Claims and Interests with respect to which they dispute liability in whole or in part.  Without limiting the foregoing, we reserve (on our own behalf and on behalf of the other Debtors) the right to object to (i) claims arising from the rejection of Executory Contracts on any basis,

including Section 502(b)(6) of the Bankruptcy Code and (ii) any claims as provided in any order of the Bankruptcy Court establishing a bar date for the filing of proofs of claim.  Any such objection will be litigated in the Bankruptcy Court; provided that the Debtors may compromise and settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any objections to Claims or Interests.  In addition, the Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such claim.

### *Disputed Claims In Certain Unimpaired Classes*

Unless otherwise ordered by the Bankruptcy Court, holders of Claims in Classes 1, 2 and 3 (other than those Claims in any such Class arising from rejection of Executory Contracts under Article IX of the Plan or as otherwise ordered by the Bankruptcy Court) need not file proofs of claim with the Bankruptcy Court and will be subject to Bankruptcy Court process only to the extent provided in the Plan.  On and after the Effective Date, all such Claims will be paid in the ordinary course of business of the Debtors.  If the Debtors dispute any such Claim, such dispute will be determined, resolved or adjudicated, as the case may be, in a manner as if the Reorganization Case had not been commenced and will survive the Effective Date and consummation of the Plan as if the Reorganization Case had not been commenced, provided that (i) the Debtors may elect, at their sole option, to proceed by objection under section 502 and other applicable provisions of the Bankruptcy Code and Bankruptcy Rules with respect to any proof of claim filed by or on behalf of the holder of a Claim in any Class and (ii) any Claim resulting from an Executory Contract rejected under Article IX of the Plan will be determined in accordance with the provisions of that Article.  Notwithstanding the foregoing, unless otherwise ordered by the Bankruptcy Court, the Debtors may elect, at their sole option, to establish one or more bar dates and require the filing of proofs of claims by holders of Claims in Classes 1, 2 and/or 3 and/or non-debtor parties to executory contracts and unexpired leases rejected pursuant to Section 365 or 1123 of the Bankruptcy Code.

### *Payments And Distributions On Disputed, Contingent and Unliquidated Claims and Claims for Which Proofs of Claim are Filed*

No partial payments and no partial distributions will be made with respect to a disputed, contingent or unliquidated Claim or Interest, or with respect to any Claim for which a proof of claim has been filed, until the resolution of such disputes or estimation or liquidation of such claims by settlement or by final order of the Bankruptcy Court.  As soon as practicable after a disputed, contingent or unliquidated Claim or Interest becomes an Allowed Claim or Interest in an amount certain, the holder of such Allowed Claim or Interest will receive all payments and distributions to which such holder is then entitled under the Prepackaged Plan.

### *Claims Based on Rejection of Executory Contracts.*

Proofs of claim with respect to all Claims arising from the rejection of Executory Contracts must be filed with the Bankruptcy Court within sixty (60) days after the later of (i) the date of entry of an order of the Bankruptcy Court approving such rejection or (ii) the Confirmation Date.  Any Claims not filed within such times shall be forever barred from assertion against the Debtors, their estates and their property.  Unless otherwise ordered by the Bankruptcy Court, all such Claims shall be allowed in accordance with provisions of the Bankruptcy Code, including section 502(b)(6), and shall, following their allowance and payment pursuant to the terms of the Plan, be unimpaired and be treated as Allowed Claims in Classes 1, 2 or 3 as appropriate.

## Releases

### *Release Of Directors And Officers*

On the Effective Date all directors and officers of the Debtors, and all individuals who were directors or officers of the Debtors during the six-year period immediately preceding the Effective Date, will be forever released and discharged from all liability to the Debtors based upon any act or omission of every kind and nature whatsoever, excluding willful misconduct or gross negligence.  The foregoing releases shall not, however, apply to any

indebtedness to the Debtors for money borrowed by any such individual.  The Debtors are not aware of any claims that exist against such officers or directors.

*Mutual Releases*

On the Effective Date, (i) each holder of a Claim or Interest that votes in favor of the Prepackaged Plan, (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity that has held, holds or may hold a Claim or Interest or at any time was a creditor or stockholder of the Debtors and that does not vote on the Prepackaged Plan or votes against the Prepackaged Plan, and (iii) each party to the Lock-Up Agreement and each of the Debtors, in each case will be deemed to forever release, waive and discharge all claims (including derivative claims), obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the right to enforce the Debtors' obligations under the Prepackaged Plan and the contracts, instruments, releases, agreements and documents assumed or delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganization Case, the Lock-Up Agreement, the Employment Agreement, the Separation Agreement, the Old Indenture or the Prepackaged Plan that such entity has, had or may have against the Debtors, any Representative Committee, the Old Indenture Trustee, any party to the Lock-Up Agreement and each of their respective present or former directors, officers, employees, predecessors, successors, members, attorneys, accountants, underwriters, investment bankers, financial advisors, appraisers, representatives and agents, acting in such capacity (which release will be in addition to the discharge of Claims and termination of Interests provided in the Prepackaged Plan and under the Confirmation Order and the Bankruptcy Code).  Such releases and waivers will not apply to (i) any and all indemnification obligations of the Debtors to Mr. Michael Solomon and/or Mr. Russell Solomon as provided by the Lock-Up Agreement; (ii) any and all rights, claims provided to or reserved by the parties to the Lock-Up Agreement, the Employment Agreement, the Separation Agreement, the Non-Compete Agreement (as defined in the Lock-Up Agreement) and the other documents associated therewith in or under such documents or the Prepackaged Plan.

*Release Of Other Claims*

On the Effective Date, the Debtors will be deemed to have forever waived and released all claims, fixed or contingent, known or unknown, against the holders of Notes or Class B Common Stock, the Old Indenture Trustee, and their respective successors, assigns, directors, officers, employees, and agents arising out of the acts or omissions of such persons.  We are not aware of any such claims that currently exist.

*Exculpation*

Neither the Debtors nor any holder of Notes, nor any of their respective members, officers, directors, employees, representatives, counsel, auditors or agents are to have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, or arising out of, the pursuit of confirmation of the Prepackaged Plan, the consummation of the Prepackaged Plan or the administration of the Prepackaged Plan or the property to be distributed under the Prepackaged Plan except for willful misconduct or gross negligence, and all such persons and entities, in all respects, will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Prepackaged Plan.

*Rights Of Action*

Any rights or causes of action accruing to the Debtors (other than the claims, rights and causes of action released as described in the three preceding paragraphs) will remain assets of the Debtors, except that all potential claims, rights and causes of action for recovery or avoidance arising under or in connection with sections 506, 544, 545, 547-550 and 553 of the Bankruptcy Code will be waived by the Debtors on the Effective Date.

**Preference Claims**

We do not intend that any Debtors will bring any claims for the return of any allegedly preferential transfers under the Prepackaged Plan during the pendency of the Reorganization Case. Preferential transfers are defined under Section 547 of the Bankruptcy Code and include, subject to certain exceptions, transfers of an interest of the debtor in property:

- to or for the benefit of a creditor;

- for or on account of an antecedent debt owed by the debtor before such transfer was made;

- made while the debtor was insolvent;

- made on or within 90 days before the date of the filing of the petition; or between 90 days and one year before the date of the filing of the bankruptcy petition, if such creditor at the time of such transfer was an insider; and

- that enables such creditor to receive more than such creditor would receive if (i) the case were a case under chapter 7 of the Bankruptcy Code; (ii) the transfer had not been made; and (iii) such creditor received payment of such debt to the extent provided by the provisions of Bankruptcy Code Section 547(b).

We do not believe that there is potential to recover on preference claims, given that all creditors (other than the holders of the Notes) will be paid in full under the terms of the Prepackaged Plan.

**Fraudulent Transfer Claims**

Similarly, we do not intend that any of the Debtors will bring any fraudulent transfer claims to recover transfers made by any of the Debtors. Fraudulent transfer actions would, in general, seek to recover transfers made by the Debtors for less than reasonably equivalent value at a time when the transferring Debtor was insolvent. Any recoveries on fraudulent transfer claims would be added to the claim of the defendant. Defendants in unimpaired classes would thus receive a full refund of any recovery received from them. In addition, we believe an implied condition to acceptance of the Prepackaged Plan by creditors in impaired classes is that no fraudulent transfer claims be brought. We believe that, even if such claims were to exist, investigating and prosecuting such claims, which involve complex factual and legal issues, and would likely delay confirmation of the Prepackaged Plan, as parties in interest might be defendants in such an action. Were confirmation of the Prepackaged Plan to be delayed, it might never be confirmed, as the agreements of necessary parties in interest to support the Prepackaged Plan were the results of many months of negotiations and would likely be withdrawn as a result of such delays. In addition, the support for the Prepackaged Plan of any defendants in such actions would likely be withdrawn.

**Other Claims**

We are not aware of, and have not investigated, other potential material claims we or any other Debtor may have at the present time. If we identify any such claims (other than those that have been released, such as fraudulent transfer claims), these may be pursued in the future.

**Certain First Day Orders**

In addition to customary procedural motions typically filed on the first day of a bankruptcy case, we intend to file with the Bankruptcy Court a number of motions which attempt to expedite payments to trade creditors and employees and ameliorate the effects of the bankruptcy proceeding on us, our creditors and employees. For example, we intend to file motions permitting us (i) to pay prepetition claims unimpaired under the Prepackaged

- 53 -

Plan (including Claims in Classes 1 and 3) as they come due or, in the alternative payment of critical vendors and prepetition wages; (ii) the ability to make returns for credit against prepetition claims in accordance with Section 564(g)* of the Bankruptcy Code; and (iii) to retain counsel and to continue the pre-petition retention agreements with Jefferies and Company, Inc., Greif & Co. and FTI Consulting subject to the terms of their contracts. We will similarly file a motion seeking authority to pay prepetition employee expenses and health claims in order that employees be paid on an uninterrupted, regular basis for wages and health insurance benefits that accrued prior to the filing of the Reorganization Case and to assume the Employment Agreement, the Separation Agreement and the employment, retention and severance agreements with the Scheduled Employees. While we will use our best efforts to obtain the approval of the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will grant any such approvals, and the Prepackaged Plan is not conditioned upon the Bankruptcy Court granting any such approvals.

**The New Notes and Terms of the New Indenture**

For a summary description of the terms of the New Notes and the New Indenture, and a comparison of the material differences between the Notes and the New Notes, see "The New Notes and the New Indenture."

**Board of Directors Upon Completion Of The Prepackaged Plan**

Our Board of Directors will initially consist of five directors after the Effective Date. In accordance with the Governance Agreement, one director will be designated by the Current Shareholder, so long as it holds no less than 7.5% of the fully diluted shares of New Common Stock (for this purpose, treating escrowed shares as being retained). The other shareholders will be entitled to designate the remaining directors. Each party entitled to designate any director will also have the right to remove such director and designate his or her replacement.

**Capital Stock Following The Prepackaged Plan**

Following the consummation of the Prepackaged Plan, 15% of the New Common Stock will be held by the Current Shareholder, and 85% of the New Common Stock will be held by the holders of Notes. For a description of the rights and privileges of the New Common Stock following the Exchange Restructuring, see "Description of Our Capital Stock."

**Other Prepackaged Plan Provisions**

*Executory Contracts And Unexpired Leases*

Under the Bankruptcy Code, the Debtors may assume or reject executory contracts and unexpired leases. As a general matter, an "executory contract" is a contract under which material performance (other than solely the payment of money) remains to be made by each party. At present, we do not intend that the Debtors will reject a significant number of executory contracts or unexpired leases, except that we have agreed in the Lock-Up Agreement to reject any remaining leases for stores we have closed or will close in connection with the restructuring, including several stores in the United Kingdom. In the Lock-Up Agreement the Company has also agreed to promptly assume all employment, retention and severance agreements with current and former employees through the Prepackaged Plan. All other contracts and unexpired leases are expected to be assumed by us by the applicable deadline under the provisions of the Bankruptcy Code. If the Debtors should later conclude that it is advisable to reject any executory contract or unexpired lease, they will do so in accordance with the applicable procedures under the Plan and the Bankruptcy Code. Pursuant to the Prepackaged Plan, however, any executory contracts not expressly rejected by the Debtors under an order of the Bankruptcy Court prior to or concurrently with confirmation of the Prepackaged Plan will be deemed assumed upon confirmation of the Prepackaged Plan. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts will be allowed in accordance with provisions of the Plan and the Bankruptcy Code, including section 502(b)(6), and will, following their allowance and payment pursuant to the terms of the Plan, be unimpaired and be treated as Allowed

- 54 -

Claims in Classes 1, 2 or 3 as appropriate.  Orders of the Bankruptcy Court in connection with confirmation of the Prepackaged Plan will specify the time limit for the filing and allowance of such Claims.

*Amendments To Articles Of Incorporation*

The Bankruptcy Code requires that upon the confirmation of a plan of reorganization, a debtor's charter documents must contain certain provisions including a provision prohibiting the issuance of non-voting equity securities.  To comply with this requirement, the Prepackaged Plan provides that our Articles of Incorporation will be amended upon confirmation of the Prepackaged Plan to prohibit us from issuing non-voting equity securities.

In addition, the Prepackaged Plan provides that our Articles of Incorporation will be amended to, among other things, (i) cancel and eliminate our Class A Common Stock, no par value, of which no shares are presently outstanding, (ii) redesignate the Class B Common Stock as the New Common Stock, (iii) amend certain terms of the New Common Stock, (iv) approve a 1,500-to-1 stock split in the New Common Stock and authorize the issuance of up to 100,000,000 shares of New Common Stock, and (v) increase the number of members of our board of directors from four to five.

*Retention Of Jurisdiction By The Bankruptcy Court*

Under the terms of the Prepackaged Plan, the Bankruptcy Court will retain jurisdiction over the reorganization proceedings relating to the Debtors for the purposes of making determinations of certain matters, including (a) all pending applications, adversary proceedings and contested matters; (b) except as otherwise required in the Prepackaged Plan, all objections to the allowance of claims and interests; (c) the amount or legality of any state, local or federal tax; (d) all applications for allowance of compensation and reimbursement of expenses; (e) all controversies arising in connection with the Prepackaged Plan and other matters provided for in the order confirming the Prepackaged Plan; (f) payments due under the Prepackaged Plan and performance of the provisions of the Prepackaged Plan; (g) such orders as may be appropriate in the event the order of the Bankruptcy Court confirming the Prepackaged Plan is stayed, reversed, revoked, modified or vacated; (h) all requests for modification of the Prepackaged Plan; and (i) all other matters not inconsistent with the Bankruptcy Code.  The Bankruptcy Court will retain jurisdiction notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date.

*Means For Execution Of The Prepackaged Plan*

On the Effective Date or as soon thereafter as practicable, the Debtors will issue and distribute to holders of Allowed Claims and Allowed Interests cash and stock as provided in the Prepackaged Plan.  The Effective Date will occur when the conditions to effectiveness set forth in the Prepackaged Plan have been fully satisfied.

*Waiver Of Subordination And Other Rights*

The distributions under the Prepackaged Plan take into account the relative priority of the claims in each class in connection with any contractual subordination, intercreditor or contribution provisions relating thereto. Accordingly, the distributions to the holders of Allowed Claims and Allowed Interests under the Prepackaged Plan will not be subject to levy, garnishment, attachment or other legal process by any other holder of an Allowed Claim or Interest in any other class by reason of any right or agreement of subordination.

**Effects Of Prepackaged Plan Confirmation**

*Discharge*

Except as otherwise expressly provided in the Prepackaged Plan, the confirmation of the Prepackaged Plan by the Bankruptcy Court will:

- bind all holders of Claims and Interests, whether or not they accept the Prepackaged Plan,

- 55 -

- discharge us effective immediately from any claim and any "debt" (as that term is defined in Section 101(12) of the Bankruptcy Code) incurred before the confirmation date, and

- extinguish the Debtors' liability in respect thereof completely including, without limitation, any liability of a kind specified in Section 502(g) of the Bankruptcy Code.

In addition, except as otherwise provided in the Prepackaged Plan, confirmation of the Prepackaged Plan will act as discharge effective as of the confirmation date as to each holder of a Claim or Interest receiving or entitled to receive any distribution under the Prepackaged Plan in respect of any direct or indirect right or Claim or Interest such claimant or interest holder had or may have had against or in the Debtors.  On and after the Confirmation Date, as to every discharged Claim and Interest, every holder of a Claim and Interest will be precluded from asserting against the Debtors or their assets or properties, any further claim or interest based on any document, instrument or act, omission, transaction or other activity of any kind or nature that occurred prior to the confirmation date.

### Waiver Of Federal Tax Discharge

Pursuant to the terms of the Prepackaged Plan, confirmation of the Prepackaged Plan by the Bankruptcy Court will not discharge pre-confirmation federal tax liabilities, if any, and related additions to tax for taxable periods that have not been audited by the Internal Revenue Service (the "IRS") or for which audits have not been completed prior to confirmation of the Prepackaged Plan.  Said tax liabilities will be determined in accordance with the provisions of the Internal Revenue Code and applicable regulations as if the Reorganization Case had not been filed, except for an extension of time for the assessment and collection of taxes and, with respect to tax liabilities and related additions to tax for taxable periods for which audits have been commenced but not completed prior to confirmation of the Prepackaged Plan, the jurisdiction of the Bankruptcy Court and rights of the Debtors under Bankruptcy Code Section 505.  The Debtors will retain all rights under the Internal Revenue Code and all applicable federal law to contest any proposed federal tax liabilities for any preconfirmation federal taxes for such periods and, once they have been finally determined and assessed, will pay any such liabilities in accordance with the terms of the Bankruptcy Code including the provisions permitting periodic payments over six years from the assessment date.

### Cancellation Of Securities And Agreements

The provisions of the Prepackaged Plan will cancel the Notes, and all of our obligations under the Old Indenture, and any and all other agreements and documents relating to the Notes.

### Revesting

On the Effective Date, we will be vested with all of the property of our estates free and clear of all claims, liens, encumbrances, charges and other interests of holders of Claims and Interests except as provided in the Prepackaged Plan, and may operate our businesses free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court.  Our secured lenders will retain their respective security interests in the assets of the Debtors.

## Official Committee

Pursuant to Section 1102(a) of the Bankruptcy Code, following the commencement of a bankruptcy proceeding under Chapter 11 of the Bankruptcy Code, the United States Trustee may appoint a committee of creditors holding unsecured claims against the Chapter 11 debtor and may appoint additional committees of creditors or of equity security holders as deemed appropriate to assure the adequate representation of creditors and equity security holders in the Chapter 11 case.  If we file the Prepackage Plan, we expect to move to confirmation quickly so that the Prepackaged Plan may be confirmed prior to the formation of any official committee, in which case it is likely that the United States Trustee will decline to appoint an official committee.

- 56 -

If appointed, each official committee may appear and be heard on any issue in the Reorganization Case and may also:

- consult with the trustee or debtor in possession concerning the administration of the case;

- investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of our business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan of reorganization;

- participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan of reorganization formulated, and collect and file with the bankruptcy court acceptances or rejections of a plan of reorganization;

- request the appointment of a trustee or examiner; and

- perform such other services as are in the interest of those represented.

Ordinarily, the statutory committee of creditors appointed by the United States Trustee will include those persons willing to serve that hold the largest claims of the kinds represented on the committee. However, Section 1102(b) of the Bankruptcy Code permits the United States Trustee to appoint, as the statutory committee, the members of any committee organized by creditors prior to the commencement of the bankruptcy proceedings pursuant to the Prepackaged Plan, if such committee was fairly chosen and is representative of the different kinds of claims to be represented in the Reorganization Case.

**Modification Of The Prepackaged Plan**

Subject to the restrictions in the Lock-Up Agreement, we (on our own behalf and on behalf of the other Debtors) reserve the right, in accordance with the Bankruptcy Code, to amend or modify the Prepackaged Plan prior to the entry of the confirmation order. Amendments to the Prepackaged Plan's classification or treatment of one or more classes of claims or interests that do not materially and adversely change the treatment of the other classes of Claims or Interests may be made either before or after the filing of the petition under Chapter 11. Such amendments may be approved by the Bankruptcy Court at the confirmation hearing without resolicitation of creditors and equity holders who are not further impaired. In addition, the Debtors may make any other amendments or modifications to the Prepackaged Plan before or after the confirmation date in accordance with the provisions of Section 1127 of the Bankruptcy Code.

**Conditions To Effectiveness Of The Prepackaged Plan**

The effectiveness of the Prepackaged Plan is subject to, and conditioned upon, a number of items set forth in the Prepackaged Plan. As with all other material in this offering memorandum relating to the Prepackaged Plan, the following summaries of certain of the conditions to effectiveness of the Prepackaged Plan do not purport to be complete and are subject, and are qualified in their entirety by reference, to the Prepackaged Plan including all Appendices thereto.

Conditions to the effectiveness of the Prepackaged Plan include that the order of the Bankruptcy Court confirming the Prepackaged Plan will have been entered and not stayed.

In addition, the Debtors will have (x) taken all steps necessary and performed all acts required by the Bankruptcy Code in order to confirm the Prepackaged Plan, (y) obtained an unstayed order from the Bankruptcy Court in connection with the adequacy of the disclosure information pursuant to which votes on the Prepackaged Plan were solicited, and (z) set the Effective Date to occur following the date of the Confirmation Order, unless such order has been stayed.

- 57 -

**Alternatives To The Prepackaged Plan**

*M&A Process*

At the same time that we are soliciting consents to participate in the Exchange Restructuring and votes to accept or reject the Prepackaged Plan pursuant to this offering memorandum, we are also actively seeking to be acquired by a third party in an M&A Transaction.  There can be no guaranty that we will be able to find a buyer or that any proposed M&A Transaction would ultimately close.  By consenting to the Exchange Restructuring, you will additionally be consenting to tender your Notes upon the closing of any M&A Transaction in exchange for consideration that is economically consistent with the consideration you would have received had the Restructuring taken place immediately before the M&A Transaction.

*Liquidation Under Chapter 7*

We have evaluated the effects of a liquidation of our assets, including our subsidiaries who may also be Debtors under the Reorganization Case.  In considering this alternative, we have taken into account the nature, status and underlying values of our tangible and intangible assets, the ultimate realizable value of such assets, and the extent to which certain of our assets are subject to the liens and security interests of secured creditors.  The results of this evaluation are set forth in "Consolidated Liquidation Analysis under Chapter 7" attached as Exhibit G to this offering memorandum.

A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of holders of claims against and equity interests in the Company are set forth above under "– Liquidation Analysis."  We believe that liquidation under Chapter 7 would result in:

- smaller distributions being made to holders of claims than those provided for in the Prepackaged Plan because of:

    o   the likelihood that our assets would have to be sold or otherwise disposed of in a less orderly fashion over a short period of time;

    o   additional administrative expenses involved in the appointment of a trustee;

    o   additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of our operations; and

- equity interest holders receiving or retaining less or even no property.

**Alternative Plan Of Reorganization**

If the Prepackaged Plan is not confirmed, the Debtors (or if the period in which only the Debtors may file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors business or an orderly liquidation of assets.  We have explored numerous alternatives in connection with the extensive process of formulating and developing of the Prepackaged Plan.  We believe that the Prepackaged Plan, as described in this offering memorandum, enables creditors and equity holders to realize the most value under the circumstances. Moreover, since the Prepackaged Plan – as opposed to any other plan of reorganization – has substantial support from the holders of impaired Claims and Interests, it is more likely to be confirmed than any other plan of reorganization.

**Recommendations With Respect To The Prepackaged Plan**

Our Board of Directors has approved the Prepackaged Plan and the transactions contemplated thereby, and recommends that holders of Notes and Class B Common Stock vote to accept the Prepackaged Plan as a potential alternative to the Exchange Restructuring.

## THE NEW NOTES AND THE NEW INDENTURE

*The New Notes will be issued under the Indenture (the "New Indenture") dated as of the consummation of the Restructuring between the Company and The Bank of New York, as trustee (the "Trustee"), which will be substantially similar to the form of the New Indenture attached as Exhibit H. The following summary of certain provisions of the New Indenture does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"), and to all of the provisions of the form of the New Notes and the New Indenture, including the definitions of certain terms therein and those terms made a part of the New Indenture by reference to the Trust Indenture Act, as in effect on the date of the New Indenture. The New Notes will be subject to all such provisions, and holders of New Notes are referred to the New Indenture and the Trust Indenture Act for a statement thereof. Capitalized terms used in the following summary are as defined in the New Indenture. As used in this section, the term "Company" refers to MTS, Incorporated and not to any of our subsidiaries.*

*The material terms of the New Indenture may be modified from the form of the New Indenture attached as Exhibit H prior to the issuance of the New Notes with the consent of the Company, the Current Shareholder and holders of Notes as provided in the Lock-Up Agreement. For example, a representative committee of our major trade vendors has indicated that the trade vendors may request a lien on certain of our assets. Although we have not agreed to this request, if we, the Current Shareholder and the requisite holders under the Lock-Up Agreement agree to such a request, it is possible that the form of the New Indenture would be modified to permit this request prior to the issuance of the New Notes. If the form of the New Indenture attached as Exhibit H is modified in accordance with the terms of the Lock-Up Agreement it is possible that we may not provide you with the details of such modification. We can not accurately predict if any modifications will be made to the form of the New Indenture prior to the issuance of the Notes.*

The New Notes will be issued only in registered form, without coupons, in denominations of $1.00 and integral multiples of $1.00. Initially, the Trustee will serve as Registrar and Paying Agent for the New Notes. The New Notes may be presented for registration or transfer and exchange at the offices of the Registrar, which initially will be the Trustee's Corporate Trust Office, in New York, New York. No service charge will be made for any registration of transfer or exchange of the New Notes, except for any tax or other governmental charge that may be imposed in connection therewith. We will pay principal (and premium, if any) and interest on the New Notes at the Trustee's corporate trust office.

The New Notes will be general unsecured obligations of the Company and will be subordinated in right of payment to all Senior Indebtedness, including borrowings under the Credit Facilities. Borrowings under the Credit Facilities will be secured by our accounts receivable and Inventory. The New Notes will rank pari passu in right of payment with all of our other senior subordinated Indebtedness issued in the future, if any, and senior in the right of payment to all of our subordinated Indebtedness issued in the future, if any. The New Notes will rank pari passu with the notes issuable to Mr. Russell Solomon under the Employment Agreement. To the extent our future domestic Restricted Subsidiaries meet certain materiality tests, the Restricted Subsidiaries will guarantee the New Notes on a senior subordinated basis. See "—Future Guarantees."

### Principal, Maturity and Interest

The New Notes will be limited to $30.0 million aggregate principal amount (plus any Additional Notes) and will mature five years from the date of their issuance.

Interest on the New Notes will accrue at a rate of 10% per annum if paid entirely in cash or, at our option, at the rate of 12% per annum paid in a combination of 2% in cash and 10% in additional New Notes. Interest will be payable semi-annually in arrears. Interest will accrue from the most recent interest payment date to which interest

has been paid or, if no interest has been paid, from the date of issuance.  Interest will be computed on the basis of a 360-day year of twelve 30-day months.

## Optional Redemption

The New Notes will be redeemable at our option, in whole or in part, at any time, at a purchase price in cash equal to 101% of the aggregate principal amount thereof, plus accrued and unpaid interest thereon, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

In the event that less than all of the New Notes are to be redeemed at any time pursuant to an optional redemption, selection of such New Notes for redemption will be made by the Trustee in compliance with the requirements of the principal national securities exchange, if any, on which the New Notes are listed or, if the New Notes are not then listed on a national securities exchange, on a pro rata basis, by lot or by such method as the Trustee shall deem fair and appropriate.  Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each Holder of New Notes to be redeemed at its registered address.  If any New Note is to be redeemed in part only, the notice of redemption that relates to that New Note will state the portion of the principal amount thereof to be redeemed.  Another New Note in a principal amount equal to the unredeemed portion thereof will be issued in the name of the Holder thereof upon cancellation of the original New Note.  On and after the redemption date, interest will cease to accrue on New Notes or portions thereof called for redemption as long as we have deposited with the Paying Agent for the New Notes funds in satisfaction of the applicable redemption price pursuant to the Indenture.

## Subordination of the New Notes

The payment of the principal of, premium, if any, and interest on the New Notes will be subordinated in right of payment, to the extent and in the manner provided in the New Indenture, to the prior payment in full in cash or cash equivalents of all Senior Indebtedness.  The New Notes will rank pari passu with the notes issuable to Mr. Russell Solomon under the Employment Agreement.

Upon any payment or distribution of assets or securities by us of any kind or character, whether in cash, property or securities, upon any dissolution or winding up or total liquidation or reorganization of us, whether voluntary or involuntary or in bankruptcy, insolvency, receivership or other proceedings (excluding any payment or distribution of Permitted Junior Securities and excluding any payment from funds deposited in accordance with, and held in trust for the benefit of holders as set forth in "Legal Defeasance and Covenant Defeasance" (a "Defeasance Trust Payment")), all Senior Indebtedness then due will first be paid in full in cash or cash equivalents before the holders of the New Notes or the Trustee on behalf of such holders will be entitled to receive any payment by us of the principal of, premium, if any, or interest on the New Notes, or any payment by us to acquire any of the New Notes for cash, property or securities, or any distribution by us with respect to the New Notes of any cash, property or securities (excluding any payment or distribution of Permitted Junior Securities and excluding any Defeasance Trust Payment).  Before any payment may be made by, or on behalf of, us of the principal of, premium, if any, or interest on the New Notes upon any such dissolution or winding up or total liquidation or reorganization, whether voluntary or involuntary or in bankruptcy, insolvency, receivership or other proceedings, any payment or distribution of our assets or securities of any kind or character, whether in cash, property or securities (excluding any payment or distribution of Permitted Junior Securities and excluding any Defeasance Trust Payment), to which the holders of the New Notes or the Trustee on their behalf would be entitled, but for the subordination provisions of the New Indenture, will be made by us or by any receiver, trustee in bankruptcy, liquidation trustee, agent or other Person making such payment or distribution, directly to the holders of the Senior Indebtedness (pro rata to such holders on the basis of the respective amounts of Senior Indebtedness held by such holders) or their representatives or to the trustee or trustees or agent or agents under any agreement or indenture pursuant to which any of such Senior Indebtedness may have been issued, as their respective interests may appear, to the extent necessary to pay

- 61 -

all such Senior Indebtedness in full in cash or cash equivalents after giving effect to any prior or concurrent payment, distribution or provision therefor, to or for the holders of such Senior Indebtedness.

No direct or indirect payment (excluding any payment or distribution of Permitted Junior Securities and excluding any Defeasance Trust Payment) by us of principal of, premium, if any, or interest on the New Notes, whether pursuant to the terms of the New Notes, upon acceleration, pursuant to an Offer to Purchase, as a payment into the Defeasance Trust or otherwise, will be made if, at the time of such payment, there exists a default in the payment of all or any portion of any Senior Indebtedness, whether at maturity, on account of mandatory redemption or prepayment, acceleration or otherwise, and such default will not have been cured or waived or the benefits of this sentence waived by or on behalf of the holders of such Senior Indebtedness. In addition, during the continuance of any non-payment event of default with respect to any Designated Senior Indebtedness pursuant to which the maturity thereof may be immediately accelerated, and upon receipt by the Trustee of written notice (a "Payment Blockage Notice") from the holder or holders of such Designated Senior Indebtedness or the trustee or agent acting on behalf of the holders of such Designated Senior Indebtedness, then, unless and until such event of default has been cured or waived or has ceased to exist or such Designated Senior Indebtedness has been discharged or repaid in full in cash or the benefits of these provisions have been waived by the holders of such Designated Senior Indebtedness, no direct or indirect payment (excluding any payment or distribution of Permitted Junior Securities and excluding any Defeasance Trust Payment) will be made by us of principal of, premium, if any, or interest on the New Notes, whether pursuant to the terms of the New Notes, upon acceleration, pursuant to an Offer to Purchase or otherwise, to such holders, during a period (a "Payment Blockage Period") commencing on the date of receipt of such notice by the Trustee and ending 179 days thereafter. Notwithstanding anything in the subordination provisions of the New Indenture or the New Notes to the contrary, (x) in no event will a Payment Blockage Period extend beyond 179 days from the date the Payment Blockage Notice in respect thereof was given, (y) there will be a period of at least 181 consecutive days in each 360-day period when no Payment Blockage Period is in effect and (z) not more than one Payment Blockage Period may be commenced with respect to the New Notes during any period of 360 consecutive days. No event of default that existed or was continuing on the date of commencement of any Payment Blockage Period with respect to the Designated Senior Indebtedness initiating such Payment Blockage Period (to the extent the holder of Designated Senior Indebtedness, or trustee or agent, giving notice commencing such Payment Blockage Period had knowledge of such existing or continuing event of default) may be, or be made, the basis for the commencement of any other Payment Blockage Period by the holder or holders of such Designated Senior Indebtedness or the trustee or agent acting on behalf of such Designated Senior Indebtedness, whether or not within a period of 360 consecutive days, unless such event of default has been cured or waived for a period of not less than 90 consecutive days.

The failure to make any payment or distribution for or on account of the New Notes by reason of the provisions of the New Indenture described under this "Subordination of the New Notes" heading will not prevent, or be construed as preventing, the occurrence of any Default or Event of Default in respect of the New Notes. See "Events of Default" below.

By reason of the subordination provisions described above, in the event of our insolvency, funds which would otherwise be payable to holders of the New Notes will be paid to the holders of Senior Indebtedness to the extent necessary to pay the Senior Indebtedness in full in cash, and we may be unable to meet fully or at all its obligations with respect to the New Notes. Furthermore, by reason of such subordination, in the event of any such insolvency, our creditors who are also holders of Senior Indebtedness may recover more, ratably, than our other creditors, including holders of the New Notes.

**Future Guarantees**

The New Indenture also provides that at any time either (x) in excess of 10.0% of our consolidated net assets are owned by Restricted Subsidiaries (other than Foreign Subsidiaries) or (y) in excess of 10.0% of our Consolidated EBITDA is derived from Restricted Subsidiaries (other than Foreign Subsidiaries), within 90 days of the filing of the financial statements with the Commission which indicate that either clause (x) or clause (y) above is applicable, we will cause such Restricted Subsidiaries (other than Foreign Subsidiaries) to (i) execute and deliver to

- 62 -

the Trustee a supplemental indenture substantially in the form attached to the New Indenture pursuant to which such Restricted Subsidiary will become a party to the New Indenture and thereby unconditionally guarantee on an unsecured senior subordinated basis (on substantially the same terms as the subordination of the New Notes) (a "Subsidiary Guarantee") all of our Obligations under the New Notes and the New Indenture on the terms set forth therein and (ii) deliver to the Trustee an opinion of counsel that such supplemental indenture has been duly authorized, executed and delivered by such Restricted Subsidiary and constitutes a valid, binding and enforceable obligation of such Restricted Subsidiary (which opinion may be subject to customary assumptions and qualifications). Thereafter, such Restricted Subsidiary will (unless released in accordance with the terms of the New Indenture) be a Guarantor for all purposes of the New Indenture. The Subsidiary Guarantee of a Guarantor will be released upon the sale or transfer of a majority of the capital stock of such Guarantor owned directly or indirectly by us, provided that such sale or transfer complies with all of the terms of the New Indenture, or such Guarantor becoming an Unrestricted Subsidiary in accordance with the terms of the New Indenture.

Each Guarantee will be a continuing guarantee and will (a) remain in full force and effect until payment in full of all of the obligations covered thereby, (b) be binding upon each Guarantor and (c) inure to the benefit of and be enforceable by the Trustee, the holders and their successors, transferees and assigns.

## Offer to Purchase Upon Change of Control

Following the occurrence of a Change of Control (the date of such occurrence being the "Change of Control Date"), we will notify the holders of the New Notes of such occurrence in the manner prescribed by the New Indenture and will, within 60 days after the Change of Control Date, make an Offer to Purchase all New Notes then outstanding at a purchase price in cash equal to 101% of the aggregate principal amount thereof, plus accrued and unpaid interest thereon, if any, to the Purchase Date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

If a Change of Control occurs which also constitutes an event of default under the Credit Facilities, the lenders under the Credit Facilities would be entitled to exercise the remedies available to a secured lender under applicable law and pursuant to the terms of the Credit Facilities. Accordingly, any claims of such lenders with respect to our assets will be prior to any claim of the holders of the New Notes with respect to such assets.

If we make an Offer to Purchase, we will comply with all applicable tender offer laws and regulations, including, to the extent applicable, Section 14(e) and Rule 14e-1 under the Exchange Act, and any other applicable Federal or state securities laws and regulations and any applicable requirements of any securities exchange on which the New Notes are listed, and any violation of the provisions of the New Indenture relating to such Offer to Purchase occurring as a result of such compliance will not be deemed a Default or an Event of Default.

## Certain Covenants

### *Limitation on Indebtedness*

The New Indenture will provide that we will not, and will not cause or permit any Restricted Subsidiary to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness), except for Permitted Indebtedness; provided, however, that we may Incur Indebtedness if, at the time of and immediately after giving pro forma effect to such Incurrence of Indebtedness and the application of the proceeds therefrom, the Consolidated Coverage Ratio would be greater than (x) 2.00 to 1.00 if such Indebtedness is Incurred prior to the second anniversary of the Issue Date or (y) 2.25 to 1.00 if such Indebtedness is incurred thereafter.

The limitations contained in the preceding paragraph will not apply to the Incurrence of any of the following (collectively, "Permitted Indebtedness"), each of which will be given independent effect:

(a)      Indebtedness under the New Notes and any Guarantees;

- 63 -

(b)        Indebtedness Incurred under the Credit Facilities in an aggregate principal amount at any one time outstanding not to exceed after giving effect to such Incurrence the maximum committed amount (without giving effect to any borrowing base restrictions) under the Credit Facilities on the Issue Date less any amounts derived from any Asset Sale and applied to the required reduction of such Indebtedness (resulting in a permanent reduction of the related commitment to lend or amount to be reborrowed in case of a revolving credit facility, or in the case of a term loan, the amount actually attributed to such asset therein) under the Credit Facilities pursuant to "Disposition of Proceeds of Asset Sales" below;

(c)        Indebtedness of any Restricted Subsidiary owed to and held by us or any Restricted Subsidiary, and Indebtedness of the Company owed to and held by any Restricted Subsidiary and that is unsecured and subordinated in right of payment in liquidation to the payment of our obligations under any Senior Indebtedness, the New Indenture and the New Notes; provided, however, that an Incurrence of Indebtedness that is not otherwise permitted by this clause (c) will be deemed to have occurred upon (i) any sale or other disposition of any Indebtedness or any Restricted Subsidiary referred to in this clause (c) to a Person (other than us or a Restricted Subsidiary), or (ii) any sale or other disposition of Equity Interests of any Subsidiary which holds Indebtedness of us or another Subsidiary;

(d)        Indebtedness under Interest Rate Protection Obligations; provided, however, that such Interest Rate Protection Obligations have been entered into for bona fide business purposes and not for speculation;

(e)        Purchase Money Indebtedness and Capitalized Lease Obligations in an aggregate principal amount (including refinancings thereof) at any one time outstanding not to exceed [5/10%] of aggregate total revenue of us and our Restricted Subsidiaries during the most recently completed four fiscal quarter period on a consolidated basis (determined at the time of Incurrence); provided, however, that we and our Restricted Subsidiaries may incur any amount of additional Indebtedness of the type specified above in this clause (e) which is secured by real estate and any improvements thereon so long as the sole recourse of the obligee with respect to such Indebtedness is to the real property and/or improvements financed, fixtures related thereto and any accessions and additions thereto, replacements and substitutions therefor and the proceeds (including insurance proceeds thereof);

(f)        Indebtedness under Currency Agreements; provided, however, that such Currency Agreements have been entered into for bona fide business purposes and not for speculation;

(g)        Existing Indebtedness;

(h)        Indebtedness to the extent representing a replacement, renewal, defeasance, refinancing or extension (collectively, a "refinancing") of any outstanding Indebtedness; provided, however, that (i) any such refinancing will not exceed the sum of the principal amount (or accreted amount (determined in accordance with GAAP, if less) of the Indebtedness being refinanced (or in the case of a refinancing of the Credit Facilities the maximum permitted amount under clause (b) above), plus the amount of accrued interest thereon, plus the amount of any reasonably determined prepayment premium necessary to accomplish such refinancing and such reasonable fees and expenses incurred in connection therewith, (ii) Indebtedness representing a refinancing of Indebtedness other than Senior Indebtedness will have a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being refinanced and (iii) Indebtedness that is pari passu with, or subordinate to the New Notes may only be refinanced with Indebtedness that is made pari passu with or subordinate in right of payment to the New Notes and Subordinated Indebtedness may only be refinanced with Subordinated Indebtedness; provided, further, that Indebtedness of the Company may be refinanced by Indebtedness of a Restricted Subsidiary and Indebtedness of a Restricted Subsidiary may be refinanced by Indebtedness of the Company or that Restricted Subsidiary;

(i)        guarantees by us or a Restricted Subsidiary of Indebtedness Incurred by us or a Restricted Subsidiary so long as the Incurrence of such Indebtedness is otherwise permitted by the terms of the New Indenture.

- 64 -

(j)        Acquired Indebtedness and Indebtedness Incurred in connection with the acquisition of assets; provided, that such Indebtedness was incurred by the prior owner of such assets prior to such acquisition by us or one of our Subsidiaries and was not incurred in connection with, or in contemplation of, such acquisition by us or one of our Restricted Subsidiaries; provided further that the principal amount (or accreted value, as applicable) of such Indebtedness, together with any other outstanding Indebtedness (including refinancings thereof) incurred pursuant to this clause (j), does not exceed $5.0 million;

(k)        Indebtedness in respect of worker's compensation, self-insurance obligations, performance, surety, appeal and similar bonds and completion guarantees provided in the ordinary course of business;

(l)        Indebtedness incurred in connection with the acquisition of capital stock of Restricted Subsidiaries existing on the Issue Date representing minority interests in such Restricted Subsidiaries in an aggregate principal amount (including refinancings thereof) not to exceed $2.0 million;

(m)       additional Indebtedness of us or any of our Restricted Subsidiaries, Incurred after the Issue Date, in an aggregate principal amount at any time outstanding (including refinancings thereof), not to exceed $20.0 million; and

(n)        Indebtedness Incurred in connection with the financings or refinancings of our real property holdings existing on the Issue Date provided the proceeds of such financings are used to (i) replace or refinance Existing Indebtedness or (ii) provide additional financings as allowed under (m) above.

For purposes of determining compliance with this covenant, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (a) through (n) above or is entitled to be Incurred pursuant to the first paragraph above, we will, in our sole discretion, classify such item of Indebtedness in any manner that complies with this covenant and such item of Indebtedness will be treated as having been incurred pursuant to only one of such clauses or pursuant to the first paragraph hereof or as having been divided and incurred pursuant to more than one of such clauses or the first paragraph hereof.  Accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness will not be deemed to be an incurrence of Indebtedness for purposes of this covenant.  If the Indebtedness is Incurred, denominated and payable in other than United States currency, then the Indebtedness will be converted into United States currency using the spot foreign exchange rate of the currency in which such Indebtedness is Incurred, denominated and payable on the date of Incurrence of such Indebtedness.   Indebtedness Incurred under clause (h) above as a refinancing of the Credit Facilities may be Incurred as two or more separate facilities entered into at the same time or at different times so long as such facilities in the aggregate constitute a refinancing of the Credit Facilities in a maximum amount not to exceed the amount permitted under clause (b) above.

*Limitation on Senior Subordinated Indebtedness*

The New Indenture provides that we will not, directly or indirectly, Incur, or suffer to exist, any Indebtedness that by its terms would expressly rank senior in right of payment to the New Notes and subordinate in right of payment to any other Indebtedness.

*Limitation on Restricted Payments*

The New Indenture provides that we will not, and will not cause or permit any Restricted Subsidiary to, directly or indirectly

(i)        declare or pay any dividend or any other distribution on any Equity Interests of the Company or make any payment or distribution to the direct or indirect holders (in their capacities as such) of Equity Interests of the Company including, without limitation, any such dividend, distribution or other payment made in connection with any Merger or consolidation involving the Company (other than any dividends, distributions and payments made solely in Qualified Equity Interests of the Company or in options, warrants or other rights to purchase

- 65 -

Qualified Equity Interests of the Company or dividends or distributions by a Restricted Subsidiary to us or another Restricted Subsidiary or payments made under the Employment Agreement or the Separation Agreement);

(ii)     purchase, redeem or otherwise acquire or retire for value any Equity Interests of the Company or any of our Subsidiaries (other than any such Equity Interests owned by us or any Restricted Subsidiary);

(iii)     make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value any Subordinated Indebtedness of Guarantor Subordinated Indebtedness, except a payment of interest o principal at Stated Maturity;

(iv)     make any Investment in any Person (other than Permitted Investments); or

(v)     designate any Restricted Subsidiary as an Unrestricted Subsidiary; (any such payment or any other action (other than any exception thereto) described in (i) through (v), a "Restricted Payment"), unless

(a)     no Default or Event of Default will have occurred and be  continuing at the time or immediately after giving effect to such Restricted Payment;

(b)     immediately after giving effect to such Restricted Payment, we would be able to incur $1.00 of additional Indebtedness (other than Permitted Indebtedness) under the Consolidated Coverage Ratio test set forth in the first paragraph of "—Limitation on Indebtedness;" and

(c)     immediately after giving effect to such Restricted Payment, the aggregate amount of all Restricted Payments declared or made on or after the Issue Date (excluding Restricted Payments permitted by clauses (ii) and (iv) of the next succeeding paragraph) does not exceed an amount equal to the sum of (1) 50% of cumulative Consolidated Net Income determined for the period (taken as one period) from the beginning of the first fiscal quarter commencing after the Issue Date and ending on the last day of the most recent fiscal quarter immediately preceding the date of such Restricted Payment for which our consolidated financial information is available (or if such cumulative Consolidated Net Income will be a loss, minus 100% of such loss), plus (2) the aggregate net cash proceeds received by us (x) as capital contributions after the Issue Date or (y) from the issue and sale (other than to any of our Subsidiaries) of its Qualified Equity Interests after the issue Date (excluding the net proceeds from any issuance and sale of Qualified Equity Interests financed, directly or indirectly, using funds borrowed from us or any of our Subsidiaries until and to the extent such borrowing is repaid), plus (3) the principal amount (or accreted amount (determined in accordance with GAAP), if less) of any Indebtedness of the Company or any Restricted Subsidiary Incurred after the Issue Date which has been converted into or exchanged for Qualified Equity Interests of the Company (minus the amount of any cash or property distributed by us or any Restricted Subsidiary upon such conversion or exchange), plus (4) an amount equal to the net reduction in Restricted Payments resulting from dividends, repayments of loans or advances, or other transfers of assets, in each case to us or any Restricted Subsidiary (except to the extent any such payment is included in the calculation of Consolidated Net Income), or from redesignations of Unrestricted Subsidiaries as Restricted Subsidiaries, not to exceed the amount of Restricted Payments previously made after the Issue Date by us and our Restricted Subsidiaries in such Person.

The foregoing provisions will not prevent: (i) the payment of any dividend or distribution on, or redemption of, Equity Interests within 60 days after the date or declaration of such dividend or distribution or the giving of formal notice of such redemption, if at the date of such declaration or giving of such formal notice such payment or redemption would comply with the provisions of this New Indenture; (ii) the purchase, redemption, retirement or other acquisition of any Equity Interests of the Company, Subordinated Indebtedness or Guarantor Subordinated Indebtedness in exchange for, or out of the net cash proceeds of the substantially concurrent issue and sale (other than to any of our Subsidiaries) of, Qualified Equity Interests received by us; provided, however, that any such net cash proceeds or any Equity Interest issued in exchange for such retired Equity Interests will be excluded from clause (c)(2) of the preceding paragraph (and were not included therein at any time); (iii) the defeasance,

- 66 -

redemption, repurchase or other acquisition of Subordinated Indebtedness or Guarantor Subordinated Indebtedness with the net cash proceeds from a Refinancing; (iv) payments by us to purchase, redeem or acquire for value shares of our capital stock (other than Disqualified Equity Interests) or options on such shares held by officers or employees or former officers or employees (or their estates or beneficiaries under their estates) upon the death, disability, retirement or termination of employment of such current or former officers or employees pursuant to the terms of an employee benefit plan or any other agreement pursuant to which such shares of capital stock or options were issued or pursuant to a severance, buy-sell or right of first refusal agreement with such current or former officer or employee; provided, however, that the aggregate cash consideration paid, or distributions made, pursuant to this clause (iv) do not in any one fiscal year exceed $5.0 million; (v) Investments constituting Restricted Payments made as a result of the receipt of non-cash consideration from any Asset Sale made pursuant to and in compliance with "Disposition of Proceeds of Asset Sales" below; and (vi) the purchase of Capital Stock representing minority interests in Restricted Subsidiaries; provided, however, that the aggregate cash consideration paid pursuant to this clause (vii) does not exceed $5.0 million.

The amount of any non-cash Restricted Payment will be deemed to be equal to the Fair Market Value thereof at the date of the making of such Restricted Payment.

### Limitation on Dividend and Other Payment Restrictions Affecting Subsidiaries

The New Indenture provides that we will not, and will not cause or permit any Restricted Subsidiary to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to (a) pay dividends or make any other distributions to us or any Restricted Subsidiary on its Equity Interests or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness owed to us or any Restricted Subsidiary, (b) make loans or advances to, or guarantee any Indebtedness or other obligations of, or make any Investment in, us or any Restricted Subsidiary or (c) transfer any of its properties or assets to us or any Restricted Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) the Credit Facilities as in effect on the Issue Date, any other agreement of us or our Restricted Subsidiaries outstanding on the Issue Date as in effect on the Issue Date and any other agreement of the Company or our Restricted Subsidiaries outstanding from time to time governing Senior Indebtedness, and any amendments, restatements, renewals, replacements or refinancings thereof; provided, however, that such encumbrances and restrictions will not be more restrictive taken as a whole than the Credit Facilities as in effect on the Issue Date; (ii) applicable law; (iii) any instrument governing Indebtedness or Equity Interests of an Acquired Person acquired by us or any Restricted Subsidiary as in effect at the time of such acquisition (except to the extent such Indebtedness was Incurred by such Acquired Person in connection with, as a result of or in contemplation of such acquisition); provided, however, that such encumbrances and restrictions will not be applicable to us or any Restricted Subsidiary, or the properties or assets of the Company or any Restricted Subsidiary, other than the Acquired Person; (iv) customary non-assignment, subletting or restriction on transfer provisions or restrictions on cash or other deposits or net worth maintenance provisions under leases, licenses or other contracts entered into in the ordinary course of business; (v) Purchase Money Indebtedness for property acquired in the ordinary course of business that only imposes encumbrances and restrictions on the property so acquired and the proceeds thereof; (vi) any agreement for the sale or disposition of the Equity Interests or assets of any of our Subsidiaries; provided, however, that such encumbrances and restrictions described in this clause (vi) will be only applicable to such Subsidiary or assets, as applicable, and any such sale or disposition is made in compliance with "Disposition of Proceeds of Asset Sales" below to the extent applicable thereto; (vii) Refinancings permitted under clause (h) of the second paragraph of "Limitation on Indebtedness" above; provided, however, that the encumbrances and restrictions of such Refinancings will not be more restrictive taken as a whole than the encumbrances and restrictions in the agreements governing the Indebtedness being refinanced; (viii) the Old Indenture; or (ix) this New Indenture.

### Limitation on Liens

The New Indenture provides that we will not, and will not cause or permit any Restricted Subsidiary to, directly or indirectly, Incur, or suffer to exist, any Liens of any kind against or upon any of their respective

properties or assets now owned or hereafter acquired, or any proceeds therefrom or any income or profits therefrom, to secure any Indebtedness unless contemporaneously therewith effective provision is made to secure the Securities and all other amounts due under this New Indenture, equally and ratably with such Indebtedness (or, in the event that such Indebtedness is subordinated in right of payment to the Securities prior to such Indebtedness) with a Lien on the same properties and assets securing such Indebtedness for so long as such Indebtedness is secured by such Lien, except for Permitted Liens.

*Disposition of Proceeds of Asset Sale*

The New Indenture provides that we will not, and will not cause or permit any Restricted Subsidiary to, directly or indirectly, make any Asset Sale, unless (i) we or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the assets sold or otherwise disposed of, and (ii) at least 75% of the consideration therefor received by us or such Restricted Subsidiary is in the form of (a) cash or Cash Equivalents or (b) property or assets that are used or useful in a Permitted Business, or Equity Interests of any Person primarily engaged in a Permitted Business if, as a result of the acquisition by us or any Restricted Subsidiary thereof, such Person becomes a Restricted Subsidiary; provided that the amount of (x) any liabilities of the Company or any Restricted Subsidiary (other than our contingent liabilities and liabilities that are by their terms subordinated to the New Notes or any guarantee thereof) that are assumed by the transferee of any such assets pursuant to the customary novation agreement that releases us or such Restricted Subsidiary from further liability and (y) any notes or other obligations received by us or any such Restricted Subsidiary from such transferee that are converted by us or such Restricted Subsidiary into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received) within 180 days following the closing of such Asset Sale, will be deemed to be cash for purposes of this provision; provided further that the 75% limitation referred to above will not apply to any sale, transfer or other disposition of assets in which the cash portion of the consideration received therefor, determined in accordance with the foregoing proviso, is equal to or greater than what the after-tax net proceeds would have been had such transaction complied with the aforementioned 75% limitation.

We or such Restricted Subsidiary, as the case may be, subject to the terms of the New Indenture, must deposit all Net Cash Proceeds of any Asset Sale in a segregated escrow account until applied in accordance with the provisions set forth within this section.  We or such Restricted Subsidiary, as the case may be, may (i) apply such Net Cash Proceeds of any Asset Sale within 360 days of receipt thereof to repay Senior Indebtedness, or (ii) make an Investment in property or assets that are used or useful in a Permitted Business, or Equity Interests of any Person primarily engaged in a Permitted Business if, as a result of the acquisition by us or any Restricted Subsidiary thereof, such Person becomes a Restricted Subsidiary.

To the extent all or part of the Net Cash Proceeds of any Asset Sale are not applied as described in clause (i) or (ii) of the immediately preceding paragraph within the time periods set forth therein (the "Net Proceeds Utilization Date") (such Net Cash Proceeds, the "Unutilized Net Cash Proceeds"), we will, within 20 days after such Net Proceeds Utilization Date, be required to make a pro rata offer (an "Asset Sale Offer") to all holders of New Notes and any holders of other Indebtedness that is pari passu or senior with the New Notes or the Subsidiary Guarantees in question and that requires such offer and contains such provisions similar to those set forth in the New Indenture with respect to Offers to Purchase, to purchase or redeem with the proceeds of sales of assets, the maximum principal amount of New Notes and such other pari passu Indebtedness that may be purchased out of the Unutilized Net Cash Proceeds, at an offer price in cash equal to 100% of the principal amount thereof, plus accrued and unpaid interest to the Purchase Date; (subject to the right of holders of record on the relevant Interest Record Date to receive interest on the relevant Interest Payment Date), in accordance with the procedures set forth in the definition of "Offer to Purchase"; provided, however, that the Offer to Purchase may be deferred until there are aggregate Unutilized Net Cash Proceeds equal to or in excess of $15.0 million, at which time the entire amount of such Unutilized Net Cash Proceeds, and not just the amount in excess of $15.0 million, will be applied as required pursuant to this paragraph.

With respect to any Offer to Purchase affected pursuant to this covenant, to the extent the aggregate principal amount of New Notes tendered pursuant to such Offer to Purchase exceeds the Unutilized Net Cash

Proceeds to be applied to the repurchase thereof, such New Notes will be purchased pro rata based on the aggregate principal amount of such New Notes tendered by each Holder.  To the extent the Unutilized Net Cash Proceeds exceeds the aggregate amount of New Notes tendered by the holders of the New Notes pursuant to such Offer to Purchase, we may retain and utilize any portion of the Unutilized Net Cash Proceeds not required to be applied to repurchase New Notes tendered pursuant to such Offer for any purpose consistent with the other terms of the New Indenture.

In the event that we make an Offer to Purchase the New Notes, we will comply with any applicable securities laws and regulations, including any applicable requirements of Section 14(e) of, and Rule 14e-1 under, the Exchange Act, and any violation of the provisions of the New Indenture relating to such Offer to Purchase occurring as a result of such compliance will not be deemed an Event of Default or an event that with the passing of time or giving of notice, or both, would constitute an Event of Default.

Each Holder will be entitled to tender all or any portion of the New Notes owned by such Holder pursuant to the Offer to Purchase, subject to the requirement that any portion of a Note tendered must be tendered in an integral multiple of $1.00 principal amount and subject to any proration among tendering holders as described above.

*Sale and Leaseback Transactions*

We will not, and will not permit any of our Restricted Subsidiaries to, enter into any sale and leaseback transaction; provided that we may enter into a sale and leaseback transaction if (i) we could have Incurred Indebtedness in an amount equal to the Attributable Debt relating to such sale and leaseback transaction pursuant to the Consolidated Coverage Ratio test set forth in the first paragraph of "Limitation on Indebtedness" above, (ii) the gross cash proceeds of such sale and leaseback transaction are at least equal to the Fair Market Value of the property that is the subject of such sale and leaseback transaction and (iii) the transfer of assets in such sale and leaseback transaction is permitted by, and we apply the proceeds of such transaction in compliance with "Disposition of Proceeds of Asset Sales" above; provided, further, that we may enter into a sale and leaseback transaction if the proceeds of such transaction are used to (i) replace or refinance Existing Indebtedness or (ii) provide additional financings as allowed under "Limitation on Indebtedness."

*Merger, Sale of Assets, Etc.*

The New Indenture provides that we will not consolidate with or merge with or into any other Person and we will not sell, convey, assign, transfer, lease or otherwise dispose of all or substantially all of our properties and assets to any entity in a single transaction or series of related transactions, unless: (i) either (x) we will be the Surviving Person or (y) the Surviving Person (if other than us) will be a Person organized and validly existing under the laws of the United States of America or any State thereof or the District of Columbia and will, in any such case, expressly assume by a supplemental indenture, the due and punctual payment of the principal of, premium, if any, and interest on all the New Notes and the performance and observance of every covenant of the New Indenture to be performed or observed on our part; (ii) immediately thereafter on a pro forma basis, no Default or Event of Default will have occurred and be continuing; and (iii) except in the case of a merger or consolidation of us with or into a Wholly Owned Restricted Subsidiary, we or the entity or Person formed by or surviving any such consolidation or merger (if other than us), or to which such sale, assignment, transfer, conveyance or other disposition will have been made will, immediately after such transaction after giving pro forma effect thereto and any related financial transaction as if the same had occurred at the beginning of the applicable four-quarter period, be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the first paragraph of "Limitation on Indebtedness."

For purposes of the foregoing, the transfer (by lease, assignment, sale or otherwise, in a single transaction or series of transactions) of all or substantially all the properties and assets of one or more Restricted Subsidiaries the Equity Interests of which constitutes all or substantially all our properties and assets will be deemed to be the transfer of all or substantially all of our properties and assets.

- 69 -

*Transactions with Affiliates*

The New Indenture provides that we will not and will not cause or permit any Restricted Subsidiary to, directly or indirectly, conduct any business or enter into any transaction (or series of related transactions) with or for the benefit of any of their respective Affiliates (including, without limitation, any Unrestricted Subsidiary) or any of our officers, directors or employees or any of our Subsidiaries (each an "Affiliate Transaction"), unless (i) such Affiliate Transaction is on terms which are no less favorable to us or such Restricted Subsidiary, as the case may be, than would be available in a comparable transaction with an unaffiliated third party and (ii) if such Affiliate Transaction (or series of related Affiliate Transactions) involves aggregate payments or other consideration having a Fair Market Value in excess of $1.0 million in any fiscal year, such Affiliate Transaction is in writing and a majority of the disinterested members, if any, of our Board of Directors will have approved such Affiliate Transaction and determined that such Affiliate Transaction complies with the foregoing provisions.  In addition, any Affiliate Transaction involving aggregate payments or other consideration having a Fair Market Value in excess of $10.0 million will also require a written opinion from an Independent Financial Advisor (filed with the Trustee) stating that the terms of such Affiliate Transaction are fair, from a financial point of view, to us or our Subsidiaries involved in such Affiliate Transaction, as the case may be.

Notwithstanding the foregoing, the restrictions set forth in this covenant will not apply to (i) transactions with or among us and any Restricted Subsidiary or between or among Restricted Subsidiaries or between us and/or one or more of our Restricted Subsidiaries on the one hand, and Non-Affiliated Joint Ventures, on the other hand; (ii) reasonable fees and compensation (including customary benefit, deferred compensation, retirement and stock incentive or similar plans) paid or made available to and indemnity provided on behalf of, our officers, directors, employees, consultants or agents or any Restricted Subsidiary as determined in good faith by our Board of Directors; (iii) advances and loans to employees for relocation, entertainment and travel expenses, drawing accounts and other matters in the ordinary course of business, (iv) any transactions undertaken pursuant to any contractual obligations in existence on the Issue Date (as in effect on the Issue Date), (v) any Restricted Payments made in compliance with "Limitation on Restricted Payments" above and (vi) any transactions pursuant to the Separation Agreement or the Employment Agreement.

*Provision of Financial Information*

The New Indenture provides that we will immediately commence and use our best efforts to register the New Notes under Section 12 of the Exchange Act within 30 days after the date of issuance or as soon as reasonably possible thereafter.  Whether or not we are subject to Section 13(a) or 15(d) of the Exchange Act, or any successor provision thereto, we will file with the SEC (if permitted by SEC practice and applicable law and regulations) the annual reports, quarterly reports and other documents which we would have been required to file with the SEC pursuant to such Section 13(a) or 15(d) or any successor provision thereto if we were so subject, such documents to be filed with the SEC on or prior to the respective dates (the "Required Filing Dates") by which we would have been required so to file such documents if we were so subject.  We will also in any event (a) within 15 days of each Required Filing Date (whether or not permitted or required to be filed with the SEC) (i) transmit (or cause to be transmitted) by mail to all holders, as their names and addresses appear in the Note register, without cost to such holders, and (ii) file with the Trustee, copies of the annual reports, quarterly reports and other documents which we would be required to file with the SEC pursuant to the preceding sentence, or, if such filing is not so permitted, information and data of a similar nature, and (b) if, notwithstanding the preceding sentence, our filing of such documents with the SEC is not permitted by SEC practice or applicable law or regulations, promptly upon written request supply copies of such documents to any Holder.  In addition, for so long as any New Notes remain outstanding and prior to the filing of a registration statement under the Securities Act, if required, we will furnish to the holders and to securities analysts and prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act, and, to any beneficial Holder of New Notes, if not obtainable from the SEC, information of the type that would be filed with the SEC pursuant to the foregoing provisions, upon the request of any such Holder.

- 70 -

*Designation of Unrestricted Subsidiaries*

The New Indenture will provide that we may designate after the Issue Date any of our Subsidiaries as an "Unrestricted Subsidiary" under the New Indenture (a "Designation") only if:

(i)       no Default or Event of Default will have occurred and be continuing at the time of or after giving effect to such Designation;

(ii)       immediately after giving effect to such Designation, we could Incur $1.00 of additional Indebtedness (other than Permitted Indebtedness) under the "Limitation on Indebtedness" covenant; and

(iii)       we would be permitted to make an Investment (other than a Permitted Investment) at the time of Designation (assuming the effectiveness of such Designation) pursuant to the first paragraph of the "Limitation on Restricted Payments" covenant in an amount (the "Designation Amount") equal to the Fair Market Value of the parent's proportionate interest in the net worth of such Subsidiary on such date calculated in accordance with GAAP.

Neither we nor any Restricted Subsidiary will at any time (x) provide credit support for or guarantee any Indebtedness of any Unrestricted Subsidiary (including any undertaking, agreement or instrument evidencing such Indebtedness); provided, that we may pledge Equity Interests or Indebtedness of any Unrestricted Subsidiary on a nonrecourse basis such that the pledgee has no claim whatsoever against us other than to obtain such pledged property, (y) be directly or indirectly liable for any Indebtedness of any Unrestricted Subsidiary or (z) be directly or indirectly liable for any Indebtedness which provides that the holder thereof may (upon notice, lapse of time or both) declare a default thereon or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity upon the occurrence of a default with respect to any Indebtedness of any Unrestricted Subsidiary, except for any non-recourse guarantee given solely to support the pledge by us of the capital stock of any Unrestricted Subsidiary.  For purposes of the foregoing, the Designation of any of our Subsidiaries as an Unrestricted Subsidiary will be deemed to include the Designation of all of the Subsidiaries of such Subsidiary.

We may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "Revocation") only if:

(i)       no Default or Event of Default will have occurred and be continuing at the time of and after giving effect to such Revocation;

(ii)       all Liens and Indebtedness of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, be permitted to be Incurred for all purposes of the New Indenture; and

(iii)       any transaction (or series of related transactions) between such Subsidiary and any of its Affiliates that occurred while such Subsidiary was an Unrestricted Subsidiary would be permitted by the "Transactions with Affiliates" covenant described below as if such transaction (or series of related transactions) had occurred at the time of such Revocation.

All Designations and Revocations must be evidenced by resolutions of our Board of Directors, delivered to the Trustee certifying compliance with the foregoing provisions.

## Events of Default and Remedies

The occurrence of any of the following is defined as an "Event of Default" under the New Indenture: (a) failure to pay principal of (or premium, if any, on) any Note when due (whether or not prohibited by the provisions of the New Indenture described under "Subordination of the New Notes" above); (b) failure to pay any interest on any Note when due, continued for 30 days or more (whether or not prohibited by the provisions of the New Indenture described under "Subordination of the New Notes" above); (c) default in the payment of principal of,

- 71 -

premium, if any, on or interest on any Note required to be purchased pursuant to any Offer to Purchase required by the New Indenture when due and payable or failure to pay on the Purchase Date the purchase price for any Note validly tendered pursuant to any Offer to Purchase (whether or not prohibited by the provisions of the New Indenture described under "Subordination of the New Notes" above); (d) failure to perform or comply with any of the provisions described under "Certain Covenants—Merger, Sale of Assets, etc." above; (e) failure to perform any of our other covenants, warranties or agreements under the New Indenture or in the New Notes, continued for 30 days or more after written notice to us by the Trustee or holders of at least 25% in aggregate principal amount of the outstanding New Notes; (f) default or defaults under the terms of one or more instruments evidencing or securing Indebtedness of the Company or any Significant Restricted Subsidiaries having an outstanding principal amount of $5.0 million or more individually or in the aggregate that has resulted in the acceleration of the payment of such Indebtedness or failure by us or any Restricted Subsidiary to pay principal when due at the stated maturity of any such Indebtedness and such default or defaults will have continued after any applicable grace period and will not have been cured or waived; (g) the rendering of a final judgment or judgments (not subject to appeal) against us or any Significant Restricted Subsidiary in an aggregate amount of $5.0 million or more (net of any amounts covered by reputable and creditworthy insurance companies) which remains undischarged or unstayed for a period of 60 days after the date on which the right to appeal has expired; or (h) certain events of bankruptcy, insolvency or reorganization affecting us or any of our Significant Restricted Subsidiaries.

If an Event of Default with respect to the New Notes (other than an Event of Default described in clause (h) of the preceding paragraph) occurs and is continuing, the Trustee or the holders of at least 25% in aggregate principal amount of the outstanding New Notes, by notice in writing to us may declare the unpaid principal of (and premium, if any) and accrued interest to the date of acceleration on all the outstanding New Notes to be due and payable immediately and, upon any such declaration, such principal amount (and premium, if any) and accrued interest, notwithstanding anything contained in the New Indenture or the New Notes to the contrary, will become immediately due and payable.  If an Event or Default specified in clause (h) of the preceding paragraph with respect to us occurs under the New Indenture, the New Notes will ipso facto become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder of the New Notes.

Subject to the provisions of the New Indenture relating to the duties of the Trustee, in case an Event of Default will occur and be continuing, the Trustee will be under no obligation to exercise any of its rights or powers under the New Indenture at the request or direction of any of the holders of New Notes, unless such holders will have offered to the Trustee reasonable indemnity or security.  Subject to such provisions for the indemnification of the Trustee, the holders of a majority in aggregate principal amount of the outstanding New Notes will have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred an such Trustee.

Any such declaration with respect to the New Notes may be rescinded and annulled by the holders of a majority in aggregate principal amount of the outstanding New Notes upon the conditions provided in the New Indenture.  For information as to waiver of defaults, see "Modification and Waiver" below.

The New Indenture provides that the Trustee shall, within 30 days after the occurrence of any Default or Event of Default with respect to the New Notes outstanding, give the holders of the New Notes thereof notice of all uncured Defaults or Events of Default thereunder known to it; provided, however, that, except in the case of a Default or an Event of Default in payment with respect to the New Notes or a Default or Event of Default in complying with "Certain Covenants—Merger, Sale of Asset, etc." above, the Trustee shall be protected in withholding such notice if and so long as a committee of its trust officers in good faith determines that the withholding of such notice is in the interest of the Holders of the Notes.

No holder of any New Note will have any right to institute any proceeding with respect to the Indenture or for any remedy thereunder, unless such holder shall have previously given to the Trustee written notice of a continuing Event of Default thereunder and unless the holders of at least 25% of the aggregate principal amount of the outstanding New Notes shall have made written request, and offered reasonable indemnity or security, to the Trustee to institute such proceeding, and the Trustee shall have not have received from the holders of a majority in

aggregate principal amount of such outstanding New Notes a direction inconsistent with such request and shall have failed to institute such proceeding within 60 days. However, such limitations do not apply to a suit instituted by a holder of such a New Note for enforcement of payment of the principal of and premium, if any, or interest on such Note on or after the respective due dates expressed in such New Note.

We will be required to furnish to the Trustee annually a statement as to the performance by us of certain of our obligations under the New Indenture and as to any material default in such performance.

**No Personal Liability of Directors, Officers, Employees, Incorporator, Manager and Shareholders**

No director, officer, employee, incorporator, manager or shareholder of the Company or any of our Affiliates, as such, will have any liability for any obligations of the Company under the New Notes or the New Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each holder of New Notes by accepting a New Note waives and releases all such liability. The waiver and release will be part of the consideration for issuance of the New Notes. Such waiver may not be effective to waive liabilities under the federal securities laws and it is the view of the SEC that such a waiver is against public policy.

**Legal Defeasance and Covenant Defeasance**

We may, at our option and at any time, elect to have our obligations discharged with respect to the outstanding New Notes ("Legal Defeasance"). Such Legal Defeasance means that we will be deemed to have paid and discharged the entire indebtedness represented by the outstanding New Notes, except for (i) the rights of holders to receive payments in respect of the principal of, premium, if any, and interest on the New Notes when such payments are due, (ii) our obligations with respect to the New Notes concerning issuing temporary New Notes, registration of New Notes, mutilated, destroyed, lost or stolen New Notes and the maintenance of an office or agency for payments, (iii) the rights, powers, trust, duties and immunities of the Trustee and our obligations in connection therewith; (iv) Article III of the New Indenture; and (v) the Legal Defeasance provisions of the New Indenture. In addition, we may, at our option and at any time, elect to have our obligations released with respect to certain covenants that will be described in the New Indenture ("Covenant Defeasance") and thereafter any omission to comply with such obligations will not constitute a Default or an Event of Default with respect to the New Notes. In the event Covenant Defeasance occurs, certain events (not including non-payment, bankruptcy, receivership, reorganization and insolvency events) described under "Events of Default" will no longer constitute an Event of Default with respect to the New Notes.

In order to exercise either Legal Defeasance or Covenant Defeasance, (i) we must irrevocably deposit with the Trustee, in trust, for the benefit of the holders cash in U.S. dollars, noncallable U.S. government obligations, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants to pay the principal of, premium, if any, and interest on the New Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be; (ii) in the case of Legal Defeasance, we will have delivered to the Trustee an opinion of counsel in the United States reasonably acceptable to the Trustee confirming that (A) we have received from, or there has been published by, the Internal Revenue Service, a ruling or (B) since the Issue Date, there has been a change in the applicable federal income tax law, in either case to the effect that, and based thereon such opinion of counsel will confirm that, the holders will not recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred; (iii) in the case of Covenant Defeasance, we will have delivered to the Trustee an opinion of counsel in the United States reasonably acceptable to the Trustee confirming that the holders will not recognize income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred; (iv) no Default or Event of Default will have occurred and be continuing on the date of such deposit or insofar as Events of Default from bankruptcy or insolvency events are concerned, at any time in the period ending on the 91st day after the date of

- 73 -

deposit; (v) such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under the New Indenture or any other material agreement or instrument to which we or any of our Subsidiaries in a party or by which we or any of our Subsidiaries is bound; (vi) we will have delivered to the Trustee an officers' certificate stating that the deposit was not made by us with the intent of preferring the holders over any other our creditors or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Company or others; (vii) we will have delivered to the Trustee an officers' certificate and an opinion of counsel, each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance have been complied with; (viii) we will have delivered to the Trustee an opinion of counsel to the effect that (A) the trust funds will not be subject to any rights of holders of Senior Indebtedness, including, without limitation, those arising under the New Indenture and (B) assuming no intervening bankruptcy of the Company between the date of deposit and the 91st day following the date of the deposit and that no Holder is an insider of the Company, after the 91st day following the date of the deposit, the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally; and (ix) certain other customary conditions precedent are satisfied.  Notwithstanding the foregoing, the opinion of counsel required by clause (ii) above need not be delivered if all New Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable, (y) will become due and payable on the maturity date within one year or (z) are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in our name and at our expense.

## Governing Law

The New Indenture, the New Notes and the Guarantees, if any, will be governed by the laws of the State of New York without regard to principles of conflicts of laws.

## Modification and Waiver

Modifications, waivers and amendments of the New Indenture may be made by us and the Trustee with the consent of the holders of a majority in aggregate principal amount of the outstanding New Notes (including consents obtained in connection with a tender offer or exchange offer for the New Notes); provided, however, that no such modification, waiver or amendment to the New Indenture may, without the consent of the Holder of each New Note affected thereby, (a) change the maturity of the principal of or any installment of interest on any such New Note or alter the optional redemption or repurchase provisions of any such New Note or the New Indenture in a manner adverse to the holders of the New Notes; (b) reduce the principal amount of (or the premium of) any such Note; (c) reduce the rate of or extend the time for payment of interest on any such Note; (d) change the place or currency of payment of principal of (or premium) or interest on any such Note; (e) modify any provisions of the New Indenture relating to the waiver of past defaults (other than to add sections of the New Indenture or the New Notes subject thereto) or the right of the holders of New Notes to institute suit for the enforcement of any payment on or with respect to any such New Note or Guarantee or the modification and amendment provisions of the New Indenture and the New Notes (other than to add sections of the New Indenture or the New Notes which may not be modified, amended, supplemented or waived without the consent of each Holder affected); (f) reduce the percentage of the principal amount of outstanding New Notes necessary for amendment to or waiver of compliance with any provision of the New Indenture or the New Notes or for waiver of any Default in respect thereof; (g) waive a default in the payment of principal of, interest on, or redemption payment with respect to, the New Notes (except a rescission of acceleration of the New Notes by the holders thereof as provided in the New Indenture and a waiver of the payment default that resulted from such acceleration); (h) modify the ranking or priority of any New Note in respect thereof in any manner adverse to the holders or modify the definition of Senior Indebtedness or amend or modify the subordination provisions of the New Indenture in any manner adverse to the holders of the New Notes; or (i) modify the provisions of any covenant (or the related definitions) in the New Indenture requiring us to make an Offer to Purchase in a manner materially adverse to the holders of New Notes affected thereby otherwise than in accordance with the New Indenture.

- 74 -

The holders of a majority in aggregate principal amount of the outstanding New Notes, on behalf of all holders of New Notes, may waive compliance by us with certain restrictive provisions of the New Indenture. Subject to certain rights of the Trustee, as provided in the New Indenture, the holders of a majority in aggregate principal amount of the New Notes, on behalf of all holders, may waive any past default under the New Indenture (including any such waiver obtained in connection with a tender offer or exchange offer for the New Notes), except a default in the payment of principal, premium or interest or a default arising from failure to purchase any New Notes tendered pursuant to an Offer to Purchase, or a default in respect of a provision that under the indenture cannot be modified or amended without the consent of the Holder of each New Note that is affected.

**The Trustee**

Except during the continuance of an Event of Default, the Trustee will perform only such duties as are specifically set forth in the New Indenture.  During the existence of an Event of Default, the Trustee will exercise such rights and powers vested in it under the New Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs.

The New Indenture and provisions of the Trust Indenture Act incorporated by reference therein contain limitations on the rights of the Trustee, should it become a creditor of the Company or any other obligor upon the New Notes, to obtain payment of claims in certain cases or to realize on certain property received by it in respect of any such claim as security or otherwise.  The Trustee is permitted to engage in other transactions with us or any of our Affiliates; provided, however, that if it acquires any conflicting interest (as defined in the New Indenture or in the Trust Indenture Act), it must eliminate such conflict or resign.

**Comparison Of Key Differences Between The Notes And The New Notes**

The following table summarizes the key differences between the provisions of the New Indenture as compared to the Old Indenture.  You should read the Old Indenture and the New Indenture to determine the full extent of the differences.  This summary is qualified in its entirety by reference to both indentures.  Capitalized terms used within this summary but not defined shall have the meaning as set forth in the Old Indenture and the New Indenture respectively.

|  | **Old Indenture\*** | **New Indenture** |
| --- | --- | --- |
| Aggregate Principal Amount: | $110,000,000 | $30,000,000 |
| Interest Payment Dates: | Payable semi-annually. | Payable semi-annually. |
| Interest Rate: | 9⅜% | (i) 2.0% per year payable in cash, plus (ii) at the our option, either (a) 8.0% per year payable in cash or (b) 10.0% per year to be capitalized as principal. |
| Maturity Date: | May 1, 2005 | 5 years after the Closing of the Exchange Restructuring |
| Guarantees: | Upon the satisfaction of certain requirements, certain Restricted Subsidiaries of the Company shall guarantee on an unsecured senior subordinated basis all of the Company's | Upon the satisfaction of certain requirements, certain Restricted Subsidiaries of the Company shall guarantee on an unsecured senior subordinated basis all of the Company's |

- 75 -

|  | obligations under the Notes and the Old Indenture. | obligations under the New Notes and the New Indenture. |
|---|---|---|
| Ranking: | Unsecured indebtedness of the Company, subject to subordination in favor of our senior debt, pari passu in right of payment with any of our future senior subordinated indebtedness. | Unsecured indebtedness of the Company, subject to subordination in favor of our senior debt existing on the Issue Date, pari passu in right of payment with any of our future senior subordinated indebtedness. |
| Optional Redemption: | We have the option to redeem the Notes in whole or in part at the redemption price of 102.344% of their principal amount until December 31, 2003 and thereafter at 100.0% of their principal amount together with any interest accrued and unpaid on the redemption date. | We will have the option to redeem the New Notes in whole or in part at any time at the redemption price of 101% of their principal amount, together with any interest accrued and unpaid on the redemption date. |
| Restrictive Covenants: | The Old Indenture limits our ability, among other things, to: | The New Indenture limits our ability, among other things, to: |

The Old Indenture limits our ability, among other things, to:

- pay dividends or distributions on our capital stock, repurchase our capital stock and redeem certain subordinated debt;

- make certain investments;

- create certain liens on our assets to secure debt;

- incur additional debt;

- enter into certain transactions with affiliates; and

- consolidate, merge or transfer all or substantially all of our assets.

The New Indenture limits our ability, among other things, to:

- pay dividends or distributions on our capital stock, repurchase our capital stock and redeem certain subordinated debt;

- make certain investments;

- create certain liens on our assets to secure debt;

- the incurrence of additional debt;

- enter into certain transactions with affiliates;

- consolidate, merge or transfer all or substantially all of our assets; and

- enter into sale-leaseback arrangements.

*        If the Exchange Offer and solicitation of consents to the Old Indenture Amendments are completed, the Old Indenture will be amended to eliminate most of the restrictive covenants and some events of default, and the remaining holders of Notes who do not tender their Notes for exchange will no longer benefit from the protection to their credit interest afforded by those restrictive covenants and events of default.  See "The Exchange Restructuring – Proposed Amendments to the Old Indenture."

## TENDERING, CONSENTING AND VOTING PROCEDURES

**Noteholder Procedures for Tendering Notes and Delivering Consents to the Solicited Consents and Prepackaged Plan**

*Tender of Notes and Delivery of Consents*

The tender by a holder of Notes, and subsequent acceptance of the tender, pursuant to one of the procedures described below (including an electronic tender through the Depository Trust and Clearing Corporation ("DTC")) will constitute an agreement between that holder and us in accordance with the terms and subject to the conditions set forth in this offering memorandum, the Letter of Transmittal or Master Ballot and, if applicable, the Notice of Guaranteed Delivery. The procedures by which Notes may be tendered and consents may be given by beneficial owners that are not direct holders of Notes will depend upon the manner in which the Notes are held. We are not accepting partial tenders of the Notes in the Exchange Offer. Therefore a holder wishing to validly tender any of its Notes must tender all of them.

To validly tender Notes, a holder should, prior to the Expiration Date:

- complete and sign the Letter of Transmittal in accordance with the instructions included therein;

- have its signatures guaranteed, if required by the instructions;

- deliver the completed and signed Letter of Transmittal, together with any other documents required by the instructions, to the Exchange Agent at its address set forth on the back cover of this offering memorandum; and

- either (i) deliver certificates representing the Notes to the Exchange Agent at its address set forth on the back cover of this offering memorandum, or (ii) cause the Notes to be transferred to the Exchange Agent's account at DTC pursuant to the procedures for book-entry delivery described below.

**A holder should read the instructions included in the Letter of Transmittal carefully. Letters of Transmittal, Notices of Rejection or Notes should not be sent to us, the Information Agent or the Old Indenture Trustee for the Notes, but should be sent to the Exchange Agent only.**

All questions as to the form of any documents, and the validity (including time of receipt) and acceptance of all tenders, will be determined by us. We reserve the absolute right to reject any or all tenders that are not in proper form or the acceptance of which would, in our opinion, be unlawful. We also reserve the right to waive any defects, irregularities or conditions of tender as to particular Notes. Our interpretations of the terms and conditions of the Exchange Offer (including the instructions in the Letter of Transmittal) will be final and binding. Any defect or irregularity in connection with tenders must be cured within such time as we determine, unless waived by us. Tenders of Notes will not be deemed to have been made until all defects and irregularities have been waived by us or cured. None of the Company, the Exchange Agent or any other person will be obligated to give notice of any defects or irregularities in tenders, nor will they incur any liability for failure to give any such notice.

A holder that desires to tender its Notes but cannot comply with the procedures for tender on a timely basis, or whose Notes are not immediately available for tender, must comply with the procedures for guaranteed delivery described below under the caption "—Guaranteed Delivery Procedures."

**The proper completion, execution and delivery of the Letter of Transmittal by a holder of Notes, together with the valid tender of such Notes, will constitute (i) the giving of consent by that holder to the Solicited Consents, and (ii) a vote to accept the Prepackaged Plan.**

If any Notes are registered in the name of a person other than the signer of a Letter of Transmittal, then, in order to validly tender those Notes pursuant to the Exchange Offer, the Notes must be endorsed or accompanied by an appropriate written instrument or instruments of transfer reasonably satisfactory to us signed exactly as the name of such holder appears on the Notes, with the signatures or instruments of transfer guaranteed as provided below under the caption "—Signature Guarantees."

The method of delivery of Notes and all other documents to the Exchange Agent is at the election and risk of the tendering holder.  **Delivery will be deemed made only when actually received by the Exchange Agent.**  If delivery is made by mail, it is recommended that the holder use properly insured, registered mail with return receipt requested, and that the mailing be made sufficiently in advance of the Expiration Date to permit delivery to the Exchange Agent on or before that date.

*Tender of Notes Held Through a Nominee*

Any beneficial owner whose Notes are registered in the name of a broker, dealer, custodian bank, trust company or other nominee and wishes to tender its Notes and deliver a Letter of Transmittal should, prior to the Expiration Date, either:

- contact the registered holder promptly and instruct it to tender the Notes and deliver a Letter of Transmittal on the beneficial owner's behalf; or

- either (i) effect a valid transfer of registered ownership of the Notes to such beneficial owner or (ii) obtain certificates for Notes and an appropriate written instrument or instruments of transfer reasonably satisfactory to us signed exactly as the name of such registered owner appears on the Notes,and tendering such Notes on a properly completed Letter of Transmittal according to the holder instructions above.

*Tender of Notes Held Through DTC*

The Exchange Agent and DTC have confirmed that the Exchange Offer is eligible for the DTC Automated Tender Offer Program ("ATOP").  The Exchange Agent will establish accounts with respect to the Notes at DTC for purposes of the Exchange Offer within two business days after the date of this offering memorandum.  To tender Notes that are held through DTC, the relevant DTC participant must prior to the Expiration Date:

- electronically transmit its acceptance through ATOP (an action that will constitute acceptance of the Exchange Offer and consent to both the Solicited Consents and the Prepackaged Plan); and

- cause DTC to transfer the Notes into the Exchange Agent's account in accordance with DTC's procedures (including a proper book-entry confirmation).

Upon receiving a holder's acceptance through ATOP, DTC will edit and verify the acceptance and send an Agent's Message (as defined below) to the Exchange Agent for its acceptance.

The confirmation of a book-entry transfer into the Exchange Agent's account at DTC is referred to in this offering memorandum as a "book-entry confirmation."  The term "Agent's Message" means a message (forming part of a book-entry confirmation) that is transmitted by DTC to, and received by, the Exchange Agent stating that DTC has received an express acknowledgment from a DTC participant that the participant has received and agrees to be bound by the terms of the Letter of Transmittal, including the consent to the Solicited Consents and Prepackaged Plan, and that we may enforce that agreement against the participant.  **Those DTC participants will**

**be required to make physical delivery of the Master Ballot to the Exchange Agent on or before the Expiration Date.**

*Execution of Master Ballot*

If Notes are held either (a) by a registered holder who is also the beneficial owner, and who intends to tender Notes through DTC, or (b) through a nominee, then the registered holder of the Notes must submit a Master Ballot to the Exchange Agent prior to the Expiration Date.  The Master Ballot collects information about each beneficial owner and tabulates votes with respect to the Exchange Offer and the Prepackaged Plan.  **IF THE MASTER BALLOT IS NOT SUBMITTED PRIOR TO THE EXPIRATION DATE, ANY TENDER OF NOTES WILL BE INVALID.**

*Signature Guarantees*

All signatures on a Letter of Transmittal, Notice of Guaranteed Delivery or a notice of withdrawal, as the case may be, are required to be guaranteed by a member of the Securities Transfer Agents Medallion Program, the Stock Exchange Medallion Program, or the New York Stock Exchange, Inc. Medallion Signature Program (each of the foregoing referred to as an "Eligible Institution"), unless the Notes surrendered for exchange are being tendered:

- by a registered holder of the Notes (or by a participant in DTC whose name appears on a security position listing as the owner of such Notes) that has not completed either the box entitled "Special Delivery Instructions" or the box entitled "Special Issuance Instructions" on the Letter of Transmittal; or

- for the account of an Eligible Institution.

If Notes are registered in the name of a person other than the signer of the Letter of Transmittal, then the signatures on the Letter of Transmittal accompanying the tendered Notes must be guaranteed by an Eligible Institution as described above.  See the instructions to the Letter of Transmittal.

*Guaranteed Delivery Procedures*

If a holder desires to tender Notes pursuant to the Exchange Offer and deliver a consent to the Solicited Consents and Prepackaged Plan, and the holder's Notes are not immediately available or time will not permit the applicable Letter of Transmittal, certificates representing the Notes, and all other required documents to reach the Exchange Agent, or the procedures for book-entry transfer cannot be completed, in each case, prior to the Expiration Date, such holder may nevertheless tender its Notes and deliver a consent if all the following conditions are satisfied:

- the tender is made by or through an Eligible Institution;

- either a properly completed and duly executed Notice of Guaranteed Delivery, substantially in the form provided by us with this offering memorandum, or an Agent's Message with respect to guaranteed delivery, is received by the Exchange Agent prior to the Expiration Date, as provided below; and

- the certificates for the tendered Notes, in proper form for transfer (or a book-entry confirmation, including by means of an Agent's Message, of the transfer of the Notes into the Exchange Agent's account at DTC as described above), together with a Letter of Transmittal and Master Ballot, in each case properly completed and duly executed, with any required signature guarantees and any other documents required by the instructions to the Letter of Transmittal, are received by the Exchange Agent within three New York Stock Exchange trading days after the date of execution of the Notice of Guaranteed Delivery.

The Notice of Guaranteed Delivery may be sent by hand delivery, telegram, facsimile transmission or mail to the Exchange Agent and must include a guarantee by an Eligible Institution in the form set forth in the Notice of Guaranteed Delivery.

*Letter of Transmittal; Representations, Warranties and Covenants of Holders of Notes*

Upon the submission of the Letter of Transmittal, or agreement to the terms of the Letter of Transmittal pursuant to an Agent's Message described above, a holder, or the beneficial holder of such Notes on behalf of which the holder has tendered, will, subject to the terms and conditions of the Exchange Offer generally, be deemed among other things, to:

- irrevocably sell, assign and transfer to or upon our order or the order of our nominees, all right, title and interest in and to, and any and all claims in respect of or arising or having arisen as a result of such holder's status as a holder of, all Notes tendered thereby, such that thereafter it shall have no contractual or other rights or claims in law or equity against us or any fiduciary, trustee or other person connected with the Notes arising under, from or in connection with such Notes;

- irrevocably waive any and all rights with respect to the Notes tendered thereby (including, without limitation, any existing or past defaults by us, the Old Indenture Trustee or any party acting on our behalf or at our instruction and their consequences in respect of such Notes); and

- irrevocably release and discharge us, the Old Indenture Trustee or any party acting on our behalf or at our instruction from any and all claims such holder may have, now or in the future, arising out of or related to the Notes tendered thereby, including, without limitation, any and all claims that such holder is entitled to receive additional principal or interest payments with respect to the Notes tendered thereby or to participate in any redemption or defeasance of the Notes tendered thereby.

*Withdrawal of Tenders and Revocation of Consents*

Tenders of Notes may be withdrawn at any time prior to the Expiration Date but not thereafter.  Tenders of Notes may also be withdrawn if the Exchange Offer is terminated without any Notes being exchanged thereunder. A proper withdrawal of tendered Notes prior to the Expiration Date will be deemed a revocation of the related consent to the Solicited Consents and Prepackaged Plan.  Similarly, a consent to the Solicited Consents and the Prepackaged Plan may be revoked at any time prior to the Expiration Date, but a valid revocation of a consent will render a tender of Notes defective.  However, any such withdrawal will not affect any party's obligations under the Lock-Up Agreement.

For a withdrawal of a tender of Notes and a revocation of a Solicited Consent to be effective, a written or facsimile transmission notice of withdrawal or revocation, or a "request message" (as defined below), must be timely received by the Exchange Agent at its address set forth on the back cover of this offering memorandum.  Any notice of withdrawal or revocation must:

- specify the name of the person who tendered the Notes to be withdrawn and to which the revocation of a consent relates;

- contain the description of the Notes to be withdrawn or to which the revocation of a consent relates and identify the certificate number or numbers shown on the particular certificates evidencing such Notes (unless Notes were tendered by book-entry transfer) and the aggregate principal amount represented by such Notes; and

- be signed by the holder of the Notes in the same manner as the original signature on the Letter of Transmittal by which the Notes were tendered and the related consent was given (including any

- 80 -

required signature guarantees) or be accompanied by documents of transfer sufficient to have the Old Indenture Trustee register the transfer of the Notes in the name of the person withdrawing the Notes and revoking the related consent.

In lieu of submitting a notice of withdrawal or revocation, DTC participants may electronically transmit a request for withdrawal to DTC. DTC will then edit the request and send a request message to the Exchange Agent. The term "request message" means a message transmitted by DTC, and received by the Exchange Agent, stating that DTC has received a request for withdrawal from a DTC participant and identifying the Notes to which such request relates. If the Notes to be withdrawn have been delivered or otherwise identified to the Exchange Agent, a properly completed and presented notice of withdrawal or a request message is effective immediately upon receipt thereof even if physical release is not yet effected. A withdrawal of Notes and a revocation of consents can only be accomplished in accordance with the foregoing procedures.

Any Notes properly withdrawn, and with respect to which a consent has been properly revoked, will be deemed to be not validly tendered for purposes of the Exchange Offer. Properly withdrawn Notes may be retendered by following one of the procedures described above at any time prior to the Expiration Date.

*Acceptance by Us of Noteholder Tenders and Consents*

For purposes of the Exchange Offer, we shall be deemed to have accepted Notes tendered for exchange pursuant thereto when, as and if we give oral or written notice to the Exchange Agent of our acceptance of such Notes. Upon the terms and subject to the conditions of the Exchange Offer, delivery of any New Notes or New Common Stock for Notes accepted pursuant to the Exchange Offer will be made by the Exchange Agent as soon as practicable after issuance and receipt of any such New Notes or New Common Stock by the Exchange Agent. The Exchange Agent will act as agent for the tendering holders of Notes for the purpose of receiving New Notes and New Common Stock accepted for exchange and transmitting New Notes and New Common Stock accepted for exchange to such holders.

**Shareholder Procedures for Consenting to Charter Amendments and Prepackaged Plan**

*Delivery of Consents*

Holders of Class B Common Stock that wish to vote to accept or reject the Charter Amendments and the Prepackaged Plan should complete, date and sign the accompanying written Ballot and Consent Letter and promptly return it to us at the address set forth on the back cover of this offering memorandum on or before the Expiration Date.

*Withdrawal of Consents*

Any holder of Class B Common Stock that has executed a Ballot and Consent Letter may revoke its consent by delivering written notice of such revocation to the Exchange Agent prior to the Expiration Date. Such written notice will constitute a revocation of such holder's vote to accept or reject both the Charter Amendments and Prepackaged Plan.

**CAPITALIZATION PRIOR TO AND FOLLOWING THE RESTRUCTURING**

Under our existing Articles of Incorporation, the total number of shares of capital stock that we are authorized to issue 16,000,000 shares, of which 1,000,000 are Preferred Stock, 5,000,000 are Class A Common Stock, and 10,000,000 are Class B Common Stock.  Prior to the Restructuring, the only shares of our capital stock outstanding are the 1,000 shares of Class B Common Stock that are held by Tower Records, Incorporated.

Upon adoption of the Charter Amendments in connection with the Restructuring, we will be authorized to issue 100,000,000 shares of a single class of New Common Stock, of which 10,000,000 will be issued and outstanding immediately following the Restructuring.  The following table shows the beneficial ownership of the holders of Notes and Class B Common Stock before the consummation of the Restructuring and after consummation of the Restructuring.

| | Before Consummation of the Restructuring | | After Consummation of the Restructuring | |
|---|---|---|---|---|
| | Number of Shares of Class B Common Stock | Ownership Percentage (%) | Number of Shares of New Common Stock | Ownership Percentage (%) |
| Holders of Notes............................... | 0 | 0% | 8,500,000 (2) | 85% (2) |
| Holder of Class B Common Stock ... | 1,000 (1) | 100% | 1,500,000 (3) | 15% (3) |

_____

(1)    The holder of all of the outstanding shares of Class B Common Stock is Tower Records, Incorporated, which is 62% beneficially owned by Mr. Russell Solomon (as trustee of the Russell Solomon Trust), 37.2% beneficially owned by Mr. Michael Solomon (directly and as trustee of the Michael T. Solomon 1994 Trust, the David Solomon 1994 Trust, the Andrew Solomon Trust and the Aaron O. Solomon Trust), and 0.8% beneficially owned by Mr. David Solomon.

(2)    If the Restructuring is effected through the Exchange Restructuring, these figures will apply only to the holders of the Notes tendered into the Exchange Offer, which may constitute less than 100% of the Notes if the Minimum Tender Conditions is reduced.

(3)    Two thirds of these shares shall be escrowed subject to the terms of the Escrow Agreement described below.

## DESCRIPTION OF OUR CAPITAL STOCK

*The following description of the New Common Stock is a summary of and is qualified in its entirety by reference to our proposed Amended and Restated Articles of Incorporation, attached hereto as Exhibit I, which reflect the Charter Amendments, and our Bylaws, copies of which are available by contacting us.*

Upon the adoption of the Charter Amendments, holders of shares of New Common Stock will be entitled to:

- one vote for each share of New Common Stock held of record on all matters and in such manner as may be provided by applicable law;

- receive ratably such dividends, if any, as may be declared by our Board of Directors out of funds legally available therefor; and

- in the event of our liquidation, dissolution or winding up, share ratably in all distributions of assets which remain after our payment of all of our liabilities.

We do not intend to have the New Common Stock listed on any exchange. There can be no assurance that an active market for the New Common Stock will develop or if a market does develop of the nature and characteristics of such market.

The New Common Stock to be issued in connection with the Restructuring will not be registered under the Securities Act in reliance upon exemption under the Securities Act. See "Notice to Investors."

# THE COMPANY

## Overview

Founded in 1960, we are one of the largest specialty retailers of recorded music and movies in the United States in terms of revenues and one of the most widely recognized music retail brand names in the world. We offer a diversified line of music and movie products including compact discs, DVD and VHS recorded movies, recorded audio cassettes, and other complementary products, including books, magazines, video games, blank tapes,  personal electronics and accessories.

We attract and retain customers who buy music on a year-round basis by providing an extensive product selection in an interactive, entertaining environment. Our stores feature extended store hours, in-store listening stations and knowledgeable sales personnel.  We believe that these factors make our stores a preferred shopping destination. We offer one of the broadest selections of recorded music, including recent releases, older catalog releases and other various music formats primarily in stand-alone shopping locations in densely populated urban and suburban areas.  We offer the same depth in DVD and VHS movies, providing a broad selection of new releases and older catalog releases.

Most of our current  stores exceed 10,000 square feet and carry at least 50,000 music titles.  Flagship stores, which are located in major metropolitan areas, such as, Chicago, Honolulu, Los Angeles, New Orleans, New York, Philadelphia, San Francisco, Seattle and Washington, D.C., typically exceed 20,000 square feet and carry between 80,000 and 120,000 music titles.

Our headquarters are located in approximately 80,000 square feet of leased facilities in West Sacramento, California. These facilities house our management, marketing, sales and corporate finance personnel. The lease for these facilities terminates on April 30, 2005.  As of July 31, 2003, our total leased space consisted of approximately 1.7 million square feet of space for our stores and corporate offices. As of July 31, 2003, we were a party to approximately 116 real estate leases and subleases, relating to nearly all of our store locations as well as our administrative and warehouse facilities.  The leases expire between calendar year 2003 and calendar year 2024, with renewal options varying between one and 20 years.  Most of the U.S. stores operate as stand-alone locations. Additionally, we own seven stores, four parking lots adjacent to our stores, and our warehouse and distribution center.

## Our Prior Restructuring Efforts

During the third quarter of fiscal 2001, we commenced a business plan and restructuring process and retained a consulting firm to assist us in our efforts to improve our operations and financial performance (the "2001 Restructuring Plan").  These efforts resulted in several initiatives designed to improve our profitability, including closing and liquidating most stand-alone and combination bookstores; disposing of most of our foreign operations by direct sale, conversion to licenses or closure; closing under-performing domestic record, outlet and frame/gallery stores; and monitoring the performance of additional stores.  We also put in place several operational initiatives designed to improve our cash flow position, including reducing corporate work force and overhead expenses, reducing working capital requirements and reducing capital expenditures.

As a result of the 2001 Restructuring Plan, our former operations in Argentina, Hong Kong, Taiwan, Ireland, Canada and the United Kingdom have either been closed or converted to licenses.  Additionally, we closed a total of 15 under-performing domestic stores and bookstores.

- 84 -

On October 11, 2002, we completed the sale of Tower Records Kabushiki Kaisha ("TRKK"), our Japanese retail operation, to Nikko Principal Investments Japan, Ltd. for an aggregate purchase price of 16 billion Japanese Yen (approximately $129 million at then-current exchange rates).

During the second quarter of fiscal 2003, we commenced a further restructuring process (the "2003 Restructuring Plan") to improve our financial performance.  The 2003 Restructuring Plan contained several initiatives designed to improve our operations, including closing and liquidating an additional 13 under-performing stores, selling our Mexico investment, making cost cutting efforts focused on overhead reduction, right-sizing inventory with centralized purchasing and automatic replenishment, and closing the Pulse! Magazine publication. We began implementing our restructuring plan shortly after its adoption and have since closed six of the 13 under-performing stores through October 31, 2003.  The 2003 Restructuring Plan is currently continuing, and the present Restructuring is a key component of the 2003 Restructuring Plan.

Similarly, in February 2003, we entered into a Leasing and Employee Transfer Agreement with Virgin Retail Group Limited and Piccadilly Entertainment Store Limited (collectively, "Virgin").  We agreed to assign leases, sell store fixtures and transfer certain employees for two of our stores in the United Kingdom to Virgin in exchange for 1.5 million British Pounds Sterling (approximately $2.5 million at the then-current exchange rates), and Virgin would obtain the non-exclusive right to use the business name of "Tower Records" for the operation of these two stores for a period not to exceed one year from date of closing.  The assignment and transfer pursuant to this agreement was completed in April 2003.

## Business

### Direct Operations

As of the beginning of the 2003 fiscal year, we operated a total of 171 stores worldwide, consisting of 103 U.S. retail stores in 21 states and 68 international stores in five countries. Our operating structure consisted of (i) our U.S. stores, Internet division and wholesaling operations, (ii) our Asian stores, Internet division and wholesaling operations, and (iii) our U.K. and Ireland stores and Internet division.  As of July 31, 2003 we operated (i) 96 U.S. stores, Internet division and wholesaling operations, and (ii) our U.K. Internet division.  As of July 31, 2003 our operations were directed by a Board of Directors comprised of four directors and an executive team comprised of four members.

For the 2003 fiscal year, we derived approximately 15.4% of our total net revenues from international sales. With the sale or conversion to licenses of our international stores, we will no longer generate international revenues other than licensing and royalty fees from our licenses and our U.K. Internet division.  In fiscal 2003, we operated 52 stores in Japan; eight in England; five in Mexico, two in Ireland, and one in Singapore, each of which were closed, sold or converted to licenses at different points during the year. We sold our most significant component of the international operations, Japan, on October 11, 2002.  As a result of the divestiture of international operations, several of the other operational locations were developed into license agreements.  As of July 31, 2003, there were a total of 61 stores that operate under license agreements in 11 countries.

### Store Format And Locations

We have differentiated ourselves from competing music retailers by establishing strategic store locations, which generally feature a large, centrally located store in a densely populated urban area complemented by nearby urban and suburban stand-alone stores.  Our flagship stores in major markets typically exceed 20,000 square feet, with the majority of all stores exceeding 10,000 square feet.  Newer domestic stores range from 15,000 to 30,000 square feet, depending on the market and location.  We believe that our larger, stand-alone locations provide us with various operating efficiencies, including lower rent expense than comparable mall-based retailers.  Our large base of high-volume, stand-alone stores enables us to receive drop-shipments of product directly to store locations (thereby reducing the costs associated with warehousing and distribution).  During the fiscal year ended July 31, 2003, we did

- 85 -

not open or relocate any domestic stores. In addition, either through sale, conversion to licenses or closure, we exited our 68 international stores that were open as of July 31, 2002.

*Tower.com*

Through our wholly owned subsidiary, Tower Direct LLC, we operate an Internet company under the name "Tower.com." Tower.com operates as an online retailer of music and complementary entertainment products and information. Users have download capability on Tower.com. Tower.com has garnered high rankings and reviews from Internet and industry experts in surveys of the Internet's best websites. We plan to continue to leverage our brand name through our Internet capabilities to customers in our stores as well as Internet users in other locations. The Tower.com website offers customers thousands of titles of music and movie items in stock and ready for immediate shipping from our state-of-the-art fulfillment and distribution center, which is owned and operated by our wholly owned subsidiary, Three A's Holdings, LLC, doing business as Bayside Entertainment Distribution. We will continue to rationalize our internet operations as a fully integrated operating strategy with our traditional brick-and-mortar retail operations. We market our Internet site through the same advertising and marketing channels used for our retail stores and also through strategic alliances with well-known Internet companies, such as AOL Time Warner Inc. and Yahoo! Inc.

*Products (Recorded Music, Movie Products and Complementary Products)*

We offer a diverse line of products including compact discs, recorded audio cassettes, recorded video cassettes, DVD and other complementary products, including books, magazines, blank tapes, video games, personal electronics and accessories.

Our largest source of revenue is the sale of recorded music on compact discs and audio cassettes. For fiscal years 2003 and 2002, domestic recorded music sales accounted for approximately 59.6% and 62.9%, respectively, of our net revenues. Our stores carry a wide selection of compact discs purchased from all major and most independent recording companies, which, except for new releases and special promotions, are arranged in the stores by genre and alphabetically by artist or group. We differentiate ourselves from our competitors through the breadth and depth of our product selection. Our strategy is to offer the broadest selection of recorded music for our customers, including recent BILLBOARD Top 50 releases as well as a comprehensive variety of older releases and diverse music formats. Most of our stores carry at least 50,000 music titles, while flagship stores located in major markets, such as, Chicago, Honolulu, Los Angeles, New Orleans, New York, Philadelphia, San Francisco, Seattle and Washington, D.C., usually carry between 80,000 and 120,000 music titles.

In addition to recorded music, the majority of our stores sell DVD and VHS movie recordings. For fiscal years 2003 and 2002, domestic movie sales accounted for approximately 22.7% and 19.4%, respectively, of our net revenues. Seventeen stores also offer movie rentals. We believe that we are well positioned to capitalize on the growing DVD market and are actively reconfiguring our stores for growing DVD sales.

To complement music buyers' interests, our stores also sell books, magazines, blank tapes, video games, personal electronics and accessories. As of July 31, 2003, we operated three stand-alone bookstores, subsequently closing one of the three in August 2003. For fiscal years 2003 and 2002, sales of complementary products accounted for approximately 11.8% and 12.0%, respectively, of our domestic net revenues.

*Marketing, Advertising And Promotion*

We have long been recognized for our unique brand of retailing and seek to maximize our use of marketing, advertising and promotional activity by leveraging enhancement of our highly recognizable brand. Our fully integrated marketing plan focuses on delivering to the customer a comprehensive service of discovery, education and experience throughout all aspects of the marketing mix.

- 86 -

In catering to a wide range of customers with diverse tastes, we maintain a commitment to providing an extensive selection of packaged entertainment, including a breadth of selection spanning all musical genres, deep selection of recorded movies providing purchase opportunity to new releases as well as older titles, merchandised in stores that celebrate the unique interests and needs of the communities in which they are located. We believe our dedication to showcasing a multitude of recording artists, from emerging to super-star to local favorites, with in-store appearances and live performances, as well as author signings, sponsorships of local festivals, events and promotional tie-ins advantageously differentiates us from our competitors.

We believe that differentiated customer service is an important factor in overall customer satisfaction, brand loyalty and long term repeat purchases. We maintain a commitment to providing our customers with superior service throughout all aspects of our integrated marketing approach, including direct mail segmentation campaigns and sales promotions. Customers receive in-store customer education and discovery opportunities from our expert staff and product specialists who create an informative and interesting shopping environment.

As one of the nation's largest independent entertainment software retailers, with over 40 years in the retail community, we have developed solid relationships with our suppliers. As a result, we receive substantial marketing support funds from both our major and independent vendors through co-op advertising, and continue to achieve economies of scale in our advertising and distribution. We believe that this level of support is rooted in our vendors' recognition of the unique contribution we make to the music industry.

Marketing support inflows offset a significant portion of our advertising, marketing and promotional expenses and enables us to leverage brand equity with our customers across assorted media. We utilize newspaper, magazine, direct mail and broadcast advertising, tailoring local and national advertising campaigns to create specific demand for products, while reinforcing brand messaging and recognition.

*Suppliers*

The majority of our music purchases come from five vendors with which we have developed long-standing relationships. As a result of these relationships and our high sales volume, we receive substantial marketing support allowances, competitive purchasing terms, short lead times on inventory fulfillment, competitive pricing programs and drop shipments of orders directly to our stores. In addition, we purchase product from numerous independent distributors and labels. Unsold music product may be returned to domestic manufacturers at any time that the title remains in the current music catalog of a manufacturer; however, restocking fees are generally assessed for returned product. Product deletions are generally made only after advance notice, allowing us to return excess inventory before a title is discontinued. None of our major domestic suppliers limit returns of inventory.

The majority of our movie purchases come from seven large suppliers with whom we have developed strong relationships. As our DVD business has expanded, those suppliers have provided for increased terms, credit availability, and purchase discounts. We believe that our strong DVD sales will stimulate stronger relationships and provide even better terms and discounts in the future. In addition, books, magazines, and other complementary product purchases are made from a large number of vendors.

*Purchasing, Inventory Management And Distribution*

Since the holiday season of fiscal year 2002, our purchasing and inventory management has become mostly centralized. Unlike most of our competitors, we still allow for a small percentage of decentralization by giving our store managers discretion of local product management in order to cater to particular community product demands. Managers work closely with territory and national product managers to customize product inventory in their stores to the demographics and buying patterns of their local markets.

Our ISP (In Store Processing) system, using the IBM AS/400 computer system, enables management to monitor the levels and mix of our inventory in each of our stores on an individual basis. The ISP system provides store managers instantaneous on-line information regarding quantities on hand, turns at the store level and on a

- 87 -

combined basis, historical movement reports by SKU, pricing and cost data and customer service information. The inventory management system generates automatic replenishment by SKU level maintaining an optimum store inventory level on a store-by-store basis based upon turns by SKU and historical purchase trends. The ISP system also identifies slow-moving, deleted and overstocked titles to prompt the return of this inventory for refund. This system enables the store managers to carry appropriate levels of deep-catalog product and to maintain sufficient inventory levels for fast-moving product.

We use our U.S. distribution operation to distribute products when it is more efficient than drop shipping to Tower stores. We also sell products at the wholesale level to other retailers, particularly independent label recorded music. In addition, mail order and Internet sales are fulfilled through our U.S. distribution facility allowing, in many cases, overnight delivery to customers.

*Competition*

The retail music and movie industries are highly competitive. We compete with a wide variety of software and entertainment retailers, including regional and national mall-based music chains, international chains, deep-discount retailers, mass merchandisers, consumer electronics outlets, record clubs, e-commerce retailers, mail order, and independent operators. In addition, a uniform format has been developed that will enable music companies to sell their products via direct Internet download. We believe that sales via the Internet will continue to be a more significant part of an integrated operating strategy and accordingly have determined to emphasize order fulfillment for, and co-market with our Internet division. In addition, we believe that we will continue to benefit from recent closures in the home entertainment industry.

We believe the principal competitive factors in the retail music industry are brand name recognition, merchandising, selection, pricing, inventory management, marketing, store location, management expertise and customer service. We believe that we compete favorably with respect to each of these factors.

We compete with various mall-based music retailers such as Trans World Entertainment Corporation and Musicland. We feel the mall-based music retailers service a different demographic than our customers, catering to a Top-40 genre rather than depth and breadth of product. Specialty music retailers have experienced increasing competition from large discounters and consumer electronics stores such as Wal-Mart, Kmart, Target, Circuit City, Best Buy, Barnes and Noble and Borders. Many of these large discounters and consumer electronics stores typically feature BILLBOARD Top 50 recordings with minimal or no gross margin with the intent of generating additional store traffic and cross-selling other, higher margin products, such as consumer electronics. We also compete with mail order clubs such as BMG Music and Columbia House. The largest mail order clubs are affiliated with major manufacturers of pre-recorded music and movies and may have advantageous sourcing and marketing relationships with their affiliates.

The Internet has become an established avenue for retailing and the purchase of music and movies and continues to grow in popularity with entertainment software consumers. Our e-commerce competitors include Amazon.com, BarnesandNoble.com, Itunes.com and others, most of which have one or more marketing alliances. We expect continued growth in competing home entertainment options, including the Internet and larger numbers of television and music channels offered by cable companies. The further development of Internet and cable technologies, coupled with high quality digital recording technologies, enable direct downloading of recorded music by consumers via the Internet, which could result in significant changes in existing distribution channels for pre-recorded music. Such a development could have a material adverse effect on our business, financial condition and results of operations.

*Seasonality*

Retail music sales in the United States are typically higher during the calendar fourth quarter as a result of consumer purchasing patterns due to increased store traffic and impulse buying by holiday shoppers. As a result, the majority of U.S. music retailers, and more specifically, the mall-based retailers rely heavily on the calendar fourth

- 88 -

quarter to achieve annual sales and profitability.  Our deep-catalog approach to pre-recorded music appeals to customers who purchase music on a year-round basis.  Consequently, we have historically had reduced seasonal reliance.  In each of fiscal 2003 and 2002, the second quarter (November 1 through January 31) accounted for approximately 30% of annual sales.

### Trademarks

We regard our trademarks and service marks as having significant worldwide value and as being important to our marketing efforts and brand name recognition.  We have registered our TOWER RECORDS-VIDEO-BOOKS trademark and variations thereof, along with numerous other trademarks, with the United States Patent and Trademark Office on the Principal Register.  We also have registered our TOWER trademark, or variations thereof, in numerous foreign countries.  Our policy is to pursue the registration of our trademarks whenever possible and to vigorously oppose any infringement of our trademarks and trade names.  In connection with the sale of the Japanese operations in October of 2002, we also sold our trademark rights related to Japan.

### Employees

As of July 31, 2003, we employed approximately 3,004 persons, of whom approximately 476 were employed on a part-time basis.  Because of the seasonality of the retail music business, additional employees may be needed during the peak holiday season.  None of our employees is covered by a collective bargaining agreement.  We consider our employee relations to be good.

Our corporate office staff consists of approximately 270 employees that are responsible for executive and general operational management, buying, merchandising, advertising, finance, accounting, human resources, legal, information systems and real estate management.

## Current Management

The following table sets forth the name, age, position and years of service of the individuals who were serving as our directors and executive officers, as of November 1, 2003.  Executive officers are appointed by the Board of Directors and serve at the discretion of the Board.

| Name | Age | Years of Service | Position |
| --- | --- | --- | --- |
| Russell M. Solomon | 78 | 43 | Founder, Chairman Emeritus and Director |
| E. Allen Rodriguez | 44 | 1 | Chief Executive Officer |
| E. Allen Rodriguez | 59 | 15 | Executive Vice President, Chief Financial Officer and Director |
| Kevin Cassidy | 50 | 16 | Executive Vice President, Operations, Sales and Product |
| William Baumann | 41 | 4 | Executive Vice President, Technology and Supply Chain |
| Michael T. Solomon | 55 | 16 | Director |
| Robert Lorber | 56 | 5 | Director |

RUSSELL M. SOLOMON.  Mr. Solomon is a director and a founder of the Company and served as our Chairman. Mr. Solomon has served as President of the National Association of Recording Merchandisers ("NARM") and as a Board member of the Video Software Dealers Association. Mr. Solomon is also a member of the Board of Directors of The Good Guys!  Mr. Solomon is the father of Michael T. Solomon.  Pursuant to the Employment Agreement, Mr. Solomon is currently the Chairman Emeritus of the Corporation.

E. ALLEN RODRIGUEZ.  Mr. Rodriguez has had a working relationship with the Company since 1990, and formally joined us as Chief Executive Officer in 2003. Prior to joining the Company, Mr. Rodriguez was

Executive Vice President for Univision Communications Inc.  Previously, Mr. Rodriguez held financial positions with Prudential Capital Group and The Boston Company. He holds a Master in Business Administration degree from Stanford University, and earned a Bachelor of Arts degree from Harvard College.

DE VAUGHN SEARSON.  Mr. Searson has been Executive Vice President and Chief Financial Officer of the Company since 1988.  Mr. Searson also serves on our Board of Directors.  Prior to joining the Company, Mr. Searson was Senior Partner at Searson & Company, Certified Public Accountants. He holds a Bachelor of Science degree in Accounting from California State University, Sacramento, and is a certified public accountant.

KEVIN CASSIDY.  Mr. Cassidy began his 16-year career with the Company in 1987.  In 2002, after three years as Vice President of North American Operations, Mr. Cassidy was appointed Executive Vice President of Retail Operations, where he oversees our store-level performance. Mr. Cassidy currently is a member of the NARM Retail Advisory Board, DVD Entertainment Group Retail Advisory Board, and is a board member of Jazz Alliance International.

WILLIAM BAUMANN.  Mr. Baumann serves as our Executive Vice President, Technology and Supply Chain.  Prior to joining the Company in 1999, Mr. Baumann held senior management positions with NEC Corporation, Packard Bell, Chubb Insurance, and The Bank of Ireland.  He holds a Bachelor of Science degree in Business Administration from Southern New Hampshire University, and served for four years as a noncommissioned officer in the United States Coast Guard.

MICHAEL T. SOLOMON.  Mr. Solomon is a director and formerly was our President and General Counsel.  Mr. Solomon earned a Juris Doctor degree from Hastings College and holds a Bachelor of Arts degree in Business Administration from the University of California, Berkley.  Mr. Solomon resigned from the Company effective October 24, 2003, pursuant to the terms of the Separation Agreement.

ROBERT LORBER.  Mr. Lorber is a director.  Since 1976, he has been president of Lorber-Kamai Consulting Group, which advises Fortune 500 clients on productivity improvement.  He is also a professor at the Graduate School of Management at the University of California Davis.

Pursuant to the Governance Agreement, following the Restructuring, one director will be appointed by the Current Shareholder so long as the Current Shareholder holds no less than 7.5% of the fully diluted shares of New Common Stock (for this purpose, treating escrowed shares as being held by the Current Shareholder) and persons or entities affiliated with the family of Mr. Russell Solomon continue to hold all of the shares of the Current Shareholder, and the other shareholders will be entitled to designate the remaining four directors.  We anticipate that the Current Shareholder's designee to the board of directors will be Mr. Russell Solomon.

## Security Ownership Of Certain Beneficial Owners And Management

For information regarding beneficial ownership of our capital stock, see "Capitalization Prior to and Following the Restructuring."

## Litigation and Contingencies

We are the subject of litigation arising in the normal course of business.  In the opinion of management, our ultimate liability, if any, related to pending or threatened litigation would not materially affect our consolidated financial position or results of operations.

We entered into a consulting contract with Chilmark Partners, LLC ("Chilmark") on May 18, 2001.  By letter to Chilmark dated June 12, 2002, we terminated the contract.  On July 29, 2002, Chilmark filed suit against us in the U.S. District Court for the Northern District of Illinois, alleging breach of contract and seeking other remedies under the contract and attachment of proceeds of the sale of our Japanese subsidiary.  In August 2002, Chilmark's request for such an attachment was denied.  The litigation continues with respect to Chilmark's breach of contract

- 90 -

claim and its request for damages of approximately $2.6 million under the terms of the contract.  We believe we have meritorious defenses with respect to each of Chilmark's claims and intends to defend against the claims vigorously; however, the litigation is in the preliminary stage and there can be no assurance that we will prevail in this action.  If Chilmark receives a favorable judgment for all or a substantial portion of the total $2.6 million in damages Chilmark is seeking, such an outcome could have a material adverse effect on our consolidated financial condition, results of operations and cash flows.

We operate in numerous jurisdictions with varying state and local tax and unclaimed property laws and regulations.  While we believe that we are in compliance with such laws and regulations, state and local authorities could potentially assert claims against us relating to these laws and regulations.  In management's opinion, those claims, if any, would not materially affect our consolidated financial position and results of operations, considering our potential defenses.  However, no assurances can be given as to the ultimate resolution of any such potential claims.

**Certain Relationships And Related Transactions**

For a description of the Employment Agreement between Mr. Russell Solomon and us, and the Separation Agreement between Mr. Michael Solomon and us, see "The Restructuring and the Lock-Up Agreement – Related Agreements."  Prior to entering into the Employment Agreement, Mr. Russell Solomon's annual salary was $632,000.  Mr. Michael Solomon's annual salary was $460,000.The Separation Agreement provides that we will pay Mr. Michael Solomon a severance payment of $540,150 over eighteen months, or, in the event an M&A Transaction has occurred that generates sufficient proceeds to retire the New Notes, any unpaid severance amounts will be paid immediately in full.  The Separation Agreement will terminate in the event that the Lock-Up Agreement is terminated for any reason.  Mr. Michael Solomon's existing retention agreement was terminated upon the execution of the Separation Agreement.

In addition, we accrued royalty fees and lease obligations payable to certain of the trusts established for the benefit of Russell Solomon, Michael Solomon and their family members for royalties charged to us for the use of the trusts' trademarks and logos and for the lease of office space owned by one of the trusts, in each case in connection with our prior Japanese operations.  All such accrued royalty fees and lease obligations were paid to the trusts or otherwise satisfied on October 11, 2002 in connection with our divestiture of our Japanese operations.

In fiscal 2003, we paid $160,000 in fees to Complete Data Services, Inc. for custodial and retrieval services related to our credit card transactions and chargebacks.  Karen Searson, the spouse of DeVaughn D. Searson, our Chief Financial Officer, is the owner of Complete Data Services, Inc.  As of November 2003, we have discontinued the services provided by Complete Data Services, Inc.

MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Critical Accounting Policies**

The preparation of financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and revenues and expenses during the period.  Our management bases our estimates on historical experience and other assumptions that it believes to be reasonable under the circumstances, the results of which form the basis for making judgments about carrying values of assets and liabilities that are not readily apparent from other sources.  We continually evaluate the information used to make these estimates as our business and the economic environment change.  The use of estimates is pervasive throughout our financial statements, but the accounting policies and estimates we consider most critical are as follows:

*Revenue Recognition*

We generate revenue primarily from retail sales comprised of pre-recorded music (including compact discs and audio cassettes), movie sales (including recorded video cassettes and DVD) and other complementary products (including books, magazines, video games, personal electronics and accessories) through our stores and is recognized at the point of the retail transaction.  Reductions of revenue for returns by retail customers are provided at the point of the return.  Additionally, we generate revenue from distribution to outside customers and recognize revenue based upon the shipment of merchandise to those distribution customers.  Our distribution arrangements with these customers generally give them the right to return titles.  We reduce gross sales and direct product costs for returns at the time of the returns.  We continuously monitor collections and payments from our wholesale distribution customers and maintain a provision for estimated credit losses based upon our historical experience and any specific distribution customer collection issues that we have identified.

*Inventory Valuation*

Inventories are valued at the lower of cost or market value.  Inventory valuation requires significant judgments and estimates, including merchandise markdowns and provisions for inventory shrink caused by customer theft.  We evaluate all of our inventory units to determine excess or slow-moving units based on current quantities, anticipated store closures and projections of future demand and market conditions.  Due to industry return policies, which generally provide for full recovery of cost upon return, we do not provide an allowance for inventory returns.

*Restructuring Charges*

Since the adoption of the 2001 Restructuring Plan and the 2003 Restructuring Plan (the "Restructuring Plans"), we have closed eight out of ten of our stand-alone bookstores and nine domestic under-performing record and outlet stores and sold two of our frame/gallery stores.  We have successfully converted the Argentina, Hong Kong, Singapore, Ireland, Mexico and Taiwan operations to licenses and closed our Canadian operations. Additionally, during the year ended July 31, 2003, under our 2001 Restructuring Plan, the United Kingdom operations were either closed or transferred to Virgin Retail Group Limited and Piccadilly Entertainment Store Limited. Management has implemented several cost-cutting initiatives resulting in reductions of workforce and other administrative and operating costs resulting in annual savings of $18.8 million. During the year ended July 31, 2003, we reduced headcount by a total of 669 employees in the United States, including certain senior executives. Capital expenditures and working capital have also been closely managed under the Restructuring Plans. In accordance with the Restructuring Plans, we continue to monitor additional stores for possible future closure.

We have substantially completed the final phase of the 2001 Restructuring Plan. We adopted the 2003 Restructuring Plan in December 2002 aimed at further improving operations, monitoring and closing additional under-performing stores and assets, and evaluating our ongoing working capital investments. The continued implementation of the 2003 Restructuring Plan could result in additional restructuring costs, asset impairment charges and inventory write-downs in future periods. We expect to complete the 2003 Restructuring Plan by the end of the second quarter of fiscal 2004.

We have estimated and recorded restructuring and asset impairment charges and inventory write-downs in fiscal 2003 and 2002 related to the Restructuring Plans. These costs and charges required judgments about, among other things, employee severance costs, contract and lease terminations, related consulting and litigation fees, long-lived assets and inventory realization and other contingent liabilities. The ability to obtain agreements with lessors to terminate leases or with other parties to assign leases can also affect the accuracy of current estimates.

*Impairment Of Long-Lived Assets*

It is our policy to review our long-lived assets for possible impairment whenever events or circumstances indicate that the carrying amount of an asset may not be recoverable. We recognize impairment losses when the carrying value of the long-lived asset (asset group) is not recoverable and exceeds the estimated fair value. The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the future undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group). An impairment loss is measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds the estimated fair value. Assumptions and estimates used in the evaluation of impairment, including current and future economic trends in the many geographic regions that our stores are located, are subject to a high degree of judgment and complexity and changes in the assumptions and estimates may affect the carrying value of long-lived assets, and could result in additional impairment charges in future periods.

For a detailed discussion of our accounting policies and related estimates and judgments, see the notes to the consolidated financial statements for the fiscal year ended July 31, 2003. While we believe that the historical experience and other factors considered provide a meaningful basis for the accounting policies applied in the preparation of the consolidated financial statements, there can be no assurance that our estimates and assumptions will be accurate, which could require us to make adjustments to these estimates in future periods. The fiscal 2003 and 2002 financial information discussed below is unaudited. Our management believes the unaudited 2003 and 2002 financial statements prepared by us reflect our financial position and results of operations in accordance with generally accepted accounting principles in the United States of America (GAAP) for such periods. Our audited historical 2002 financial statements were audited by an independent accounting firm but do not contain adjustments to reflect our Japanese subsidiary's operations as discontinued operations and the reclassification of certain vendor allowances to cost of sales from SG&A expense and should not be relied upon, and we may need to receive a consent for reissuance of fiscal year 2002 financial statements to audit the reclassification of these amounts. If the fiscal 2002 financial information prepared and presented by us was to be audited, further adjustments could be required. The independent auditor who audited our 2003 financial statements declined to consent to the inclusion of its audit report in this offering memorandum due to their stated concerns about our inability to provide audit reports for years prior to 2003.

**Results Of Operations: Year Ended July 31, 2003 Compared To Year Ended July 31, 2002 (unaudited)**

*Revenues*

Net revenues were $546.4 million for the fiscal year ended July 31, 2003, a decrease of $64.4 million or 10.5% from $610.8 million for the fiscal year ended July 31, 2002. Our net revenues were derived from U.S. net revenues of $518.1 million and international net revenues (not including Japanese operations which are recorded as discontinued operations) of $28.3 million for the fiscal year ended July 31, 2003, compared to $553.3 million in the U.S. and $57.5 million internationally for the fiscal year ended July 31, 2002. Domestic recorded music sales for the fiscal year ended July 31, 2003 represented 59.6% of our net revenues versus 62.9 % for the fiscal year ended July

- 93 -

31, 2002.  We expect recorded music sales to represent a lower percentage of our net revenue in the future as sales of DVD products increase.  Retail sales represented 98.5% of our net revenues for the fiscal year ended July 31, 2003 versus 97.5% for the fiscal year ended July 31, 2002.

The overall decrease in our total revenues was driven primarily by the closure of the UK operations, closing of unprofitable domestic stores associated with the Restructuring Plan, a decline in same store sales of 4.48% attributed to an industry-wide reduction in pre-recorded music sales in the United States, which we believe is primarily due to the increased digital downloading of music, online and physical music piracy, and weaker product offerings by the major music companies.

*Gross Profit*

For the twelve months ended July 31, 2003, our gross profit decreased $14.0 million to $200.9 million from $214.9 million for the twelve months ended July 31, 2002.  The decrease in gross profit is principally due to the decreases in revenues described above.  Gross profit as a percentage of net revenues was 36.8% for the twelve months ended July 31, 2003, or 31.6% excluding the effects of the Restructuring Plans and EITF No. 02-16 reclassification adjustments.  Gross profit as a percentage of net revenues was 35.2% for the twelve months ended July 31, 2002, or 31.8% excluding the effects of the Restructuring Plans and EITF No. 02-16 reclassification adjustments.  Emerging Issues Task Force Issue No. 02-16, "Accounting by a Customer (Including a Reseller) for Certain Consideration Received from a Vendor" requires the Company's co-op support to be recorded as a reduction of cost of sales as opposed to a reduction of advertising expense as we have recorded in the past.  Management attributes the slight percentage decrease, excluding the effects of the Restructuring Plans and EITF 02-16 reclassification adjustments, primarily to weaker margins associated with the competitive pricing pressures in the United States as well as certain advertising promotions during the holiday season.  Additionally, included in cost of sales and impacting gross profit, we changed the useful life of our movie rental product from three years to one year and as a result incurred a one-time, non-cash charge of $1.2 million for the twelve months ended July 31, 2003.

*Selling, General And Administrative Expense*

Selling, general and administrative expenses decreased by $21.1 million to $196.3 million for the twelve months ended July 31, 2003 from $217.4 million for the twelve months ended July 31, 2002.  Excluding the effects of the $3.1 million and $5.9 million in professional fees related to the Restructuring Plans for the twelve months ended July 31, 2003 and 2002, respectively, selling, general and administrative expenses decreased by $18.3 million to $193.2 million during the twelve months ended July 31, 2003 from $211.5 million during the twelve months ended July 31, 2002.  Excluding the effect of professional fees related to the Restructuring Plans, closure of the UK operations in April 2003, decreases in personnel, occupancy and other administrative expenses are due to cost savings from initiatives resulting from the Restructuring Plans.  As a percentage of net revenues, selling, general and administrative expenses, excluding the effects of the professional fees related to the Restructuring Plans, was 35.4% for the twelve months ended July 31, 2003 as compared 34.6% for the twelve months ended July 31, 2002.  This increase of 0.8% as a percentage of net revenues is attributable to the decrease in net revenues as described above.  We expect to incur substantial professional fees related to our restructuring in fiscal year 2004.  Also see the impact from the adoption of EITF No. 02-16 on selling, general and administrative expense as discussed above for gross profits.

*Restructuring And Impairment Costs*

We recorded pre-tax restructuring and asset impairment charges of $26.5 million for the twelve months ended July 31, 2003 and $22.3 million for the twelve months ended July 31, 2002.  The 2003 costs were comprised of severance costs for terminated employees, asset disposal costs and costs associated with the closing of the Mexico and United Kingdom operations and the plan to close thirteen domestic stores.  Additionally, $2.3 million of inventory write-downs for restructure costs were recorded in cost of sales in the twelve months ended July 31, 2003.  Also, $3.1 million of professional fees for restructure related costs were recorded in selling, general and

- 94 -

administrative expenses in the twelve months ended July 31, 2003.  We expect to incur substantial restructuring costs in fiscal year 2004.

### Depreciation And Amortization

Depreciation and amortization expense was $19.8 million for the twelve months ended July 31, 2003 compared to $22.1 million for the twelve months ended July 31, 2002.  The decrease of $2.3 million was primarily due to the closing of under-performing stores identified in the 2003 Restructuring Plan in addition to the divestiture of the United Kingdom operations and related depreciable assets.

### Loss From Continuing Operations

Our consolidated operating loss for the twelve months ended July 31, 2003 was $41.7 million compared to $46.9 million for the twelve months ended July 31, 2002.  The decrease of $5.2 million was primarily attributable to the closure of the UK operations in April 2003 and continued cost savings realized as a result of the Restructuring Plans that have been implemented.  Excluding the effects of the Restructuring Plans, operating losses increased $5.3 million to $9.8 million for the twelve months ended July 31, 2003 from $4.5 million for the twelve months ended July 31, 2002 which was primarily attributable to the decrease in revenues and gross profit, partially offset by the decrease in selling, general and administrative expenses, as described above.

### Discontinued Operations

On October 11, 2002, we completed the sale of our Japanese subsidiary, TRKK, to Nikko Principal Investments Japan, LTD.  We sold all authorized and issued capital stock of TRKK for an aggregate purchase price of 16 billion Japanese Yen, which was approximately $129 million at then-current exchange rates.  Net proceeds were primarily used to pay down our prior credit facility.  We recorded a $15.8 million gain, net of $6.5 million in U.S. income and foreign taxes, from the sale of TRKK, which is included in income from discontinued operations on the accompanying statement of operations for the twelve months ended July 31, 2003.  In accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," TRKK's current year operating results have been presented as discontinued operations.  Additionally, the unaudited 2002 consolidated financial statements prepared by us include reclassifications to present the TRKK operations as discontinued operations.

### Interest Expense

Net interest expense decreased to $21.5 million for the twelve months ended July 31, 2003 from $24.0 million for the twelve months ended July 31, 2002.  The decrease of $2.5 million was due primarily to the reduction of outstanding debt.

### Loss on Disposal of Assets

Loss on disposal of assets increased to $9.9 million for the twelve months ended July 31, 2003 from $0.3 million for the twelve months ended July 31, 2002.  The increase of $9.6 million was due primarily to the sale or conversion to license agreement of the United Kingdom, Ireland, Mexico, and Singapore operations.

### Net Loss

As a result of the above, we reported a net loss of $59.5 million for the fiscal year ended July 31, 2003, an increase of $2.3 million from a net loss of $57.2 million for the fiscal year ended July 31, 2002.   The increase in net loss is primarily due to a one-time non-cash charge related to the disposal of assets related to its United Kingdom, Ireland and Singapore operations which were sold in fiscal 2003 and foreign translation loss, partially offset by the decrease in interest expense.  In addition, the increase in net loss is a result of the factors previously discussed.

- 95 -

**Liquidity And Capital Resources**

Our principal capital requirements are to fund working capital needs, to refurbish and support existing stores, to continue development of our technological infrastructure as needed and to make regularly scheduled principal and interest payments on our debt obligations.

Our independent auditor's report on the 2003 financial statements includes an explanatory paragraph which refers to a substantial doubt as to our ability to continue as a going concern. In addition to the factors we describe in Note 1 to the 2003 unaudited consolidated financial statements, the independent auditor's report also cited uncertainties surrounding our ability to complete the financial restructuring pursuant to the Lock-Up Agreement. We also included below a discussion of some of those factors affecting our liquidity, ability to service our debts and access to sufficient working capital.

Net cash provided by operating activities was $0.6 million for the fiscal year ended July 31, 2003. Cash provided by operating activities included $12.9 million of decreased inventory levels attributed mainly to the divestiture of the United Kingdom operations as well as benefits of the inventory management systems in the U.S. and ability to consistently maintain optimum inventory levels. $45.7 million of the $59.5 million net loss were adjustments to reconcile the net loss to cash provided by operating activities, including income from discontinued operations, depreciation and amortization, restructuring and asset impairment costs, and other non-cash components. Other changes in the balance sheet accounts were primarily attributed to the divestiture of the United Kingdom and other international operations.

Net cash provided by investing activities for fiscal 2003 in the amount of $104.2 million was focused primarily on store leasehold improvements and other capital expenditure requirements, including store relocations, refurbishment and technology investments totaling approximately $3.8 million. Included in net cash provided by investing activities are net proceeds from the sale of our former Japanese subsidiary in the amount of $109.5 million.

Net cash used in financing activities in fiscal 2003 was $112.9 million, resulting principally from repayments on other long-term debt, which followed the sale of the Japanese subsidiary. Net borrowings under our credit facility at July 31, 2003 were $58.8 million. As a result, total funded debt, including debt outstanding related to our Japanese subsidiary that has been reclassified to discontinued operations, decreased from July 31, 2002 by $112.6 million to $199.6 million.

In May 2003, we announced our decision to restructure the Notes. We did not make our related $5.2 million payments of interest on the Notes that was due each of May 1 and November 1, 2003. When we elected not to make the May 2003 interest payment on the Notes, the resulting default under the Old Indenture created a cross-default under the CIT Credit Agreement. At present, we are operating under a forbearance with CIT that lasts through February 28, 2004. If we do not complete the Restructuring or sell the Company by that date or if there are any other defaults under the CIT Credit Agreement, we will have to renegotiate our forbearance with CIT or face being in default under the CIT Credit Agreement. If we do not satisfy the terms of the forbearance or do not obtain an extension of the forbearance, CIT could enforce remedies including cessation of our access to the revolving credit line necessary to operate our business. See "The Restructuring and the Lock-up Agreement—Background— Description of Current Credit Facilities." In the Lock-Up Agreement, holders of approximately 91% of the Notes agreed not to accelerate the Notes or exercise any other remedy based on these any other defaults so long as the Lock-Up Agreement has not been terminated. If the Lock-Up Agreement were terminated, the Old Indenture Trustee or the holders of 25% of the Notes could take certain actions to cause the Notes to become immediately due and payable.

Assuming the Restructuring is consummated, we believe that the cash flow generated from our operations, together with amounts available from other financing alternatives, will be sufficient to fund our debt service requirements, lease obligations, working capital needs, our currently anticipated expenditures and other operating expenses for the next 12 months. Our ability to service the line of credit and the term loans is subject to future economic conditions and financial, business and other factors, many of which are beyond our control.

- 96 -

Our liquidity, future operating performance and ability to service our long-term financing agreements will be subject to the success of our restructuring efforts, our plan to restructure the Notes, our plan to sell the Company or our assets, relationship with key vendors, compliance with amended debt covenants, future economic conditions and other factors, many of which are beyond our control.  There can be no assurance or guaranty that we will be successful in meeting our operational and strategic objectives.  In the event that we are unable to successfully implement the Restructuring, our business, financial position and results from operations may be materially and adversely affected.

Our current line of credit, term loans and Notes impose certain restrictions on our ability to make capital expenditures and limit our ability to incur additional indebtedness. Such restrictions could limit our ability to respond to market conditions, to provide for unanticipated capital investments or to take advantage of business or acquisition opportunities. The covenants contained in the line of credit, term loan and Notes also, among other things, limit our ability to dispose of assets, repay indebtedness or amend other debt instruments, pay distributions, create liens on assets, enter into sale and leaseback transactions, make investments, loans or advances and make acquisitions.

We lease substantially all of our retail stores, warehouses and administrative facilities pursuant to operating leases that expire on dates through 2024 and generally have renewal options of one to 20 years. The terms of the leases provide for fixed or minimum payments plus, in some cases, contingent rents based on the consumer price index, or percentages of sales in excess of specified minimum amounts or other specified increases. We are generally responsible for maintenance, insurance and property taxes. Our minimum obligations in fiscal 2004 on non-cancelable operating leases are expected to be $30.8 million. Total rental expense (including taxes and maintenance, when included in rent, contingent rents and accruals to recognize minimum rents on the straight-line basis over the term of the lease) relating to all operating leases for fiscal 2004 is expected to be $35.2 million.

During the year ended July 31, 2003, we reduced headcount by a total of 669 employees in the United States, including certain senior executives.  As a result, we have estimated and accrued for $5.0 million of severance obligations in restructuring reserves in the July 31, 2003 consolidated balance sheet to be paid through January 2005.  New restructuring efforts that have resulted in cost reductions include closure of under-performing domestic stores, rationalization of store personnel costs and closure of our Pulse! Magazine.

**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE EXCHANGE RESTRUCTURING AND THE PREPACKAGED PLAN**

The following discussion summarizes certain federal income tax consequences of the Exchange Restructuring and the Prepackaged Plan to us and the holders of the Notes. Except where noted, this summary deals only with Notes held as capital assets.

The federal income tax consequences of the Exchange Restructuring and the Prepackaged Plan are complex and are subject to significant uncertainties. We have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Exchange Restructuring or the Prepackaged Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt or any resulting tax liability of such interpretation. In addition, this summary addresses neither the foreign, state, or local income or other tax consequences of the Exchange Restructuring or the Prepackaged Plan, nor the federal income tax consequences of the Exchange Restructuring or the Prepackaged Plan to special classes of taxpayers (such as broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, persons holding Notes as part of a hedge, integrated constructive sale or straddle, and investors in pass-through entities). If an entity treated as a partnership for U.S. tax purposes holds Notes, the tax treatment of a partner of such an entity will generally depend upon the status of the partner and the activities of the entity. If you are a partner of such an entity that holds Notes then you should consult your own tax advisor regarding the tax consequences to you of the Exchange Restructuring or the Prepackaged Plan.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), and regulations, rulings and judicial decisions thereunder as of the date hereof, and such authorities may be repealed, revoked or modified so as to result in U.S. federal income tax consequences different from those discussed below. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

*This summary is for informational purposes only. You are urged to consult your own tax advisors for the federal, state, local and other tax consequences applicable to you of the Exchange Restructuring and the Prepackaged Plan.*

Except where noted, the following discussion addresses only U.S. Holders of the Notes. As used herein, a "U.S. Holder" means a beneficial holder of a note that is, for U.S. federal income tax purposes, a citizen or resident of the United States, a corporation created or organized in or under the laws of the United States or any political subdivision thereof, an estate the income of which is subject to U.S. federal income taxation regardless of its source, or a trust if (x) it is subject to the primary supervision of a court within the United States and one or more U.S. persons have the authority to control all substantial decisions of the trust or (y) it has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person. A "Non-U.S. Holder" is a beneficial holder of a note other than a "U.S. Holder."

**Consequences to Us**

The possible consequences to us of the Exchange Restructuring and the Prepackaged Plan are substantially similar, except as noted below. In either case, as discussed below, our net operating loss ("NOL") carryforwards will be significantly reduced or eliminated. In addition, our utilization of any remaining losses and NOL carryforwards and possibly certain other tax attributes, including certain of the tax attributes of our subsidiaries, may be restricted following the Exchange Restructuring (or the Prepackaged Plan).

*Cancellation of Debt ("COD") Income*

In connection with the Exchange Restructuring (or the Prepackaged Plan), we will realize COD income equal to the excess, if any, of (i) the adjusted issue price of the Notes exchanged over (ii) the sum of (a) the issue price of the New Notes and (b) the fair market value of the New Common Stock. Generally, an insolvent debtor may exclude COD income to the extent of the debtor's insolvency immediately prior to the exchange. Similarly, any COD income arising from a restructuring of a debtor in bankruptcy is excluded from taxable income. In either case, the debtor must reduce certain of its tax attributes (such as NOL carryforwards, current NOLs, tax credits and tax basis in assets) by the amount of any COD income excluded from taxable income. Where the debtor joins in the filing of a consolidated federal income tax return, recently issued Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

We believe that we will be insolvent at the time of the Exchange Restructuring, and therefore, a portion of the COD income realized by us as a result of the Exchange Restructuring will be excluded from taxable income. As a result, our NOL and certain of our other tax attributes (and possibly the tax attributes of our subsidiaries) will be reduced by the amount of COD income excluded from taxable income as a result of the insolvency. We believe that our remaining available NOLs will be sufficient to offset any COD income not excluded as a result of our insolvency, but to the extent they are not the shortfall will result in taxable income to us.

Similarly, if we implement the Prepackaged Plan, then any COD income arising as a result of the exchange of the Notes for New Notes and New Common Stock will be excluded from our taxable income. In that case, our NOL and certain of our other tax attributes (and possibly the tax attributes of our subsidiaries) will be reduced by the amount of COD income excluded from taxable income. To the extent the amount of COD income exceeds the tax attributes available for reduction, the remaining COD income will simply be forgiven without further tax cost to us.

*Code Section 382 Limitation*

If a corporation with net operating losses undergoes an ownership change within the meaning of Section 382 of the Code, then such corporation's use of such pre-change net operating losses to offset income incurred following such ownership change may be limited. Such limitation also may apply to certain losses or deductions that are "built-in" (i.e., attributable to periods prior to the ownership change but not yet taken into account for tax purposes) as of the date of the ownership change that are subsequently recognized. An ownership change generally occurs when there is either (i) a shift in ownership involving one or more "5% shareholders" or (ii) an "equity structure shift" and, as a result, the percentage of stock of the corporation owned by one or more 5% shareholders (based on value) has increased by more than 50 percentage points over the lowest percentage of stock of the corporation owned by such shareholders during the "testing period" (generally the 3 years preceding the testing date). In general, if such change occurs, the corporation's ability to utilize its net operating loss carry-forwards and certain other tax attributes would be subject to an annual limitation, as described below. The unused portion of any such net operating loss carry-forwards or tax attributes each year is carried forward, subject to the same limitation in future years.

We will undergo an ownership change as a consequence of either the Exchange Restructuring or the Prepackaged Plan. In the case of the Exchange Restructuring, the Section 382 limitation following the exchange will equal the product of (i) our *pre-change* equity value and (ii) the "long-term tax exempt rate" then in effect (currently 4.74% for a change of ownership in the month of November). Because we will be insolvent immediately prior to the transaction, the Section 382 limitation will be zero and none of our NOLs that remain after a reduction for COD income, as discussed above, will be available to offset our future income following the Exchange Restructuring.

The Section 382 limitation will differ in the case of the Prepackaged Plan. Generally, a Section 382 limitation is not imposed in connection with an ownership change occurring pursuant to a confirmed bankruptcy plan where qualified creditors and stockholders of the debtor receive, in respect of their claims and prior stock ownership, at least 50% of the vote and value of the stock of the reorganized debtor. However, we do not believe that we will qualify for this exception. Nevertheless, even if that exception is not available, in the case of a

- 99 -

corporation (or consolidated group) in bankruptcy that undergoes the ownership change pursuant to a confirmed plan, the Section 382 limitation following the exchange will equal the product of (i) the *post-change* equity value of such corporation and (ii) the "long-term tax exempt rate" then in effect. Thus, in the case of the Prepackaged Plan, the Section 382 limitation will be determined after the Notes are exchanged for the New Notes and New Common Stock. Therefore, subject to that Section 382 limitation, any NOLs remaining after a reduction for COD income, as discussed above, will be available to offset our income following the Prepackaged Plan. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

Although we are currently unable to quantify the relative cash value of the increased potential utilization of the NOLs following the Prepackaged Plan as compared to the Exchange Restructuring, we do note such cash value may be significant and may affect your decision on whether to vote for the Prepackaged Plan. You are urged to consult your tax advisor regarding this matter.

Generally, if a corporation with an NOL carryover has a "net unrealized built-in gain" at the time of the ownership change, then the corporation's Section 382 limitation is increased by any such built-in gains that are recognized during the five-year period following the ownership change. Depending on the valuation of our assets at the time of the Exchange Restructuring (or the Prepackaged Plan), it is possible that we will have a net unrealized built-in gain. In that event, our Section 382 limitation may be increased on the disposition of certain of our assets during the five-year period following the Exchange Restructuring (or the Prepackaged Plan).

**Consequences to Holders of Notes of the Exchange of Notes For New Notes and New Common Stock Pursuant to the Exchange Restructuring (or the Prepackaged Plan)**

*Tax Consequences to Exchanging Holders*

Each holder of Notes that exchanges Notes pursuant to the Exchange Restructuring (or the Prepackaged Plan) will exchange the Notes for (i) New Notes and (ii) New Common Stock. Assuming the Notes qualify as "securities" (as discussed below), such exchange should qualify as a reorganization within the meaning of Section 368(a)(1)(E) of the Code. Section 354 of the Code generally provides for tax-free treatment on the exchange of "stock or securities" for "stock or securities" pursuant to a reorganization. The test as to whether a debt instrument is a "security" involves an overall evaluation of the nature of the debt instrument, with its term usually regarded as a significant factor. Although the matter is not free from doubt, we believe that each of the Notes and the New Notes should be treated as securities. In such case, no gain or loss will be recognized by an exchanging holder pursuant to the Exchange Restructuring (or the Prepackaged Plan). Each exchanging holder's tax basis in the New Notes exchanged will be allocated among the New Notes and the New Common Stock based on their relative fair market values (which, in the case of the New Notes, will be deemed to equal their issue price, as described below) and the holding period of each of the New Notes and New Common Stock will include the holding period of the Notes exchanged therefor.

If the Notes qualify as securities but the New Notes do not so qualify, then the exchange should still qualify as a reorganization within the meaning of Section 368(a)(1)(E) of the Code; however, an exchanging holder would be required to recognize and report as income *the lesser* of (i) the total gain realized as a result of the exchange and (ii) the "issue price" (as discussed below) of the New Notes. The total gain realized with respect to each Note being exchanged would be equal to the excess, if any, of (i) the sum of (a) the issue price of the New Notes and (b) the "fair market value" of the New Common Stock received for such Note, over (ii) the adjusted tax basis of such Note. Such gain would be treated as ordinary income to the extent attributable to any market discount (as described below) such holder had accrued with respect to such Note unless such holder elected to include the market discount in income as it accrued. Assuming the New Notes were not deemed to be "securities," each exchanging holder's basis in the New Notes would be equal to the issue price of such New Notes, and such holder's basis in the New Common Stock would equal such holder's adjusted tax basis in the Notes tendered in the Exchange Restructuring (or the Prepackaged Plan), decreased by the issue price of the New Notes, and increased by the amount of gain recognized by such holder as a result of the exchange. The holding period of the New Common Stock would include the holding period of the Notes exchanged therefor and the holding period in the New Notes would begin on the day after the Exchange Restructuring (or Prepackaged Plan) is consummated.

- 100 -

For purposes of this discussion, the "issue price" of the New Notes will depend on whether they, or the Notes, are deemed to be "publicly traded." The New Notes or the Notes will generally be treated as publicly traded if, at any time during the 60-day period ending 30 days after the issue date of the New Notes or the Notes, the New Notes or the Notes are or were, as the case may be, "traded on an established market." Subject to certain exceptions, a debt instrument generally will be treated as traded on an established market if (1) it is listed on certain securities exchanges, interdealer quotation systems, or certain foreign exchanges or boards of trade, (2) it is traded either on certain boards of trade that are designated as a contract market or on an interbank market, (3) it appears on a system of general circulation that provides a reasonable basis to determine fair market value by disseminating either recent price quotations of identified brokers, dealers or traders or actual prices of recent sales transactions, or (4) price quotations are readily available from brokers, dealers or traders. Debt instruments generally are not considered to be traded on an established market if indications of interest are publicly disseminated without actual trading or offer prices, as in the case of the so-called "yellow sheets."

We do not believe that the Notes or the New Notes will be considered publicly traded; however, there can be no assurance that the IRS will not take a contrary position. If neither the Notes nor the New Notes are publicly traded, then the issue price of the New Notes will be their stated principal amounts. If a substantial amount of the New Notes is publicly traded, then the issue price of New Notes would equal the trading price of the New Notes at the time of consummation of the Exchange Restructuring or the Prepackaged Plan, as the case may be. If the New Notes are not publicly traded but a substantial amount of the Notes are publicly traded, then the issue price of a New Note would equal the trading price of the portion of a Note at the time of the Exchange Restructuring (or the Prepackaged Plan) for which the New Note was exchanged.

*Tax Consequences to Non-Exchanging Holders*

The consummation of the Exchange Restructuring is conditioned upon tender of 100% of the aggregate principal amount of the outstanding Notes. However, we may elect to complete the Exchange Restructuring if less than 100% of the Notes is tendered (with the consent of the Current Shareholder and the holders of 85% of the Notes). Holders who do not tender their Notes pursuant to the Exchange Restructuring will be able to take the position on their tax returns that they did not recognize income, gain or loss for U.S. federal income tax purposes as a result of the Exchange Restructuring. Although the issue is not free from doubt, we believe that the Old Indenture Amendments should not constitute a significant modification of the Notes for purposes of applicable Treasury Regulations and, accordingly, such amendments should not constitute a deemed exchange of the Notes for deemed new notes (the "Deemed New Notes") for U.S. federal income tax purposes. However, the IRS may take the position that the Old Indenture Amendments are significant modifications for purposes of the Treasury Regulations, and therefore, no assurance can be given that such modifications will not result in a deemed exchange of the Notes.

## Ownership of the New Notes

*Original Issue Discount ("OID") on the New Notes*

The New Notes will be issued with OID because a portion of the interest payable on the New Notes may, at our election, be capitalized as principal. As a result, holders of the New Notes will be required to include OID in income for U.S. federal income tax purposes under a constant yield accrual method regardless of their method of accounting. Thus, U.S. Holders may be required to include OID in income in advance of the receipt of cash attributable to such income. Holders of the New Notes generally will not be required to include separately in income cash payments received on such notes, even if denominated as interest, to the extent such payments constitute payments of previously accrued OID.

A New Note is treated as issued with OID equal to the excess of the New Note's "stated redemption price at maturity" over its "issue price." The stated redemption price at maturity of a New Note includes all payments on such note, whether denominated as principal or interest. The "issue price" will be determined as described above. The amount of OID includible in income by an initial U.S. Holder of a New Note is the sum of the "daily portions" of OID with respect to such note for each day during the taxable year or portion thereof in which such U.S. Holder holds such note ("accrued OID"). A daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID that accrued in such period. The "accrual period" of a note may be of any length and

- 101 -

may vary in length over the term of the note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the first or last day of an accrual period. The amount of OID that accrues with respect to any accrual period is the product of the New Note's adjusted issue price at the beginning of such accrual period and its yield to maturity, determined on a basis of compounding at the close of each accrual period and properly adjusted for the length of such period. "Yield to maturity" is the interest rate at which the present value of all principal and interest payments required to be made under a debt instrument is equal to the issue price of the instrument. The "adjusted issue price" of a note at the start of any accrual period is equal to its issue price, increased by the accrued OID for each prior accrual period and reduced by any prior payments made on such note. While it is not free from doubt, in initially calculating the OID with respect to the New Notes, we will be assumed to not exercise our option to capitalize interest as principal. If, with respect to any interest payment, we elect to capitalize interest as principal, then, for purposes of determining the amount of OID on the New Notes, the New Notes will be treated as retired and reissued on the date of the exercise for an amount equal to the adjusted issue price on that date. In that case, the amount of OID that will accrue on a New Note after the option is exercised will be recalculated under the rules set forth above. You should consult your own tax advisor regarding the possible consequences of our election to capitalize interest payments as principal.

*Acquisition Premium and Bond Premium*

If the tax basis of an exchanging holder in the New Notes (calculated as described above under "-- Exchange of the Notes for New Notes and New Common Stock--Tax Consequences to the Exchanging Holders"), immediately after the consummation of the Exchange Restructuring or the Prepackaged Plan, as the case may be, is less than the "stated redemption price at maturity," but is in excess of the issue price, the holder has acquired the New Notes with "acquisition premium." As a result, such holder's includable OID will be reduced by an amount equal to the OID multiplied by a constant fraction calculated so as to cause the full amount of the acquisition premium to be amortized over the life of such New Notes. For purposes of this discussion, the stated redemption price at maturity is the sum of all payments due under a New Note.

If an exchanging holder has a tax basis in the New Notes immediately after the exchange that is greater than the stated redemption price at maturity, the holder has acquired the New Notes with "bond premium." Such holder will not be required to include any OID in income with respect to the New Notes so acquired. Holders that acquire New Notes with bond premium should consult their tax advisors regarding the manner in which such premium is calculated and the election to amortize bond premium over the life of the instrument.

*Market Discount*

If an exchanging holder held Notes with market discount and any portion of such market discount is not recognized in the exchange of the Notes for New Notes and New Common Stock as described above under "-- Exchange of the Notes for New Notes and New Common Stock--Tax Consequences to the Exchanging Holders" the market discount rules of Sections 1276 through 1278 of the Code would apply to the New Notes and the New Common Stock. These rules provide, in part, (i) that any unrecognized accrued market discount in a Note at the time of consummation of the Exchange Restructuring (or the Prepackaged Plan) will carry over to the New Notes and the New Common Stock exchanged therefor, pro rata, based on their respective fair market values at the time of consummation of the Exchange Restructuring (or the Prepackaged Plan) and to the extent of any gain recognized on a future taxable disposition of any such instrument, will be taxable as ordinary income, (ii) the New Notes will also have unaccrued market discount to the extent the holder's tax basis of such New Notes increased by any accrued market discount, is less than the issue price of such New Notes, and (iii) the unaccrued market discount described in clause (ii) will accrue over the life of such New Notes and, to the extent of any gain recognized on a future taxable disposition of any New Notes, will be taxable as ordinary income.

As an alternative to the inclusion of market discount on the foregoing basis, the holder may elect to include market discount in income currently as it accrues on all market discount instruments acquired by such holder in that taxable year or thereafter, in which case the rule requiring deferral of certain interest deductions will not apply. This election may be revoked only with the consent of the IRS. Holders that acquire New Notes with market discount should consult their tax advisors regarding the manner in which accrued market discount is calculated and the election to include such market discount in income currently.

- 102 -

*Sale, Exchange or Retirement of the New Notes*

Upon the sale, exchange, redemption, retirement at maturity or other taxable disposition of New Notes, a holder generally will recognize taxable gain or loss equal to the difference between the sum of the cash and the fair market value of all other property received on such disposition (less any amount received on account of accrued but unpaid interest, which will be taxed as ordinary income) and such holder's adjusted tax basis in the New Notes. The adjusted tax basis of the New Notes generally will equal the holder's initial tax basis in the New Notes calculated as described above in "-- Exchange of the Notes for New Notes and New Common Stock--Tax Consequences to the Exchanging Holders," increased by any OID or market discount includable in income by the holder with respect to such New Note, and reduced by the amount of any payments previously received by the holder (other than qualified stated interest) and any premium amortized by such holder with respect to the New Notes. Any such gain or loss, subject to the market discount rules, will be capital gain or loss, and will be long-term capital gain or loss if, at the time of such disposition, the holder's holding period for the New Notes is more than one year. The deductibility of capital losses is subject to limitations.

*Backup Withholding and Information Reporting*

In general, an exchanging holder of a Note may be subject to backup withholding at the applicable tax rate (currently 28%) with respect to the total consideration payable to such holder pursuant to the Exchange Restructuring (or the Prepackaged Plan), unless such holder (a) is an entity that is exempt from withholding (including corporations, tax-exempt organizations and certain qualified nominees) and, when required, demonstrates this fact, or (b) provides the payor with its taxpayer identification number ("TIN") (which for an individual would be the holder's social security number) and otherwise complies with applicable requirements of the backup withholding rules. In addition, such payments to holders that are not exempt entities will generally be subject to information reporting requirements. The amount of any backup withholding from a payment to a holder will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund, provided that the required information is furnished to the IRS. In general, a holder of New Notes will be subject to backup withholding and information reporting requirements with respect to interest, OID, principal and premium, if any, paid on the New Notes and the proceeds of a sale of New Notes in the same manner and subject to the same exceptions described above.

We will report to holders and to the IRS the amount of any "reportable payments" (including any interest paid) and any amounts withheld with respect to the New Notes during the calendar year.

**Ownership of the New Common Stock**

*Distributions*

If distributions are paid on the New Common Stock, these distributions generally will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles, and will constitute a tax-free return of capital that is applied against the holder's tax basis in the New Common Stock to the extent these distributions exceed those earnings and profits. Distributions in excess of our current and accumulated earnings and profits and the holder's tax basis in the New Common Stock will be treated as a gain from the sale or exchange of such shares. For the tax years 2003 through 2008, individual U.S. Holders are subject to a maximum tax rate on dividends equal to 15%, which corresponds to the maximum tax rate for long-term capital gains. However, under current legislation for tax years beginning after December 31, 2008, dividends will be taxed at the same rate as other items of ordinary income, which will exceed the tax rate for long-term capital gains.

*Gain on Disposition of the New Common Stock*

A U.S. Holder will recognize gain or loss on the sale or exchange of the New Common Stock to the extent of the difference between the amount realized on such sale or exchange and the holder's adjusted tax basis in such shares. Such gain or loss generally will constitute long-term capital gain or loss if the holder has held such shares

for more than one year.  Individual U.S. Holders are subject to a maximum tax rate of 15% on long-term capital gain.

**Information Reporting and Backup Withholding Tax**

Under certain circumstances, Treasury regulations require information reporting and backup withholding on certain payments on common stock.  A U.S. Holder may be subject to backup withholding at the applicable tax rate (currently 28%) with respect to payments on our common stock, unless such holder (a) is an entity that is exempt from withholding (including corporations, tax-exempt organizations, and certain qualified nominees) and, when required demonstrates this fact, or (b) provides the payor with its TIN (which for an individual would be the holder's social security number) and otherwise complies with applicable requirements of the backup withholding rules.  In addition, such payments to holders that are not exempt entities will generally be subject to information reporting requirements.

## ACCOUNTING TREATMENT

**Accounting Treatment Of The Exchange Restructuring**

The Exchange Restructuring will be accounted for by us under the Financial Accounting Standards Board (FASB) Statement of Financial Accounting Standards (SFAS) No. 15, "Accounting by Debtors and Creditors for Troubled Debt Restructurings."  SFAS 15 establishes standards of financial accounting and reporting by a debtor and by a creditor for a troubled debt restructuring, where such restructuring stems from an agreement between the creditor and the debtor or is imposed by law or by a court.

Per the terms of the Lock-up Agreement and the Exchange Offer, the Exchange Restructuring would meet the criteria of SFAS 15.  The accounting treatment is summarized below.

Based upon the terms of the Exchange Offer and the proposed partial debt-to-equity exchange, we will grant shares of New Common Stock and issue New Notes to the holders of Notes to settle the outstanding Notes. The difference between the fair value of the New Common Stock granted and the carrying amount of the outstanding Notes, less the amount of New Notes issued, will be recognized as a gain on restructuring of the Notes. All associated costs will further reduce the gain on restructuring of the Notes.

**Accounting Treatment Of The Prepackaged Plan**

In the event of a restructuring through the Prepackaged Plan, the Restructuring will be accounted for under the guidelines of the AICPA's Statement of Position 90-7 (SOP 90-7), "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code."  Under these guidelines, referred to as "fresh-start reporting," all assets and liabilities are restated to reflect their reorganization value, which approximates fair market value for financial reporting purposes, at the date of reorganization.  Goodwill is replaced in the resulting initial balance sheet by an intangible asset entitled "reorganization value in excess of amounts allocable to identifiable assets."

- 104 -

Manually signed facsimile copies of the Letter of Transmittal, Ballot and Consent Letter and Master Ballot will be accepted.  The Letter of Transmittal, Ballot and Consent Letter or Master Ballot, and any other required documentation, should be sent or delivered by each holder of Notes and Class B Common Stock or such holder's broker, dealer, commercial bank, trust company or other nominee to the Exchange Agent at its address set forth below:

### The Exchange Agent is:



| *By Facsimile:* | *By Registered or Certified Mail:* | *By Hand or Overnight Delivery:* |
|---|---|---|
| (212) 298-1915 | The Bank of New York | The Bank of New York |
| Attention:  Mr. William Buckley | Corporate Trust Operation | Corporate Trust Operation |
| Reorganization Unit | Reorganization Unit | Reorganization Unit |
| Confirm by Telephone: | 101 Barclay Street – 7 East | 101 Barclay Street – 7 East |
| (212) 815-5788 | New York, NY  10286 | New York, NY  10286 |
| | Attention: Mr. William Buckley | Attention: Mr. William Buckley |

Questions and requests for assistance, and requests for additional copies of this offering memo, the Letter of Transmittal, the Ballot and Consent Letter, the Master Ballot and the Notice of Guaranteed Delivery may be directed to the Information Agent at its telephone numbers and location listed below.  You may also contact your broker, dealer, commercial bank, trust company or other nominee for assistance.

### The Information Agent is:



**501 Madison Avenue, 20th Floor**
**New York, NY 10022**
**Banks and Brokers Call Collect: (212) 750-5833**
**All Others Call Toll-Free: (888) 750-5834**



acted as financial advisor to the Company in connection with the Exchange Offer